**FURGANG & ADWAR, L.L.P.**
Philip Furgang (PF-5654)
Stephanie Furgang Adwar (SA-1711)
CenterRock East
2 Crosfield Avenue
West Nyack, New York 10994
Tel: 845-353-1818

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------X

| | |
|---|---|
| ROCKLAND EXPOSITION, INC. | Case No. 08-cv-07069 (KMK) (GAY) |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| AUTOMOTIVE SERVICE ASSOCIATION of NEW JERSEY, Inc. d/b/a AASP/NJ, TOM ELDER, THOMAS GRECO, THOMAS GRECO PUBLISHING, INC. and GLENN VILLACARI | **JURY DEMANDED** |
| Defendants. | |

### The Parties

1.    Plaintiff Rockland Exposition, Inc., was and is a corporation of the State of New York with a place of business at 388 East Main Street, Middletown, NY 10940 (REI).

2.    Defendant Automotive Service Association of New Jersey, Inc. d/b/a AASP/NJ ("AASP/NJ") is a not-for-profit corporation organized and existing under the laws of the State of New Jersey having offices at 3633 State Route 33, Post Office Box 734, Neptune, New Jersey

07753. AASP/NJ is a trade association of collision repair shops principally located in the State of New Jersey.

3.      Defendant Tom Elder (Elder) is an individual with a place of business at Compact Kars, Inc., 3 Trenton Lakewood Road, Clarksburg, New Jersey 08510 and is president of the Board of Directors of AASP-NJ and, in this capacity, is directly responsible for the wrongful acts set forth herein.

4.      Defendant Thomas Greco Publishing, Inc. (TGP) is, upon information and belief, a corporation of the State of New Jersey with a place of business at 244 Chestnut Street, Suite 202, Nutley, NJ 07110.

5.      Defendant Thomas Greco (Greco) is an individual with a place of business at 244 Chestnut Street, Suite 202, Nutley, NJ 07110, is, upon information and belief, president of Defendant TPG and a member of the Board of Directors of AASP-NJ and, in these capacities, is directly responsible for the wrongful acts set forth herein.

6.      Defendant Glenn Villacari (Villacari) is an individual with a place of business at 95 Park Avenue, Nutley, NJ 07110 and is a member of the Board of Directors of AASP-NJ and, in this capacity, is directly responsible for the wrongful acts set forth herein.

## Jurisdictional Statement

7.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1338(a), (b), 17 *U.S.C.* §§ 501-509 and 15 *U.S.C.* §1114, 1116 - 1118, 1121 and 1125(a), and the Court's pendent jurisdiction.

8.    Venue is proper pursuant to 28 *U.S.C.* §1400 in that Defendants do business in this District and this is an action arising under the Copyright Act of the United States.

## Allegations Relevant To All Claims

9.    Since 1974, Plaintiff REI and its predecessor and related companies have been in the business of running trade shows in such venues as the 100,000 square foot Field House of Rockland Community College, Suffern, New York.  Most of these shows have an automotive theme.

10.    In 1983, REI began, and has continuously thereafter, identified many of its automotive trade shows with the trademark **NORTHEAST**. (Exemplars of flyers for three different shows are attached as **Exhibit A**).

11.    From 1983 to the present REI advertises and provides the **NORTHEAST** RV SHOW annually.

12.    From 1984 to the present REI advertises and provides the **NORTHEAST** RV SHOW'S FALL RV MARKETPLACE annually.

13.     From 1983 through 1993 REI presented the **NORTHEAST** TRUCK SHOW annually.

14.     From 1987 through 1992 REI presented the **NORTHEAST** TOW TRUCK SHOW annually.

15.     From 1991 through 1992 REI presented the CRUZIN THE **NORTHEAST** (a custom car show) annually.

16.     From 1991 through to the present, REI presents **NORTHEAST** REGIONAL AUTOBODY/AUTOMOTIVE TRADE SHOW.

17.     The public has come to identify **NORTHEAST** as synonymous with the services provided by Plaintiff REI.

18.     REI has at all times been the sole and exclusive presenter of these shows and maintains exclusive control of the quality of the services identified by the trademarks **NORTHEAST** for automotive trade shows, including, but not limited to, exclusive control of advertising, engagement of support staff, exhibitor installation, and the like.  As with other trade shows, REI invites interested parties to sponsor the events but such sponsors exercise no control over the decisions and conduct of the show.

19.     REI widely advertises and promotes its **NORTHEAST** trade shows.  As a consequence, REI's **NORTHEAST** shows (76 to date) have earned a gross amount of over $13,000,000.00 since 1983.

20.      The common practice of many trade shows, including REI's trade shows, is to have trade association involvement.

**Defendant AASP-NJ Contracts with REI:**

21.      In or about April 1989, REI visited the Auto Congress and Trade Show (ACTS-'89) held at a Sheraton Hotel near the Meadowlands, New Jersey.

22.      ACTS was a trade show exhibiting the wares and vendors of automotive collision repair shops.

23.      Upon information and belief, ACTS was organized and run by Automotive Show's Inc., and the Automotive Service Association of New Jersey ASA-NJ was the sponsor.   ASA-NJ is a predecessor of Defendant AASP-NJ.  (As Defendant AASP-NJ has changed its name several times, to avoid confusion, we will refer to it herein as AASP-NJ, but such reference shall apply to all name permutations.)

24.      By far, the dominant exhibitors were vendors to the collision repair stores because Defendant AASP-NJ was and is known as a repair trade association of collision repair shops in New Jersey.

25.      REI sought and received AASP-NJ's endorsement to run an ACTS show in Suffern, New York in 1990.  AASP-NJ's sponsorship was sought so its members would be encouraged to attend.

26.     Under REI's exclusive direction and control, vendors' accommodations were improved over the prior show in the Meadowlands.   In the 1990 show all vendors were accommodated in the Rockland Community College Field House.   In prior years in ACTS, many vendors were forced to display their wares in a parking garage subject to temporary lighting, poor heat, and wind. Other exhibitors were forced to display in outer hallways near the hotel ballroom.

27.     So limited were facilities before REI ran the ACTS show, it was primarily a "table top" event because there was no room or clearance for full size displays.   Thus, rather than a full–fledged trade show, meant to generate business for the vendors, ACTS was little more than a social gathering for AASP-NJ members (e.g., annual dinner, awards and a  party).

28.     The size of the ACTS '89 event in the Meadowlands in 1989 was 140 booths with 80 vendors and approximately 500-600 actual attendees.

29.     REI, using its superior organizational abilities, advertising, and promotional skills, planned to produce an enlarged event drawing attendees and exhibitors from New York, New Jersey, Connecticut, Pennsylvania and surrounding states to the geographically central location of Suffern, New York.

30.     Based upon REI's success in running its similar **NORTHEAST** trade shows, AASP-NJ entered a contract with REI that provided that REI would run the show and AASP-NJ would act as sponsor for 1990 (See Contract attached as **Exhibit B**).

-6-

31.     REI has and had developed, at significant expense and effort, exhibitor and attendee mailing lists, including automotive tool and equipment suppliers, from REI'S other automotive shows ("Lists").   Under the contract with AASP-NJ, REI agreed to use these lists in REI's promotion of the ACT show provided AASP-NJ agreed that these lists were the exclusive property of REI.

32.     As part of its services, REI supplies all of its own support equipment (e.g., pipe/drape, tables, chairs, carpet, electrical, road signs, registration).  As set forth in the written contract, REI controlled and controls all phases of its show. REI provided Defendants with detailed monthly progress reports.

33.     REI directed that AASP-NJ could run the AASP-NJ annual dinner at a nearby hotel on the same weekend as the **NORTHEAST** REGIONAL AUTOBODY/AUTOMOTIVE TRADE SHOW trade show, but prohibited AASP-NJ from the conduct of the dinner or any other events during any of the show operating hours.

34.     REI also directed that it, REI, would (and does) make the final decisions on all seminar and related speakers AASP-NJ might want to invite to the show to prevent exhibitor conflicts.

35.     REI and AASP-NJ's contract (**Exhibit B**) was for a one year period for REI's performance of the two day ACTS show in 1990. The contract provided that AASP-NJ would have

to decide within 45 days after the 1990 ACTS event if it wanted to renew the contract for the following year.

36.     The Board of Directors of AASP-NJ sent the contract to their attorney for review and then voted 9-1 to accept the contract with REI.

37.     REI was advised that the sole opposing vote was by AASP-NJ's Executive Director because the Executive Director of AASP-NJ had always overseen the entire event and he did not want to give up control to REI. Shortly after entering the contract with REI, AASP-NJ's Executive Director retired.

38.     When REI ran the ACTS show, it substantially increased revenues over the prior years. Booth exhibits increased by over 57%. The number of vendors increased by over 27%. Attendance grew by 40% with an audience drawn from the entire northeast.

39.     With REI running its show with AASP-NJ as a sponsor, the income provided to AASP-NJ doubled from that which was earned from the AASP-NJ ACTS event in 1989.

40.     For the 1991 show, REI increased the length of the show from two to three days.

41.     REI also changed the name of the 1991 show to **NORTHEAST**, so that the show would be identified as one of REI's family of marks and so that the show would have the good will of REI's **NORTHEAST** family of trademarks.

42.     From the 1991 show onward, the show was and is presented under the trademark: **NORTHEAST** REGIONAL AUTOBODY/AUTOMOTIVE TRADE SHOW.

-8-

43.     This type of trade show requires a long lead time and requires a large office commitment by Plaintiff REI.

44.     REI advised AASP-NJ that if AASP-NJ wished to continue as sponsor, REI required a two-year automatically renewable contract with a deposit for both the 1991 and 1992 events.

45.     AASP-NJ sent the contract to their lawyer for review and approval and then agreed to the change in the contract terms by signing and returning the contracts with the deposits.

46.     In 1991, REI ran six different **NORTHEAST** shows engaging the facilities of the Rockland Community College Field House in Suffern, New York. These shows were: Cruzin' the **NORTHEAST** Custom Car Show; **NORTHEAST** RV Show; **NORTHEAST RV** Fall Caper; **NORTHEAST** Truck Show; **NORTHEAST** Tow Truck Show; and the show sponsored by Defendants: **NORTHEAST** Regional Autobody/Automotive Trade Show.

47.     By implementing these changes, the **NORTHEAST** REGIONAL AUTOBODY/AUTOMOTIVE TRADE SHOW increased in size over the ACTS show in 1990 by over 17%. The number of vendors increased by more than 13%.

48.     For each show, following the 1991 show, Defendant entered a written contract for a two year period on the same terms. Thus, in 1991, AASP-NJ signed a contract for the years 1992 and 1993 and paid the 1993 deposit. (1992's deposit was already paid after the 1990 event.)

49.     On information and belief, the amount of money paid to AASP-NJ from its sponsorship in preceding years was principally responsible for making AASP-NJ so financially

strong as to enable it to heavily promote its services to potential membership throughout the State of New Jersey, adding a paid executive director with a car and benefits, hiring lobbyists and establishing a hotline for members.

50.     From 1993 to 1999 REI substantially increased the size of its show. Exhibitors doubled from 80 to 160. Display booths were increased from 140 booth to 442 booths. Attendance increased from 600 to 4,500 attendees, now being drawn from the entire northeastern United States.

51.     In 2002, as a consequence of new environmental laws and consolidation in the automotive repair industry, there were less exhibitors, and attendance dropped off.

52.     In 2004, AASP-NJ once again contracted to be a sponsor for the 2005 and 2006 shows (**Exhibit C**).   This contract continued all of the terms and conditions of the previous contracts, including the automatic renewal clause.

53.     In 2007, Defendants paid their deposit for the 2009 show.

54.     Each year REI provided Defendants with a copy of REI's exhibitor lists on a confidential basis so that AASP-NJ could sell advertising space for an issue of AASP-NJ's in-house magazine to be distributed at the show.

55.     The contracts between REI and Defendants recites that these lists are the exclusive property of REI. (**Exhibit C** at p.1, ¶5).

56.     REI ran its 2008 **NORTHEAST REGIONAL** AUTOBODY/AUTOMOTIVE TRADE SHOW and AASP-NJ was the sponsor.

**Defendant's Wrongful Conduct**

57.     On March 18, 2008, one week before the move-in for the 2008 event in Suffern, New York, REI received a telephone call from Defendant Villacari.  Defendant Villacari advised REI that AASP-NJ had decided to go "in a different direction for 2009."

58.     The oral advice was a direct breach of the terms of the contract between REI and Defendants.

59.     On March 20, 2008, Defendants e-mailed a request for attendee badges for the sales and management staff of a competitor, the Meadowlands Expo Center.

60.     REI objected and refused because the Meadowlands Expo Center staff are competitors and this was an obvious attempt to solicit the vendors and exhibitors at the 2008 event and reminded AASP-NJ that there was a  no solicitation policy in place, and that this  policy extended to the Meadowlands' staff.

61.     On March 25, 2008, set-up day for the Suffern **NORTHEAST REGIONAL** AUTOBODY/AUTOMOTIVE TRADE SHOW  show, REI faxed Defendant AASP-NJ a request for written confirmation of Defendants' decision that Defendants did not wish to participate or sponsor the **NORTHEAST REGIONAL** AUTOBODY/AUTOMOTIVE TRADE SHOW in 2009 **(Exhibit D)**.

-11-

62.     REI advised AASP-NJ that it will be running the 2009 event in Suffern for the tentative dates in March, 2009, and that AASP-NJ had paid its deposit to participate in that event.

63.     On March 26, 2008,  AASP-NJ mailed out a press release to REI's confidential exhibitor list and then e-mailed REI's confidential exhibitor list, announcing that it was "moving its event" to the Meadowlands for 2009 (Press release and e-mail attached hereto as **Exhibit E**) thereby breaching the contract (**Exhibit C**).

64.     Most members of Defendants' AASP-NJ Trade Show Committee, including Committee Members who were trade show exhibitors, denied any knowledge or notice of this change and were only advised when they received the press release.

65.     On March 27, 2008, (large vendor equipment move-in day for the 2008 **NORTHEAST REGIONAL** AUTOBODY/AUTOMOTIVE TRADE SHOW) REI received a letter from AASP-NJ, by its attorney, threatening REI not to "interfere" with AASP-NJ's 2009 event and unilaterally advising REI  that AASP-NJ's contract with REI has ended  (**Exhibit F**).

66.     On March 28, 2008, the first day of 2008 event, confusion begins as the exhibitors ask REI why it was moving its show to the Meadowlands.

67.     AASP-NJ and the staff from the Meadowlands solicited exhibitors at the Exhibitor's Headquarters at the hotel the evening following the first day of the show. AASP-NJ's conference journal include a full page four-color advertisement for the Meadowlands in 2009 using the

infringing NORTHEAST trademark.  AASP-NJ's journal lists April 3-5, 2009, as the dates of its infringing 2009 show.

68.    The contract further provides that AASP-NJ shall not be involved in, or endorse, any other related expositions  four months prior or four months subsequent to the latest contracted exposition. (See **Exhibit C** at p.3, ¶1 ) The latest contracted exposition is the 2009 show for which AASP-NJ paid its deposit.  Therefore, this limitation applied to the four months prior and subsequent to the 2009 show.  In other words, Defendants were prohibited by the contract from engaging in these activities until the end of July, 2009.  However, Defendants breached this agreement by getting involved in and endorsing the 2009 show at the Meadowlands prior to and subsequent to the *2008* show.

69.    REI's 2009 show is scheduled for March 20-22, 2009.

70.    Meadowlands' staff advised exhibitors at the 2008 show, that the AASP-NJ show will be March 20-22, 2009, wilfully causing further confusion.

71.    On March 29, 2008, the second day of the **NORTHEAST** REGIONAL AUTOBODY/AUTOMOTIVE TRADE SHOW, Meadowlands' staff attended the show and visited exhibitors individually with AASP-NJ with Defendants Villacari and Elder.  Despite REI's demands that such solicitation cease, Defendants and Meadowlands' staff walked the exhibit floor soliciting for the Meadowlands event.

72.     Defendants, upon information and belief, intentionally led exhibitors to the false conclusion that REI was going to be involved with the Meadowland's show. Upon information and belief, Defendants purposefully mislead exhibitors into believing that REI was still involved in order to palm off the AASP-NJ event as that of REI.

73.     REI gave Defendant Villacari a copy of the REI report page showing that Defendant AASP-NJ had paid its deposit for the **NORTHEAST** REGIONAL AUTOBODY/AUTOMOTIVE TRADE SHOW in 2009 and, therefore, was contractually bound to sponsor REI's **NORTHEAST** REGIONAL AUTOBODY/AUTOMOTIVE TRADE SHOW 2009.

74.     Defendant Villacari admitted that Defendant AASP-NJ was bound and stated that "it was too late."

75.     On March 30, 2008, the last day of the show, the larger exhibitors told REI that they did not want to move to the Meadowlands because of the cost.

76.     Under the contract (**Exhibit C** at p.2, ¶6), termination of the contractual relations between Defendant AASP-NJ and REI requires notification within 45 days of the end of the prior years show and does not take effect until after the next contracted show.  The notice of attempted termination was not sent in mid-April, 2007, as required under the contract to terminate the 2009 show.   Instead, Defendant AASP-NJ paid the deposit for the 2009 show, indicating AASP-NJ's acceptance of the contract to continue to run the 2009 show. An attempted termination was not made until after the deposit was paid and REI had made a commitment for the 2009 show.

-14-

77.    REI maintains an exhibitor prospect mailing list.   Defendants have not been authorized and have been improperly using  REI's "significant exhibitor prospect mailing list" which they agreed under the contract is the exclusive property of  REI .  (**Exhibit C** at p.1 ¶5)

78.    On or about the end of March, 2008, Defendants infringed upon Plaintiff's trademark **NORTHEAST** in advertising and in press releases to identify its competing 2009 trade show.

79.    REI's exhibitors  expressed confusion over the competing trade shows.

80.    Defendants have knowingly and purposefully diverted significant business from REI by infringing REI's **NORTHEAST** trademark and by palming off their show as that of REI by use of REI's **NORTHEAST** trademark as its own and by the improper use of REI's trade secret protected exhibitor prospect mailing list.

81.    To date, at least one exhibitor has cancelled its contract with REI and asked for a refund so that it can exhibit in Defendants' show and two other exhibitors have expressed that they were likely to cancel their contracts, as well.   No large exhibitors (i.e., those taking large display booths) have signed with either show arising out of the confusion caused by Defendants' wrongful acts.

82.    Over the years, REI created many original advertising brochures.  On or about the end of April, 2008, Defendants began to copy and distribute advertising materials which improperly incorporates identical copies of the text and layout of significant portions of three of

Plaintiff's copyrighted brochures.  (See Plaintiff's Brochures attached as **Exhibits G, H,** and **I,** and Defendants' infringing advertising materials attached as **Exhibit J.**)

83.     Defendants have and are distributing a series of press releases and articles to the public falsely claiming ownership of the **NORTHEAST** trademark, claiming to have used the **NORTHEAST** trademark for 32 years, and claiming to have brought suit against REI for running a competing trade show, for trademark infringement of REI's own **NORTHEAST** trademark, and for improperly using confidential information.

84.     Defendants ran a press release in CollisionWeek which, upon information and belief, was falsely presented as a reported article.  **(Exhibit K)**  This press release was run in the form of an interview with AASP/NJ President, Defendant Elder, on April 21, 2008.  In this "interview," Defendants falsely allege:

a.     That it was the Defendants who had begun to look for new space when they outgrew the Sheraton at the Meadowlands.  As set forth above, it was REI which approached Defendants to offer its services to run a more successful show.  Defendants' statement was made with knowledge of its falsity, and with reckless disregard for the truth,  in a calculated effort to diminish the value of REI's services in the eyes of the trade and the public.

b.     That AASP-NJ was responsible, through its persistence, for the growth of the show. In fact, AASP-NJ, upon contracting with REI to run the trade show, allowed REI

to do everything and REI is the party that was responsible for the growth of the show.  This false statement was made in an effort to make Plaintiff REI appear to be less qualified, and less responsible for the success of the trade show. Defendants' statements were made with knowledge of their falsity and with reckless disregard for the truth,  in a calculated effort to diminish the value of REI's services in the eyes of the trade and the public.

c.      That in the first year that REI ran the trade show, it was only moderately more successful than in the previous year when Defendants had Automotive Show, Inc. run the trade show.  In order to send this point home, Defendants allege that there were merely "about 10 more vendors" that year and that Defendants were concerned.  In fact, in the first year of REI running the show, the number of vendors increased from 80 to 102, an increase of 22 vendors and a 27% increase.  The number of sold booths went from 140 to 220, an increase of 80 booths or a 57% increase.  And, attendance rose by 40% and drew an audience from the entire northeast.  Most importantly, AASP-NJ doubled the money it received  from the 1989 event. Due to these improvements, Defendants were not concerned at all, they were, instead, elated by REI's performance.  Defendants' statement was made with knowledge of its falsity and with reckless disregard for the truth,  in a calculated effort to diminish the value of REI's services in the eyes of the trade and the public.

-17-

d.      That AASP-NJ requested REI to provide a new marketing strategy and, when REI

was only able to come up with "some minor changes," and only in the "same venue

with the same approach,"this proved "unacceptable to AASP-NJ and to [its]

vendors." In fact, Defendants only requested that REI figure out how to drop its

printing and postage costs by $25,000. REI presented ways to decrease this fee, but

could not possibly cut it by the requested amount. Additionally, at the very meeting

where REI presented its ideas, Defendants paid REI the deposit for the 2009 show,

contractually committing AASP-NJ to the 2009 show. Defendants' statements were

made with knowledge of their falsity and with reckless disregard for the truth, in

a calculated effort to diminish the value of REI's services in the eyes of the trade

and the public.

e.      That "AASP-NJ's NORTHEAST Automotive Trade Show is the only show with a

32-year history of strong industry sponsorship and support." And that "AASP-NJ

has been giving back to the industry through the NORTHEAST show for 32 years."

As set forth above, when REI began to run the trade show, 19 years ago, it was

named ACTS '89. REI was responsible for changing the name so as to benefit from

REI's **NORTHEAST** family of marks. **NORTHEAST** was only used since 1991,

18 years, not 32 years, and it was never used by AASP-NJ in any way, to identify

itself or its services. Defendants' statements were made with knowledge of their

-18-

falsity and with reckless disregard for the truth,  in a calculated effort to diminish the value of REI's services in the eyes of the trade and the public.

85.     Also, in that April 21, 2008, press release (**Exhibit K**), Defendants confirm that Defendant TGP is knowingly promoting the infringing use of **NORTHEAST** in its publications.

86.     On information and belief, another press release. made to appear as a reported news article, published in CollisionWeek on May 27, 2008 (attached hereto as **Exhibit L**)  This press release refers to Defendant AASP-NJ's "new web presence."  Defendants falsely state in this article that "[T]his forward-thinking type of site is what AASP-NJ has been attempting to get from our show producers for the last decade.  Although it took some serious changes to get to where we wanted to go, I think one look at the website justifies everything."  In fact, Defendants never asked anything of the sort from REI, and simply and happily collected the money that REI earned in its successful shows.  Defendants could have instituted its own website at any time, but never did. REI's services were solely to run a trade show, not run AASP-NJ's business or website. Defendants' statements were made with knowledge of their falsity and with reckless disregard for the truth,  in a calculated effort to diminish the value of REI's services in the eyes of the trade and the public.

87.     On information and belief, a press release made to appear as a reported article, was published in CollisionWeek, on June 27, 2008 (attached hereto as **Exhibit M**).  In that press release,  Defendants represent again that "AASP-NJ has been sponsoring the NORTHEAST show

-19-

for over 30 years." As set forth above, **NORTHEAST** was first used in 1991, eighteen years ago, and **NORTHEAST** was never used by AASP-NJ as a trademark in any way. **NORTHEAST** is a part of REI's family of **NORTHEAST** trademarks. Defendants' statements were made with knowledge of their falsity and with reckless disregard for the truth, in a calculated effort to diminish the value of REI's services in the eyes of the trade and the public.

88.    Defendant Thomas Greco published a column in the May, 2008 edition of *New Jersey Automotive*, the official publication of AASP/NJ, entitled "There is ONLY ONE NORTHEAST 2009 Show!" (Attached hereto as **Exhibit V**).

a.    This column refers to "amateur brochures for another show taking place . . . in Suffern, N.Y." As set forth above, Defendants copied and distributed advertising materials which improperly incorporates identical copies of the text and layout of significant portions of three of Plaintiff's copyrighted brochures. (See Plaintiff's Brochures attached as **Exhibits G, H,** and **I**, and Defendants' infringing advertising materials attached as **Exhibit J**.).

b.    This column also states that "we have heard and read the untrue statements regarding unions." Plaintiff has made no untrue statements regarding unions.

c.    This column also states that "confusion is by no means a coincidence" because Defendants "were told that there would be a competing show." As set forth above, Defendants are in breach of their contract with Plaintiff, as they had already

-20-

committed to the 2009 show, and Plaintiff, in turn had committed to the 2009 show and is therefore going forward with its 2009 show.

d.      This column also states that last year's show had a "record low attendance of 3,400." In 1989, the last time that Defendants produced their own show, rather than sponsor Plaintiff's show, there were approximately 500-600 attendees.

89.     Defendants' statements are disparaging and were made with knowledge of their falsity and with reckless disregard for the truth, in a calculated effort to diminish the value of REI's services in the eyes of the trade and the public.

90.     Defendants admit that **NORTHEAST** is a trademark. In AASP-NJ's letter of March 27, 2008, Defendant AASP-NJ accused Plaintiff REI that REI's use of **NORTHEAST** is "misleading" and "confusing" (**Exhibit F**).

91.     On March 31, 2008, Defendant AASP-NJ wrote another letter, by its attorney, repeating the same accusations (**Exhibit N**).

92.     On May 20, 2008, Defendant AASP-NJ wrote Plaintiff once again demanding that Plaintiff cease using Plaintiff's Northeast Regional 2009 Trade Show."

93.     On June 9, 2008, Plaintiff, by its counsel, wrote to Defendants advising, among other claims that Defendants were (a) infringing upon its copyright in advertising; (b) infringing upon Plaintiff REI's trademark rights in **NORTHEAST**, (c) breached its contract with Plaintiff, and (d) are unlawfully using REI's trade secrets.

94.    REI also gave notice to Defendants that it was going to start a law suit against them.

Specifically, REI stated:

> Unless we receive word, in writing, from AASP-NJ within two (2) weeks of the date of this e-mailed, confirmation by certified mail, return receipt requested, letter, acknowledging that all commercial activities with regard to AASP-NJ's and its Board Members' use of NORTHEAST and our clients' copyrighted works has been halted, and that we shall be immediately provided with a full accounting, *we will be forced to take further legal action to insure that our client's exclusive rights and contracts are respected. In commencing this action, we will seek, among other causes of action, trademark infringement, copyright infringement, theft of trade secrets, tortious interference with contractual relations, tortious interference with business relations, and breach of contract. The action shall be commenced in the United States District Court for the Southern District of New York. At that time we will make an application for a temporary restraining order. We expect to commence this action in or about July 7, 2008, in the United States Courthouse at 300 Quarropas Street, White Plains, New York 10601-4150.* As this date approaches, we will advise you of the specific date and time we plan to approach the court. *AASP, AASP-NJ, and its Board of Directors are further cautioned that any attempt to commence an action in another jurisdiction is considered forum shopping for which additional relief shall be sought.* (emphasis added) (Exhibit O)

95.    On June 25, 2008, Defendant AASP-NJ, by its attorney, wrote REI stating that it had just received Plaintiff's letter of June 9, 2008, and required a few days to address this letter. (Exhibit P)

96.    Instead, Defendants falsely mislead Plaintiff and then filed a "strike suit"by commencing an action the very next day in the United States District of New Jersey, thereby forum shopping, even though they were cautioned not to do so.

97.     Defendant AASP-NJ's forum shopping strike suit comprises a 14 page complaint against Plaintiff and its president which, on information and belief, had been in long preparation. (**Exhibit Q**).

98.     Then, on June 27, 2008, *after* Defendants filed their complaint (**Exhibit Q**), Defendant sent a letter, by its attorney, purporting to respond to Plaintiff's letter of June 9, 2008, and demanding that Plaintiff refund AASP-NJ's deposit (thereby admitting its breach of contract), and making the outrageous demand that REI turn over REI's proprietary lists of exhibitors and attendees, lists which Defendants have contractually admitted belong to REI. (**Exhibit R**)

99.     Plaintiff, promptly upon learning of the copyright infringements by Defendants, located the original works and filed, on a Special Handling basis, applications for Copyright Registration of its works so that it could commence this action.

100.    Upon applying for these registrations, Plaintiff promptly authorized the preparation of this action.

## COUNT ONE
### (*Copyright Infringement*)

101.    This Count arises out of the occurrences as set forth hereinabove and hereinafter and is directly related to the counts for copyright infringement under 17 U.S.C. §101, et seq.

102.    Plaintiff repeats and realleges the allegations of ¶¶ 1 through 101 as if set forth herein.

-23-

103.     Plaintiff is the owner of all right, title and interest in the copyright of the advertising brochure ("Brochure 1" - **Exhibit G**)  identified on Certificate of Copyright Registration No. VA 1-635-656. ( **Exhibit S**)

104.     Defendants have knowingly and willfully violated Plaintiff's copyright by continuing to copy and distribute their infringing advertising (i.e., their Work) without license or authority to do so.

105.     By reason of Defendants' past infringement and continued infringement Plaintiff has sustained and will continue to sustain substantial injury, loss and damages to its ownership rights in Brochure 1.

106.     Defendants have been copying,  distributing and otherwise using their Work to market its trade show and  have thereby been engaging in unfair trade practices and unfair competition against Plaintiff causing Plaintiff irreparable injury.

107.     Unless Defendants are restrained from further copying, reproducing, and using Brochure 1and enjoined to remove and destroy any infringing copies taken from Brochure 1, Defendants shall continue to cause injury to the business reputation of Plaintiff by said infringement of Plaintiff's copyright and by Defendants unfairly competing with Plaintiff

108.     Plaintiff has suffered irreparable harm and there is no adequate remedy at law for the future injuries and damage as a result of the Defendants' copyright infringements and Plaintiff is suffering monetary damages in an amount not thus far determined. The aforesaid acts of

Defendant have been and are likely to cause damage to Plaintiff in an amount not presently known but believed to be in excess of five thousand dollars ($5,000.00).

## COUNT TWO
### (Copyright Infringement)

109.    This Count arises out of the occurrences as set forth hereinabove and hereinafter and is directly related to the counts for copyright infringement under 17 U.S.C. §101, et seq.

110.    Plaintiff repeats and realleges the allegations of ¶¶ 1 through 109 as if set forth herein.

111.    Plaintiff is the owner of all right, title and interest in the copyright of the advertising brochure ("Brochure 2" - **Exhibit H**) identified on Certificate of Copyright Registration No. VA 1-635-674. **(Exhibit T)**

112.    Defendants have knowingly and willfully violated Plaintiff's copyright by continuing to copy and distribute Brochure 2 without license or authority to do so.

113.    By reason of Defendants' past infringement and continued infringement Plaintiff has sustained and will continue to sustain substantial injury, loss and damages to its ownership rights in Brochure 2.

114.    Defendants have been copying,  distributing and otherwise using their Work to market its trade show and  have thereby been engaging in unfair trade practices and unfair competition against Plaintiff causing Plaintiff irreparable injury.

-25-

115.    Unless Defendants are restrained from further copying, reproducing, and using Brochure 1 and enjoined to remove and destroy any infringing copies taken from Brochure 2, Defendants shall continue to cause injury to the business reputation of Plaintiff by said infringement of Plaintiff's copyright and by Defendants unfairly competing with Plaintiff

116.    Plaintiff has suffered irreparable harm and there is no adequate remedy at law for the future injuries and damage as a result of the Defendants' copyright infringements and Plaintiff is suffering monetary damages in an amount not thus far determined. The aforesaid acts of Defendant have been and are likely to cause damage to Plaintiff in an amount not presently known but believed to be in excess of five thousand dollars ($5,000.00).

## COUNT THREE
### (Copyright Infringement)

117.    This Count arises out of the occurrences as set forth hereinabove and hereinafter and is directly related to the counts for copyright infringement under 17 U.S.C. § 101, et seq.

118.    Plaintiff repeats and realleges the allegations of ¶¶ 1 through 117 as if set forth herein.

119.    Plaintiff is the owner of all right, title and interest in the copyright of the advertising brochure ("Brochure 3" - **Exhibit I**) identified on Certificate of Copyright Registration No. VA 1-635-638. (**Exhibit U**)

-26-

120.    Defendants have knowingly and willfully violated Plaintiff's copyright by continuing to copy and distribute the Work without license or authority to do so.

121.    By reason of Defendants' past infringement and continued infringement Plaintiff has sustained and will continue to sustain substantial injury, loss and damages to its ownership rights in the Work.

122.    Defendants have been copying,  distributing and otherwise using Brochure 3 to market its trade show and  have thereby been engaging in unfair trade practices and unfair competition against Plaintiff causing Plaintiff irreparable injury.

123.    Unless Defendants are restrained from further copying, reproducing, and using Brochure 3, and enjoined to remove and destroy any infringing copies taken from Brochure 3, Defendants shall continue to cause injury to the business reputation of Plaintiff by said infringement of Plaintiff's copyright and by Defendants unfairly competing with Plaintiff

124.    Plaintiff has suffered irreparable harm and there is no adequate remedy at law for the future injuries and damage as a result of the Defendants' copyright infringements and Plaintiff is suffering monetary damages in an amount not thus far determined. The aforesaid acts of Defendant have been and are likely to cause damage to Plaintiff in an amount not presently known but believed to be in excess of five thousand dollars ($5,000.00).

## COUNT FOUR
### (*Federal Trademark Infringement*)

125.    This is a count for trademark infringement and arises under the trademark laws of the United States (the Lanham Act) 15 U.S.C. §§ 1125, 1116, 1117, and 1121.

126.    Plaintiff repeats and realleges the allegations of ¶¶ 1 through 125 as if set forth herein.

127.    The use by Defendants of the **NORTHEAST** trademark is likely to cause confusion as to the source of the services as to Plaintiff's family of **NORTHEAST** trademarks to identify automotive trade shows.

128.    The use by Defendants of the **NORTHEAST** trademark in connection with trade shows is a deliberate act of infringement intended to trade on the reputation and the goodwill of Plaintiff in its long standing use of its family of **NORTHEAST** trademarks.

129.    The use by Defendants of **NORTHEAST** deprives Plaintiff of control of its reputation and its good will in its family of **NORTHEAST** trademarks.

130.    The use by Defendants of the **NORTHEAST** trademark, as set forth herein, was intended to and did:

a)      cause likelihood of confusion or misunderstanding among vendors, prospective vendors, and members of the relevant trade as to the sponsorship or approval by Plaintiff of the services of Defendant AASP-NJ;

-28-

b)      cause likelihood of confusion or misunderstanding among vendors, prospective vendors, and members of the relevant trade as to Defendant AASP-NJ's affiliation, connection, or association with Plaintiff;

c)      represent to vendors, prospective vendors, and members of the relevant trade that Plaintiff's services were the services of Defendant AASP-NJ or vice versa; and

131.    Defendants' foregoing actions have been knowing, deliberate, willful, and in disregard of Plaintiff's rights.

132.    Plaintiff is damaged by the complained of conduct of Defendants in an amount to be determined.

133.    Plaintiff has no adequate remedy at law.

134.    Plaintiff is entitled to an award of actual damages, exemplary damages, and attorneys' fees for these wilful acts.

135.    The said conduct of Defendants has caused, and if not enjoined, will continue to cause irreparable damage to the rights of Plaintiff in its business reputation and good will, in an amount not presently known but believed to be in excess of three million dollars ($3,000,000.00)

## COUNT FIVE
### (Breach of Contract)

136.   This is a count for breach of contract and arises out of the contractual relationship between Plaintiff and Defendant AASP-NJ and arises out of the allegations set forth above in connection with Counts One through Four.

137.   Plaintiff repeats and realleges the allegations of ¶¶ 1 through 136 as if set forth herein.

138.   As set forth above, Plaintiff and Defendant AASP-NJ are bound by a contract.

139.   Defendants have materially breached the contract in several ways including, but not limited to:

     a.   paying the deposit on the 2009 show and then improperly attempting to terminate the contract;

     b.   endorsing and being involved in a competing show four months before and four months after the 2008 show; and

     c.   utilizing Plaintiff REI's proprietary customer list without authorization.

140.   Defendants have breached their contract with Plaintiff by failing to perform the contract as aforesaid and have damaged the plaintiffs in an amount not presently known but believed to be in excess of two hundred thousand dollars ($200,000.00).

## COUNT SIX
### (*Tortious Interference with Prospective Business Advantage*)

141.   This is a claim for relief from Defendants' tortious interference with prospective business advantages and arises from those acts alleged in support of Counts One through Five.

142.   Plaintiff repeats and realleges the allegations of ¶¶ 1 through 141 as if set forth herein.

143.   At all times herein relevant, Defendants have been aware or reasonably should have been aware that Plaintiff owned the **NORTHEAST** family of trademarks used by Plaintiff in connection with its trade show services.

144.   At all times herein relevant, Defendants have been aware or reasonably should have been aware that Plaintiff intended to run an autobody/automotive trade show in 2009.

145.   On information and belief, Defendants entered upon the premises of Rockland Community College Field House with employees and agents of the Meadowlands Exposition Center during the 2008 **NORTHEAST** Autobody/Automotive Trade Show and intentionally and willfully solicited and endorsed a competing 2009 autobody and automotive trade show so as to interfere with Plaintiff's ability to engage in its business.

146.   Plaintiff has been injured in its  business as a direct and proximate result of the aforesaid unlawful activities by Defendants in an amount not presently known but believed to be in excess of three million dollars ($3,000,000.00)

147.   On information and belief, Defendants have been guilty of oppression, fraud, and malice in doing the aforementioned unlawful acts.

148.   Plaintiff has no adequate remedy at law.

149.   The said conduct of Defendants has caused, and if not enjoined, will continue to cause irreparable damage to the rights of Plaintiff in its business reputation and good will.

150.   Plaintiff is entitled to exemplary damages in an amount in excess of three million dollars ($3,000,000.00) and the award of attorneys' fees.

**COUNT SEVEN**
*(Tortious Interference with Contracts)*

151.   This is a claim for relief from Defendants' tortious interference with contracts arising out of the same facts as alleged in connection with the acts of trademark and copyright infringement and arises out of the same facts as alleged in connection with Counts One through Six.

152.   Plaintiff repeats and realleges the allegations of ¶¶ 1 through 151 as if set forth herein.

153.   Plaintiff has contracts in place with vendors and exhibitors to participate in Plaintiff REI's 2009 **NORTHEAST** Regional Autobody/Automotive Trade Show.

154.   Upon information and belief, Defendants are aware of Plaintiff's contracts with its vendors and exhibitors.

-32-

155.   Upon information and belief, Defendants have been intentionally procuring the breach of contracts by these vendors and exhibitors and, in fact, at least one exhibitor has already breached its contract with Plaintiff in order to contract with Defendants.

156.   Plaintiff has been injured in its business as a direct and proximate result of the aforesaid unlawful activities by Defendants in an amount in an amount not presently known but believed to be in excess of two hundred and fifty thousand dollars ($250,000.00).

157.   On information and belief, Defendants have been guilty of oppression, fraud, and malice in doing the aforementioned unlawful acts.

158.   Plaintiff has no adequate remedy at law.

159.   The said conduct of Defendants has caused, and if not enjoined, will continue to cause irreparable damage to the rights of Plaintiff in its business reputation and good will.

160.   Plaintiff is entitled to exemplary damages in an amount in excess of two hundred and fifty thousand dollars ($250,000.00) and the award of attorneys' fees.


**COUNT EIGHT**
*(False and Deceptive Advertising, Trade Libel, and Disparagement Under the Lanham Act)*

161.   This is a claim for false and deceptive advertising, fraud, trade libel, defamation and trade disparagement of Plaintiff and the services of Plaintiff REI. and arises under the Trademark Laws of the United States (the Lanham Act) 15 U.S.C. §§ 1125, 1116, 1117, and 1121.

162.   Plaintiff repeats and realleges the allegations of ¶¶ 1 through 161 as if set forth herein.

163.   Plaintiff REI provides its trade show services to the autobody and automotive industry.

164.   Commencing in or about March, 2008, Defendants began making oral representations to Plaintiff's vendors and exhibitors (Plaintiff's customers) that Defendants would be operating a trade show at the Meadowlands Exposition Center in 2009.

165.   From March, 2008 until present, Defendants have falsely claimed ownership of the trademark **NORTHEAST**.  Defendants are  maliciously and falsely representing that Plaintiff is infringing the **NORTHEAST** trademark and maliciously representing that Plaintiff has no right to operate a trade show to the autobody and automotive community.  Further, Defendants are falsely representing and advertising that it has used the **NORTHEAST** trademark for 32 years.

166.   These statements are at all times, including the time when published, false, untrue, and defamatory and known to be such by Defendants.

167.   Defendants made and published the statements with malice and willfully intended that the statements injure Plaintiff.

168.   Defendants have damaged Plaintiff in an amount in an amount not presently known but believed to be in excess of three million dollars ($3,000,000.00).

169.   Plaintiff has no adequate remedy at law.

170.   Unless restrained and compelled to publish corrective print advertisements, Defendants will continue to cause injury to the business reputation of Plaintiff by publishing substantially similar print advertisements and press releases.

171.   Plaintiff is entitled to exemplary damages in an amount in excess of three million dollars ($3,000,000.00) Dollars.

## COUNT NINE
### (Common Law Trade Libel)

172.   This Count arises under common law trade libel and arises out of the same acts and conduct alleged herein.

173.   Plaintiff repeats and realleges the allegations of ¶¶ 1 through 172 as if set forth herein.

174.   Defendants intentionally and willfully published false and defamatory statements concerning Plaintiff to third parties.

175.   The statements are and were at all times, including the time when published, false, untrue, and defamatory and known to be such by Defendants.

176.   Defendants made and published the statements with malice and willful intent to injure Plaintiffs.

177.   Defendants' acts and conduct, without Plaintiff's consent, have damaged Plaintiff and Plaintiff has been irreparably injured in its business and in its good name and character. Plaintiff's standing in its businesses has been seriously impaired.

178.   Plaintiff has no adequate remedy at law.

179.   Defendants' unlawful and improper acts and conduct have damaged Plaintiff in a in an amount not presently known but believed to be in excess of sum not presently known but reasonably believed to be in excess of three million dollars ($3,000,000.00).

180.   Unless restrained, Defendants will continue to cause injury to Plaintiff's trademark and to Plaintiff's business reputation and standing.

181.   Plaintiff is entitled to attorneys' fees, treble damages of all profits earned by Defendants  and exemplary damages in excess of three million dollars ($3,000,000.00)


## COUNT TEN
### *(State Unfair Competition, Trademark Infringement, Dilution, and Palming Off)*

182.   This is a counterclaim for relief arising under the Trademark Laws of the State of New York and, more particularly, New York General Business Law, Article 24, and arises out of of the same acts and conduct alleged in Counts One through Nine and is subject to the and the Court's pendent jurisdiction.

183.   Plaintiff repeats and realleges the allegations of ¶¶ 1 through 182 as if set forth herein.

-36-

184.   Over twenty-five years after Plaintiff had been using its **NORTHEAST** trademark, Defendants appropriated the identical trademark applied to trade shows, thereby palming off Defendants' services as the services of Plaintiff and/or vice versa.

185.   Defendants, in the course of adopting and using Plaintiff's trademark **NORTHEAST** has intended by the aforesaid acts to:

a)   cause likelihood of confusion or misunderstanding among vendors, prospective vendors, and members of the relevant trade as to the approval by Plaintiff of the work and services of Defendant AASP-NJ;

b)   cause likelihood of confusion or misunderstanding among vendors, prospective vendors, and members of the relevant trade as to Defendant AASP-NJ's affiliation, connection, or association with Plaintiff;

c)   represent to vendors, prospective vendors, and members of the relevant trade that Plaintiff's services were the services of Defendant AASP-NJ or vice versa;

186.   Additionally, Defendants, without the consent of Plaintiff, have falsely represented that Plaintiff's trademark **NORTHEAST** is Defendant AASP-NJ's trademark, and such use is likely to cause confusion, mistake, or deceive as to the source or origin of Plaintiff's services and/or dilute Plaintiff's trademark.

187.   Plaintiff has no adequate remedy at law.   The said conduct of Defendants has caused, and if not enjoined, will continue to cause irreparable damage to the rights of Plaintiff in

its business reputation and good will, in an amount not presently known but believed to be in excess of three million dollars ($3,000,000.00)

## COUNT ELEVEN
### *(Misappropriation of Trade Secrets)*

188.    This is a claim for relief for theft of trade secrets and arises under common law of the State of New York and out of the same acts and conduct alleged in Counts One through Ten.

189.    Plaintiffs repeat and reallege each and every allegation contained in ¶ 1 through ¶188 as though fully set forth herein.

190.    Plaintiff provided Defendants with Plaintiff's lists of exhibitors and vendors which Defendants contractual admit is the exclusive property of Plaintiff.

191.    Plaintiff derives economic value from its proprietary confidential and other trade secret information (trade secrets) because such trade secrets are generally not known to the public, not readily ascertainable, and of significant value to the operation of Plaintiffs.

192.    Plaintiff has taken and does take steps to maintain the secrecy of its trade secrets, including, but not limited to, limiting access to confidential information and advising Defendants and obtaining their contractual agreement that, in particular, its lists are confidential and proprietary.

193.   The trade secrets herein were only disclosed Defendants and others who had a need to know and only to the extent of such need to know in order that they could carry out the performance of the contract between the parties.

194.   Defendants have misappropriated Plaintiff's trade secrets by using and disclosing the trade secrets to others without a right to do so, all in breach of the confidences reposed in Defendants by Plaintiff and the contract between Plaintiff and Defendant AASP-NJ in the Defendants' disclosing of the trade secrets in breach of the written agreements between Plaintiff and Defendants to respect the exclusive nature of the lists.

195.   As a result of Defendants' trade secret misappropriation, Plaintiff has been injured in its business.

196.   Plaintiff has suffered irreparable harm and there is no adequate remedy at law.

197.   Plaintiff has and will continue to suffer irreparable harm and damage as a result of Defendants' acts and Plaintiff has also suffered monetary damages in an amount not thus far determined. The aforesaid acts of Defendants have and will damage Plaintiff in an amount not presently known but believed to be in excess of six hundred and thirty thousand dollars ($630,000.00).

198.   Unless restrained, Defendants will continue to cause to cause injury to the business of Plaintiff by continuing to use and to disclose and make available to third parties, including competitors of Plaintiff.

199.    Plaintiff is entitled to the award of attorneys' fees and exemplary damages in excess of six hundred and thirty thousand dollars ($630,000.00).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rockland Exposition, Inc., demands judgment against Defendants Alliance of Automotive Service Providers of New Jersey, Tom Elder, Thomas Greco, Thomas Greco Publishing, Inc. and Glenn Villacari (jointly and severally) as follows:

(1)    That Defendants, their agents and employees, and all other persons or entities within their respective control or supervision, and all other persons or entities acting in concert or participation with them, be enjoined during the pendency of this action and permanently from using, copying, or otherwise exploiting Plaintiffs' copyright and copyrighted work;

(2)    That Defendants, their agents and employees, and all other persons or entities within their respective control or supervision, and all other persons or entities acting in concert or participation with them, be enjoined during the pendency of this action and permanently from using, disclosing, converting, appropriating, retaining, selling, transferring, or copying any property, confidential information, or trade secrets of Plaintiffs;

(3)    That Defendants, their agents and employees, and all other persons or entities within their respective control or supervision, and all other persons or entities acting in concert or participation with them, be enjoined during the pendency of this action and permanently from

-40-

using, copying, or otherwise gaining access to and/or exploiting Plaintiff's lists of vendors and exhibitors;

(4)     That Defendants, their agents and employees, and all other persons or entities within their respective control or supervision, and all other persons or entities acting in concert or participation with them, be enjoined during the pendency of this action and permanently from infringing upon Plaintiff's family of NORTHEAST trademarks by using **NORTHEAST REGIONAL AUTOBODY/AUTOMOTIVE TRADE SHOW** or any other term confusing similar to NORTHEAST.

(5)     That Defendants,  their agents and employees, and all other persons or entities within their respective control or supervision, and all other persons or entities acting in concert or participation with them, be enjoined during the pendency of this action and permanently from unfairly competing with Plaintiffs in any manner;

(6)     That Defendants, their agents and employees, and all other persons or entities within their respective control or supervision, and all other persons or entities acting in concert or participation with them, be enjoined during the pendency of this action and permanently to return to Plaintiff all copies of Plaintiff's Lists;

(7)     That Plaintiff be awarded judgment against Defendants in an amount sufficient to compensate Plaintiffs for the losses it has suffered, as set forth in each of the causes of action contained herein;

(8)     That Plaintiff be awarded exemplary damages as sought in the causes of action contained herein;

(9)     That Plaintiff be awarded pre-judgment interest and post-judgment interest;

(10)    That Plaintiffs be awarded attorneys fees and all other expenses and costs of this litigation;

        Such other and further relief that this Court may deem appropriate.

                                FURGANG & ADWAR, L.L.P.
                                Attorneys for Plaintiffs Rockland Exposition, Inc.

                                By _____
                                Stephanie Furgang Adwar (SA 1710)
                                Philip Furgang (PF 5654)
                                CenterRock East
                                2 Crosfield Avenue
                                West Nyack, New York 10994
                                Tel: 845-353-1818

Dated: January 5, 2009

## CERTIFICATE OF SERVICE

I certify that I have caused to be served on this date a copy of the within First Amended Complaint upon Mandel & Peslak, LLC, attorneys for Defendants Thomas Greco and Thomas Greco Publishing Inc., and upon Lester Schwab Katz & Dwyer, LLP, attorneys for Defendants Automotive Service Association of New Jersey, Tom Elder, Thomas Greco, Thomas Greco Publishing, Inc. And Glenn Villacari  by e-mail and by filing same with the clerk of the United States District Court for the Southern District of New York.

FURGANG & ADWAR, LLP

By: _____

Philip Furgang (PF-5654)
Attorneys for Plaintiff

Dated:        January 5, 2009
              New York, New York

1