UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROCKLAND EXPOSITION, INC.,

Plaintiff,

-v-

ALLIANCE OF AUTOMOTIVE SERVICE
PROVIDERS OF NEW JERSEY, TOM ELDER,
THOMAS GRECO PUBLISHING, INC. and GLENN
VILLACARI,

Defendants.

---

Case No. 08-CV-7069 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>

Philip Furgang, Esq.
Stephanie Furgang Adwar, Esq.
Furgang & Adwar, L.L.P.
New York and West Nyack, NY
*Counsel for Plaintiff*

Armando Llorens, Esq.
Law Offices of Armando Llorens
Suffern, NY
*Counsel for Plaintiff*

Arthur M. Peslak, Esq.
Mandel & Peslak, LLC
Freehold , NJ
*Counsel for Defendants*

Benjamin Zelermyer, Esq.
Law Offices of Wesley Chen
New York , NY
*Counsel for Defendants*

Thomas Anthony Catalano, Esq.
Lester, Schwab, Katz and Dwyer LLP
New York , NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiff Rockland Exposition, Inc. ("Plaintiff" or "REI") brings this action against Defendants Alliance of Automotive Service Providers of New Jersey ("AASP"), Tom Elder, Thomas Greco, Thomas Greco Publishing, Inc., and Glenn Villacari (collectively, "Defendants"). Plaintiff alleges federal claims for copyright protection, trademark infringement, and trade libel and false advertising, and New York state law claims for trademark infringement, unfair competition, dilution, trade libel, misappropriation of trade secrets, tortious interference with contract, tortious interference with business relations, and breach of contract. Defendants now move for partial summary judgment to dismiss Counts Four through Eleven of Plaintiff's Amended Complaint. For the forgoing reasons, Defendants' motion is granted in part and denied in part.

## I. Background

This Court has extensively described the factual background and procedural history of this case in two prior opinions. *See Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.* ("*Rockland I*"), Nos. 08-CV-7069, 08-CV-11107, 2009 WL 1154094, at *1-4 (S.D.N.Y. Mar. 19, 2009); *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.* ("*Rockland II*"), 706 F. Supp. 2d 350, 352-53 (S.D.N.Y. 2009). Here, it will only highlight those facts which are relevant to the pending motion.

### A. Factual Background

AASP is a non-profit organization of independent automotive collision and repair businesses (Defs.' R. 56.1 Statement of Material Facts ("Defs.' 56.1") ¶ 1), and claims that for over thirty years, it has presented an annual trade show at which various exhibitors showcase their goods and services to AASP members and to others in the automotive collision and repair

business, (*id.* ¶ 3).[1]  AASP claims that it first began referring to its annual trade show as the

"Northeast" Autobody Congress and Trade Show as early as 1985 (*id.* ¶ 8), and since then has

promoted its annual "Northeast" trade show through advertising and other means, (*id.* ¶ 10).[2]

REI is in the business of running trade shows, and claims that it and its predecessor and related

companies have been in the business of running trade shows, mostly with an automotive theme,

since 1974.  (Counter Statement Under R. 56.1, Pl.'s Contentions ("Pl.'s 56.1") ¶ 2.)  Since its

inception in 1983, REI has identified many of its trade shows with the mark "Northeast."  (Dep.

of David McCarey ("McCarey Dep.") 7, May 8, 2009; Pl.'s 56.1 ¶¶ 3-4); *see also Rockland I*,

2009 WL 1154094, at *1.

In or around 1989, AASP entered into an agreement with REI, whereby REI agreed to

manage and promote an annual automotive/autobody trade show with AASP (the "Northeast

Automotive Trade Show").  *Rockland I*, 2009 WL 1154094, at *1.  Prior to its agreement with

REI — from 1978 through 1989 — AASP's executive director and volunteers had managed

AASP's annual automotive trade show.  (Aff. of Thomas R. Greco ("Greco Aff.") ¶ 17.)  The

1990 show was referred to in promotional literature as "Automotive Association of New Jersey

Presents the 13th Annual ACTS '90" (Defs.' Ex. O), and in 1991, the promotional literature

referred to the show as "Automotive Service Association of New Jersey Presents the 14th Annual

Northeast '91 Autobody/Automotive Trade Show," (Defs.' Ex. P).  Between 1990 and 2008, REI

managed the annual Northeast Automotive Trade Show, which was held in Suffern, New

---

[1] AASP was formed in 1962, and has been presenting an annual trade show since 1978. *Rockland I*, 2009 WL 1154094, at *1; (Aff. of Thomas R. Greco ("Greco Aff.") ¶¶ 5, 8, 17).

[2] In its submissions to the Court in connection with the 2009 motion for summary judgment, AASP claimed that it had been using "Northeast" to identify its trade shows since 1984.  *See Rockland I*, 2009 WL 1154094, at *1.

York. *Id.*

Until 2004, REI and AASP continued to enter into written agreements governing the terms of the trade show, with a two-year period on the same terms. *Rockland I*, 2009 WL 1154094, at *2.[3]  In 2004, REI and AASP entered into a contract covering the 2005 and 2006 Northeast Automotive Trade Shows.  (Am. Compl. Ex. C (the "Contract").)  The Parties did not execute a new agreement in 2005 or 2006, but AASP provided REI with a $2000 deposit for each of the 2007 and 2008 Northeast Automotive Trade Shows.  *See Rockland I*, 2009 WL 1154094, at *2.  The 2004 Contract contained an automatic two-year renewal provision, which was the subject of the Court's previous rulings of March 19, 2009 and November 5, 2009.[4] Following the March 2007 show, relations between REI and AASP began to deteriorate, largely

---

[3] The contract was made between AASP and REI "for the purposes of promoting, managing, and operation of the Northeast Regional Autobody/Automotive Trade Show to be held annually" at Rockland Community College.  (Am. Compl. Ex. C (the "Contract").)  It provided that REI would "be responsible for the management, promotion and direction of the exposition," and would "handle all exhibitor space sales, and show service rentals."  (*Id.* at 1.)  It also delegated to REI the management of "all finances such as but not limited to, advertising, show supplies, etc. as approved by AASP[]."  (*Id.*)  Per the Contract, AASP agreed to provide "endorsement, approval and support by [its] own organizatoin," and to handle all hotel functions.  (*Id.*)  Furthermore, the Contract provided that "AASP[] Northeast Regional Autobody/Automotive Trade Show agrees to the use of their name in any way including but not limited to mailings, brochures, signs, advertisements, etc."  (*Id.*)  Per the contract, REI agreed not to manage or promote another Auto Body Congress Trade Show within 200 miles of New Brunswick, New Jersey while under contract with AASP, and AASP also recognized REI's exclusive rights to the other trade shows which REI already managed at Rockland Community College.  (*Id.* at 2.)  REI was to be paid a coordinator salary/management fee for running the show, and all direct show expenses were to be paid for by AASP.  (*Id.*)

[4] The Contract provides that AASP "must within 45 working days of the close of [that year's] show, either submit a $2,000 deposit to [REI] to hold the [dates for the show two years later] or they must serve written notice by registered mail that they wish to discontinue [the] agreement after the [next year's] event."  (Contract 2-3.)  Therefore, for example, the Court held that AASP would have had to have provided REI with notice within 45 days after the 2007 show to terminate their relationship for the 2009 show.  *Rockland I*, 2009 WL 1154094, at *9.

because of AASP's concern about REI's management of the show.  *See Rockland I*, 2009 WL 1154094, at *2.  At a July 2007 meeting to discuss AASP's concern, REI gave AASP a memorandum containing suggestions for improvement for the 2009 show, and requesting a "written decision" from AASP about its willingness to participate in the 2009 and 2010 shows by March 31, 2008.  (Defs.' Ex. 190); *see also Rockland I*, 2009 WL 1154094, at *2.  AASP provided REI with the $2,000 deposit for the 2009 show and did not notify REI within 45 days of the 2007 show that it wished to terminate the agreement for the 2009 show.  (Pl.'s 56.1 ¶¶ 22-23); *see also Rockland I*, 2009 WL 1154094, at *2 & n.3.  At a March 3, 2008 meeting, REI proposed a new arrangement to AASP for future shows, which provided for a higher deposit from AASP and contained different payment terms.  *Rockland I*, 2009 WL 1154094, at *2.  Following this meeting, REI sent a follow-up letter to AASP asking AASP to confirm (by fax or email) its willingness to participate in shows after the March 2008 show — even though the Contract bound AASP for the 2009 show — by March 31, 2008.  (Defs.' Ex. 107); *see also Rockland I*, 2009 WL 1154094, at *2-3.  The March 3, 2008 letter also stated that if "AASP/NJ decides to participate [in the Northeast Regional Autobody/Automotive Trade Show] in future years[,] they will have the first option to do so with Rockland Exposition, Inc."  (Defs.' Ex. 107.)

AASP notified REI on March 18, 2008 via telephone that it had decided not to proceed with REI on presenting a 2009 show.  (Defs.' 56.1 ¶ 31.)  In response, REI sent AASP a letter on March 25, 2008, informing AASP that REI "**will** continue to promote and manage a 2009 Northeast Regional Autobody/Automotive Trade Show (on the March 27, 28, 29, 2009 dates) . . . even with the loss of the AASP/NJ sponsorship."  (Defs.' Ex. 164 (emphasis in original).)  On March 27, 2008, just prior to the 2008 show, AASP, through its attorney, sent a letter to REI, notifying it in writing that "the contract has expired" and that "[y]ou have been notified that the

upcoming event will be the last one held through your company for the present and foreseeable future." (Defs.' Ex. 195); *see also Rockland I*, 2009 WL 1154094, at *3. Responding to REI's contention that it would hold a 2009 Northeast show without AASP, the letter stated that REI "agreed to promote, manage and operate the Northeast Regional Auto Body/Automotive Trade show [and] [t]his does not include ownership of [the] show or the name, which is clearly owned by AASP-NJ." (Defs.' Ex. 195.) On March 31, 2008, the day after the 2008 show ended, AASP sent REI another letter, again through an attorney, this time stating that "AASP[] has elected to sever its business relationship with Rockland Exposition, Inc., and will not be entering into any agreements with you involving its planned 2009 Trade Show." (Defs.' Ex. 196.) AASP also wrote that "[t]he mark Northeast Regional Autobody/Automotive Trade Show is clearly and unequivocally the property of AASP/NJ" and may not be used by REI "for any purpose." (*Id.*)

On March 26, 2008, two days before the start of the 2008 Northeast Automotive Trade Show, AASP sent a letter to the 2008 exhibitors, announcing its intent to move its 2009 Northeast Automotive Trade Show to the Meadowlands, to be held on March 20-22, 2009. (Defs.' 56.1 ¶ 35; Defs.' Ex. 21.) On April 10, 2008 REI issued a press release announcing that REI would hold a "Northeast Regional 2009 Trade Show" at Rockland Community College in March 2009. (Defs.' Ex. 197.) In small print at the bottom of the press release, REI noted that "AASP/NJ has elected to end its 20 year business relationship with Rockland Exposition/David McCarey." (*Id.*) On April 24, 2008, REI sent a deposit to Rockland Community College for its "Northeast Regional 2009 Trade Show," listing its show dates as March 20-22, 2009. (Defs.' Ex. 106.) David McCarey ("McCarey"), REI's President, testified at his deposition that REI changed its show dates from March 27-29, 2009 to March 20-22, 2009, because he thought that having REI's show on the same dates as AAPS's would help REI's show "retain exhibitors."

(McCarey Dep. 411-12, Oct. 14, 2010 (Defs.' Ex. E).)

The 2008 Northeast Automotive Trade Show had been presented by REI and AASP as the "31st Annual AASP Northeast 2008 Regional Autobody/Automotive Trade Show." (Defs.' Ex. 170.)  AASP promoted its 2009 show as the "32nd annual" Northeast 2009 Automotive Trade Show (Defs.' Ex. 167), and also held its 33rd and 34th "Annual Northeast" shows in 2010 and 2011 at the Meadowlands, (Defs.' 56.1 ¶ 46).  REI promoted its 2009 Northeast show as the "20th Annual Event" and called it the "Northeast Regional Trade Show."  (Defs.' Ex. 166.)  REI solicited exhibitors for its 2009 show from approximately April 2008 to February 2009.  On February 19, 2009, REI announced that it would postpone its 2009 Northeast show pending the outcome of this litigation.  (McCarey Dep. 763-65, Oct. 15, 2010 (Defs.' Ex. F); Defs.' Ex. 198.)[5]  In its press release, REI stated that the decision to postpone the show was "based on the uncontrollable widespread damage and ongoing confusion in the Automotive Autobody Repair Marketplace," based on the litigation between REI and AASP.  (Defs.' Ex. 198.)

Both REI and AASP have applied to the United States Patent and Trademark Office ("USPTO") to federally register the term "Northeast" as a service mark.  REI submitted a Trademark/Service Mark Application to the USPTO on June 28, 2008, and submitted an

---

[5] Between April 2008 and February 2009, REI signed contracts with less than twenty exhibitors for its 2009 show, and several of these exhibitors cancelled their contracts prior to REI's postponement announcement.  (McCarey Dep. 766-68, Oct. 15, 2010.)   The contracts produced by REI show that REI signed contracts with thirteen paying exhibitors for its 2009 show prior to its postponement announcement.  (Defs.' 56.1 ¶ 67; Defs.' Ex. X.)  One exhibitor, the Radiator Store, sent REI a letter on September 12, 2008, informing REI that it "will not be a vendor in the 20th Annual 2009 Northeast Trade Show" because it "w[as] under the impression that the show was still being run by AASP/NJ," and therefore requested a refund of its deposit.  (Defs.' Ex. 199; McCarey Dep. 768, Oct. 15, 2010.)  REI also received cancellation notices from at least three other exhibitors — Motor Information Systems, Eckler Industries, Inc., and Bonny Marlin, Inc. — prior to its February 19, 2009 postponement announcement.  (Defs.' Ex. X.)

amendment to its application on July 3, 2008. (Defs.' Exs. 41, 42.) The amended application states that REI first used the mark "Northeast" to promote and conduct automotive trade shows as early as September 15, 1982. (Defs.' Ex. 42.) AASP submitted its own application to the USPTO on December 12, 2008 for the service mark "Northeast," as used to promote and conduct trade shows for the automotive collision and repair industry, and claims that its first use was in 1985. *See* U.S. Trademark Application Serial No. 77631779 (filed Dec. 12, 2008).[6] AASP initiated a proceeding against REI before the Trademark Trial and Appeal Board regarding the disputed "Northeast" mark, and that case is suspended pending the disposition of this action. *See Assoc. of Auto. Serv. Providers of N.J. v. Rockland Exposition, Inc.*, No. 91188273 (T.T.A.B.).

---

[6] AASP did not submit its Service Mark application as an exhibit to its motion for summary judgment. However, REI has requested the Court to take judicial notice of AASP's application (Pl.'s Sur-reply in Opp'n to Defs.' Mot. for Partial Summ. J ("Pl.'s Sur-reply") 3 & n.3), and the Court may do so pursuant to Federal Rule of Evidence 201(b)(2), which permits the Court to take judicial notice of a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Here, the USPTO Trademark Electronic Search System ("TESS") indicates that AASP submitted the application described above, and therefore, the service mark application is part of the USPTO public record. *See Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010) ("The Court may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States Copyright Office."); *Autodesk, Inc. v. Dassault Sys. SolidWorks Corp.*, No. 08-CV-04397, 2008 WL 6742224, at *2 n.1 (N.D. Cal. Dec. 18, 2008) (taking judicial notice of trademark application publicly available on USPTO website) (citing *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 (Fed. Cir.1993)); *cf. Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (taking judicial notice of federal copyright registrations, as published in the Copyright Office's registry); *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 n.2 (8th Cir. 1996) (taking judicial notice of federal trademark registration). AASP also submitted an application for Northeast in a design format. *See* U.S. Trademark Application Serial No. 77644571 (filed Jan. 7, 2009).

B. Procedural History

On June 28, 2008, AASP filed suit in the District of New Jersey against REI and

David McCarey, REI's President, before the Honorable Mary L. Cooper (the "New Jersey

Action").  AASP alleged that REI and McCarey used AASP's trademark without authorization

and asserted claims against REI and McCarey for, inter alia, (1) false designation of origin; (2)

dilution; (3) unfair competition; (4) trademark violation; (5) tortious interference; (6)

misappropriation of confidential business information; and (7) an accounting.  (AASP Am.

Compl. ¶¶ 33-62.)[7]  REI brought the instant action on August 8, 2008, setting forth claims

arising out of the same operative facts as the New Jersey Action, with additional copyright and

contract claims.[8]  Both AASP and REI filed motions for preliminary injunctions, which were

denied, and on December 22, 2008, Judge Cooper granted REI's motion to transfer the New

Jersey Action to the Southern District of New York, and the two cases were consolidated before

this Court on December 24, 2008.[9]  (Nos. 08-CV-7069, 08-CV-11107.)

As noted, the Court has already decided two motions for partial summary judgment in

---

[7] AASP filed its Second Amended Complaint on January 7, 2009 to add claims for fraudulent inducement of the 2004 Agreement by REI, breach of duty of loyalty, breach of implied covenant of good faith and fair dealing, and breach of contract.  (AASP Second Am. Compl. ¶¶ 87-120.)  The Second Amended Complaint does not include the dilution claim.  On April 25, 2011 the Parties entered into a stipulation whereby AASP agreed to dismiss, with prejudice, its claims for fraud and fraudulent inducement, breach of the duty of loyalty, breach of the covenant of good faith and fair dealing, tortious interference, and misappropriation of confidential business information.  (No. 08-CV-7069, Dkt. No. 125.)  AASP retained the right to assert any of these claims as affirmative defenses to REI's claims.  (*Id.*)

[8] REI amended its Complaint on January 5, 2009, alleging additional facts.  (No. 08-CV-7069, Dkt. No. 30.)

[9] For a lengthier discussion of the procedural history of this case, see *Rockand I*, 2009 WL 1154094, at *4, and *Rockland II*, 706 F. Supp. 2d at 352-53.

this case, on March 19, 2009 and November 5, 2009.  In response to REI's first motion for

partial summary judgment on its breach of contract claim, Defendants argued that AASP's

March 2008 letters, which had been requested by REI, relieved it from any obligation to

participate in the 2009 show.  *See Rockland I*, 2009 WL 1154094, at *12.  This Court disagreed,

finding that "the 2004 Agreement would automatically renew and that advance, written notice of

termination would be required to terminate the agreement and, thereby, suspend automatic

renewal."  *Id*. at *7.  The Court then ruled that, because AASP's notice was not given within

forty-five days of the 2007 show, "it was contractually obligated to sponsor the 2009 trade show

under REI's management."  *Id.* at *9.  The Court also held that AASP breached the Contract's

non-compete clause by promoting its own 2009 show while still under contract with REI.  *Id.* at

*9.[10]  But, the Court denied REI's request for specific performance, refusing to order AASP to

participate in REI's 2009 show or to comply with the non-compete clause.  *Id.* at *15.  Instead,

the Court decided that damages were sufficient to right those wrongs, particularly because AASP

had relied on REI's representations that it could opt-out of any post-2008 contractual obligations

if it did so by March 31, 2008.  *Id.* at *11-15.  The Court decided REI's second motion for partial

summary judgment, and AASP's cross motion for partial summary judgment on November 5,

2009, holding that AASP's March 2008 notice of termination, though ineffective to terminate the

contract prior to the March 2009 show, was effective to terminate the contract for the March

2010 show and beyond.  *See Rockland II*, 706 F. Supp. 2d at 357.

Defendants served Plaintiff with the instant Motion for Partial Summary Judgment on

---

[10] The non-compete clause provides that AASP "will not be involved in or endorse any other related exposition four months prior or four months after the latest contracted exposition." (Contract 3.)

October 6, 2011, and the motion was fully submitted on April 2, 2012.  Defendants move for

summary judgment in relation to Counts Four through Eleven of REI's Amended Complaint.

REI voluntarily dismisses Count Nine, for common law trade libel, and Count Eleven, for

misappropriation of trade secrets.  (Pl.'s Opp'n to Defs.' Mot. for Partial Summ. J. ("Pl.'s

Opp'n") 2 n.1.)  The Court held oral argument on June 20, 2012.

## II.  Discussion

### A.  Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine dispute as

to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "When ruling on a

summary judgment motion, the district court must construe the facts in the light most favorable

to the non-moving party and must resolve all ambiguities and draw all reasonable inferences

against the movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003);

*see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006) (noting that a court

must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine

issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d

Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim.  In that event, the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations

omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted);

*see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006)

("[S]peculation alone is insufficient to defeat a motion for summary judgment."). A fact is

material when "it might affect the outcome of the suit under governing law." *McCarthy v. Dun*

*& Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). At

summary judgment, a court is not charged with weighing the evidence and determining its truth,

but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v.*

*N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be to

"isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

    B. Analysis

        1. Federal Trademark Infringement

    In Count Four of its Amended Complaint, REI claims that AASP's use of "Northeast" in

the name of its trade shows constitutes trademark infringement in violation of section 43(a) of

the Trademark Act of 1946 (the "Lanham Act"), codified as 15 U.S.C. § 1125(a). (Am. Compl.

¶¶ 125-35; Pl.'s Opp'n 7-8.) In particular, REI argues that its use of "Northeast" qualifies as a

"service mark" under 15 U.S.C. § 1127, and that AASP's continued use of "Northeast" in

connection with its automotive trade shows infringes on REI's rights in violation of § 1125(a).

Under 15 U.S.C. § 1125(a), "[a]ny person who, on or in connection with any goods or services . .

. uses in commerce any word, term, name, symbol, or device, or any combination thereof, . . .

which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

connection, or association of such person with another person, or as to the origin, sponsorship, or

approval of his or her goods, services . . . shall be liable in a civil action by any person who

believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1); *see also ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 225 (S.D.N.Y. 2008) (same).

To state a claim for trademark or service mark infringement under section 43(a) of the Lanham Act, a plaintiff must demonstrate that "(1) it has a valid trademark or [service mark] entitled to protection, and (2) the defendant's use of a similar [mark] is likely to cause confusion among consumers as to the origin of the goods or services." *Morgans Grp. LLC v. John Doe Co.*, No. 10-CV-5225, 2012 WL 1098276, at *4 (S.D.N.Y. Mar. 31, 2012) (citing *Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2005)); *see also Thoip v. Walt Disney Co.*, 736 F. Supp. 2d 689, 702-03 (S.D.N.Y. 2010) ("'A claim of trademark infringement . . . is analyzed under [a] familiar two-prong test . . . [which] looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.'" (footnote omitted) (quoting *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir.2003))). Both registered and unregistered trademarks/service marks are entitled to protection, and section 43(a), under which REI proceeds, "creates a cause of action for infringement of unregistered []marks." *Silberstein v. Fox Entm't Grp., Inc.*, 424 F. Supp. 2d 616, 632 (S.D.N.Y. 2004); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (noting that it "is common ground that § 43(a) protects qualifying unregistered trademarks").[11]  "[W]here a plaintiff cannot establish that its mark is entitled to protection, a court need not consider whether a defendant's use of a similar mark is likely to cause confusion." *Morgans Group*, 2012 WL 1098276, at *4. Therefore, as a threshold matter, the Court will address whether REI used the term "Northeast"

---

[11] Neither REI nor AASP has been granted a registration number.

13

as a service mark, and if so, whether a reasonable jury could conclude that the mark is entitled to protection. *See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 62 (2d Cir. 2000) (noting that to state a claim under section 43(a), a plaintiff "must show that it owns a valid trademark eligible for protection.").

### a. Whether REI used "Northeast" as a "service mark"

Under the Lanham Act, a "trademark or service mark is any combination of words, names, symbols or devices that are used to identify and distinguish goods or services and to indicate their source." *Am. Express Co. v. Goetz*, 515 F.3d 156, 159 (2d Cir. 2008) (citing 15 U.S.C. § 1127). Section 1127 of the Lanham Act provides that a service mark can indicate the source of a particular service, "even if that source is unknown." 15 U.S.C. § 1127. A service mark is "identical to a trademark in all respects," except that it is used to identify the source of services, rather than goods. *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 933 n.4 (11th Cir. 2010) (citation omitted); *see also Murphy v. Provident Mut. Life Ins. Co. of Phila.*, 923 F.2d 923, 927 (2d Cir. 1990) ("A servicemark differs from a trademark only in that a servicemark identifies services rather than goods . . . [and] the standards for determining infringement are essentially the same." (citations omitted)).[12] As used in the Lanham Act, the term "services" has been defined as "'the performance of labor for the benefit of another.'" *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*,182 F.3d 133, 137 (2d Cir. 1999) (quoting *In re Adver. & Mktg. Dev., Inc.*, 821 F.2d 614, 619 (Fed. Cir. 1987)). "Those services must not be 'solely for the benefit of the performer; the services must be

---

[12] The Parties refer to trademark and service mark interchangeably. However, given that REI was a provider of services, rather than goods, the designation "service mark" is appropriate to describe its claimed interest in "Northeast."

rendered to others.'" *Id.* at 138 (quoting *Murphy*, 923 F.3d at 927).

Defendants do not contest that REI provides a "service," as understood by the Lanham Act, as REI provides the service of organizing and managing trade shows.  Defendants argue, however, that REI has never used the "Northeast" mark to identify the services that it provides, and in fact has only used "Northeast" to identify the trade shows, the subject of its services. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J ("Defs.' Mem.") 6-9.)  For a party to claim a valid service mark, "[i]t is not enough for the applicant to be a provider of services; the applicant must also have used the mark to identify the named services for which registration is sought." *Advertising & Marketing*, 821 F.3d at 620-21 (holding that advertising firm showed that it used slogan THE NOW GENERATION as a service mark for its promotional services where the company's letterhead contained the mark and a byline naming the firm the "creators, producers, and suppliers of THE NOW GENERATION sales *promotion service*"); *see also Caliber*, 605 F.3d at 933 (noting that plaintiff held a federal registration for the service mark "Slash it! Sales Event," to describe its "advertising agency services, namely, promoting the services of automobile dealerships through the distribution of printed and audio promotional materials and by rendering sales promotion advice"); *St. Luke's Cataract and Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1207 (11th Cir. 2009) (holding that plaintiff established that its use of "LaserSpecialist.com" was a service mark where it used the name on its website and advertising to "identify St. Luke's as a source of oculoplastic surgery"); *cf. In re Moody's Investors Serv. Inc.*, 13 U.S.P.Q.2d 2043, 1989 WL 274418, at *4-5 (T.T.A.B. Nov. 17, 1989) (noting that a service mark must "be used in such a manner that it would be readily perceived as identifying [the named] services," and holding that the term "Aaa" as used by Moody's was not used "as a mark identifying applicant's service of providing ratings of fixed interest rate obligations," but

was the rating symbol itself and not protectable as a service mark); *In re British Caledonian Airways Ltd.*, 218 U.S.P.Q. 737, 737 (T.T.A.B. 1983) (refusing registration of a service mark where "the term sought to be registered is not used as a service mark to identify and distinguish applicant's services but instead identifies a type of seat used in the rendering of applicant's services").[13]

Following this line of cases, the Second Circuit has held that "a mark that does not perform the role of identifying a source is not a trademark [or a service mark]." *American Express*, 515 F.3d at 159. Therefore, to be considered a service mark under the Lanham Act, the mark must have been used "to differentiate or identify the origin of [the party's] goods or services," as distinct from the subject or product of those services. *Id.* at 161. In *American Express*, for example, a marketer had sought to sell the slogan "My Life, My Card" to credit card companies, and had distributed promotional material using this tagline to several credit card companies. *Id.* at 160-61. In holding that the slogan was not used by the marketer to identify his services, but rather as a component of his business proposal to the credit card companies — and therefore not protectable as a service mark — the Second Circuit analogized his slogan to the services offered by advertising agencies. *Id.* at 160. The Patent and Trademark Office's Trademark Trial and Appeal Board ("T.T.A.B.") has long held that such "slogans cannot be

---

[13] Although the cases decided by the Federal Circuit and the Patent and Trademark Office's Trademark Trial and Appeal Board ("T.T.A.B.") involve the standard that an applicant must meet to federally register a service mark, the Supreme Court has stated that "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *accord Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006) (same). Therefore, the standard used by the USPTO for the registration of service marks is useful for determining whether a mark is entitled to protection as a service mark under section 43(a).

registered as [a] mark[] by the advertising agency . . . because the slogan does not identify and distinguish the services of the advertising agency, but rather *is* the creative work itself." *Id*. at 160 (citing *In re Admark, Inc.*, 214 U.S.P.Q. 302, 303 (T.T.A.B. 1982); *Advertising and Marketing*, 821 F.2d at 620). The Second Circuit in *American Express* found dispositive that the marketer never displayed the slogan to consumers and never followed the phrase with a reference to himself or his company. *Id.* Therefore, the marketer never intended that the slogan would identify his services, "but instead [intended it] to interest [credit card] companies in a slogan that would identify personalized cards with whichever company elected to make this product available to its customers." *Id.*

Relying on *American Express*, Defendants argue that REI has never used the claimed "Northeast" mark to identify its *services* (of organizing and promoting automotive trade shows), and instead has only used the mark to describe the *shows* themselves, and that as a result, REI's use of "Northeast" is not entitled to service mark protection. (Defs.' Mem. 8-9.) "Unlike trademarks, service marks usually cannot be 'affixed' or displayed in close connection with the services, so advertisements and solicitations are often used as evidence of use." *American Express*, 515 F.3d at 161; *see also Moody's*, 1989 WL 274418 at *4 (noting that the T.T.A.B. makes the determination of "[w]hether a designation sought to be registered has been used as a mark for the goods or services recited in an application . . . by examining the specimens of record in the application").

REI has included in its exhibits several advertising flyers and promotional materials for the "Northeast" shows it has managed. (*See* Pl.'s Exs. A, B, C, D, E, F, G, K, L.) Each of these flyers displays the "Northeast" mark prominently and in bold capital letters, identifying "Northeast" as the name of the show. (*See, e.g.*, Pl.'s Exs. A ("1983 GREATER NORTHEAST

4x4 Truck - Van and Accessories Show"); B ("9th Annual 1983 Greater Northeast Recreation Vehicle Camping Equipment Show"); C ("NORTHEAST R.V. Caper"); E ("NORTHEAST 88 Tow Truck Expo").)  However, several of the flyers do not identify REI anywhere as the entity responsible for the organization and management of the shows.  (Pl.'s Exs. A, B, C, D.)  While these flyers list Dave McCarey, REI's president, as the point of contact, they do not name REI as the show producer or coordinator.[14]  Defendants argue that these exhibits (A through D) do not demonstrate REI's use of "Northeast," especially because REI contends that this use was by "related companies."  (Sur-reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J ("Defs.' Sur-reply") 4-5.)  Several other flyers, (Pl.'s Exs. E, F, G, J, K), however, list Dave McCarey as the show coordinator, and demonstrate his affiliation with Rockland Exposition, implying that REI is responsible for the management and coordination of the shows.[15]  Plaintiff's Exhibit E is a flyer for the "NORTHEAST 88 Tow Truck Expo," and includes Rockland Exposition, Inc. on the front page.  Plaintiff's Exhibit F is a flyer for the 1991 "Cruzin the Northeast Custom Car Show," and in small print underneath the title, the flyer states "Produced by: Rockland Exposition Inc. The same people who organize the Northeast Truck Show."  Plaintiff's Exhibits G, J, and K are flyers for the 1990, 1991 and 1992 Northeast shows which REI produced with AASP.

---

[14] Any references to Dave McCarey prior to 1997 are in relation to Dave McCarey Sr., the former president of REI, who passed away in 1997.  (McCarey Dep. 8, May 8, 2009.)

[15] For the purpose of determining whether REI has demonstrated that it used "Northeast" as a service mark, the Court will therefore only consider Plaintiff's Exhibits E through K, which use the term "Northeast" and also include a reference to REI.
Plaintiff's Exhibit L does not refer to REI as the show coordinator, and only mentions REI on the Seminar Registration Form, where it indicated that participants should return the completed form with registration fee to NORTHEAST '01 TRADE SHOW, c/o Rockland Exposition.  (Pl.'s Ex. L.)

Defendants do not directly address the promotional material in Plaintiff's exhibits, but assert generally that REI has conflated the promotion of its services with the name of its shows, and in fact has only used "Northeast" as the name for some of its trade shows, and never to promote its services in organizing those shows.  (Defs.' Mem. 8-9.)  Defendants also focus on REI's letterhead and argue that unlike in *Advertising & Marketing*, where A&M in its letterhead clearly identified itself as the "creators, producers and suppliers of the NOW GENERATION sales promotion services," 821 F.2d at 621, REI's letterhead (Defs.' Ex. 106), makes no mention whatsoever of the "Northeast" mark, (Defs.' Mem. 8).  However, unlike the marketer in *American Express*, REI, through its use of "Northeast" on its show promotional materials did "display[] the slogan to []consumers," an element of use that the Second Circuit in *American Express* found lacking.  515 F.3d at 160.  Furthermore, Plaintiff's Exhibit F can be analogized to the letterhead in *Advertising & Marketing*, in that it identifies REI as the show's producer, and also states that REI is the organizer of the Northeast Truck Show.  *See* 821 F.2d at 621; *cf. American Express*, 515 F.3d at 160 (noting that the fact that the phrase "My Life, My Card" was never followed by a reference to the defendant or his company was relevant in determining that he had not used phrase as a service mark).  REI therefore has provided some evidence to demonstrate that it used the "Northeast" mark "in connection with services [it] rendered" in organizing and promoting automotive themed trade shows.  *American Express*, 515 F.3d at 161 (internal quotation marks and emphasis omitted); *see also Home Builders Ass'n of Greater St. Louis v. L & L Exhibition Mgmt., Inc.*, 226 F.3d 944, 949 (8th Cir. 2000) (holding that the names that the plaintiff gave its trade shows "are, without question, unregistered service marks . . . [because] they are names used by [plaintiff] to identify and distinguish its home show services").  Furthermore, REI's use of "Northeast" in large font and all capital letters is a factor weighing in

favor of its use of the term as a service mark. *See In re Post Props., Inc.*, 227 U.S.P.Q. 334, 335

(T.T.A.B. 1985) (holding that applicant's use of QUALITY SHOWS was a service mark because

it was set off from the text of the advertising in extremely large font, and used in a way that

made a commercial impression separate from the other elements of the advertising material);

U.S. Patent & Trademark Office, Trademark Manual of Examining Procedure (TMEP) §

1301.02 (8th ed. 2011) (noting that factors to be considered in determining whether a term

functions as a service mark include "whether the wording claimed as a mark is physically

separate from textual matter, whether a term is displayed in capital letters or enclosed in

quotation marks, and the manner in which a term is used in relation to other material on the

specimen"). Therefore, a disputed issue of material fact exists as to whether REI's use of

"Northeast" constitutes a service mark.[16]

### b. Whether REI's use of "Northeast" is entitled to protection

Even if REI's use of "Northeast" may arguably constitute a service mark, REI must still

show that its use of the mark is entitled to protection. *Morgans Group*, 2012 WL 1098276, at

*4. There are two inquiries here. As a threshold matter, REI must demonstrate "first use" of

"Northeast" in conjunction with its trade shows. If REI can show first use, it then bears the

burden of demonstrating that its mark is a valid service mark entitled to protection.

---

[16] It bears noting that not all the advertising flyers set off "Northeast" separate from the
rest of the text (*see* Pl.'s Ex. F ("CRUZIN THE NORTHEAST")), and that all the flyers use
capital letters for the entire name of the trade show, not just "Northeast." Furthermore, some
flyers use the term "Greater Northeast" (Pl.'s Ex. A, B), while others just use "Northeast." Thus,
this issue is far from doubt, but the existence of such doubt is why summary judgment is not
granted on this basis.

### i. First Use

It is a "well-established principle that trademark rights are acquired and maintained through use of a particular mark." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007). To claim any right in a particular mark, therefore, the party asserting the right must be "the first to use [the] mark to identify his goods or services in a given market." *Id.* at 147; *Hawaii-Pac. Apparel Grp., Inc. v. Cleveland Browns Football Co.*, 418 F. Supp. 2d 501, 506 (S.D.N.Y. 2006) ("It is therefore only the senior user of a mark that can bring a claim for trademark infringement . . . ." (citing *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 150 (2d Cir. 1997)); *see also Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use.").[17]

Defendants argue that REI cannot demonstrate first use of the "Northeast" mark in relation to automotive themed trade shows. (Defs.' Mem. 9; Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply") 6-7; Defs.' Sur-reply 3-4.) REI claims to have first used "Northeast" in relation to its trade shows in 1983 (McCarey Affirmation ¶¶ 3-4).[18] However, the advertising flyers which REI has provided to demonstrate use of "Northeast" between 1983 and 1988 do not identify REI as the promoter or organizer of the trade shows.

---

[17] However, as will be discussed in Section II.B.1.b.ii, *infra*, for marks that are descriptive and thus not inherently distinctive, a demonstration of first use does not end the inquiry, as the claimed owner of the mark is also required to establish secondary meaning. Therefore, a showing of first use is necessary, but not sufficient, to establish that REI has a protectable interest in the "Northeast" mark. *See TCPIP Holding Co. v. Haar Comm'cns, Inc.*, 244 F.3d 88, 93-94 (2d Cir. 2001) (explaining that a descriptive mark can only qualify for trademark protection if it has acquired secondary meaning).

[18] In its amended Trademark/Service Mark application, REI claims that its first use in commerce of "Northeast" was on September 15, 1982. (Defs.' Ex. 42.)

(Pl.'s Exs. A-D.)[19]  REI claims that its use of "Northeast" from 1983 to 1988 was through a "related company," and thus that it can claim first use of "Northeast." (Pl.'s 56.1 Counter-Statement ¶ 51; Pl.'s Sur-reply 5.)  To rebut this point, Defendants have provided evidence demonstrating that AASP used the term "Northeast" to refer to its automotive trade show as early as 1985.  (Defs.' Ex. 146.)

"[T]he Lanham Act permits an applicant to establish ownership [of a mark] under the 'related companies' doctrine by showing that it controlled the first user of the mark."  *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1347 (D.C. Cir. 2008).  Section 5 of the Lanham Act provides:

> Where . . . a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the . . . applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.  If first use of a mark by a person is controlled by the . . . applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the . . . applicant . . . .

15 U.S.C. § 1055; *see also Carpenteri v. Marini*, No. 05-CV-00766, 2006 WL 2349586, at *5 (D. Conn. July 11, 2006) ("The related companies doctrine permits trademark ownership by a

---

[19] The flyers which do not list REI as affiliated with the "Northeast" shows are: Plaintiff's Exhibit A, an advertisement for the "1983 Greater Northeast 4x4 Truck - Van and Accessories Show;" Plaintiff's Exhibit B, an advertisement for the 1983 "9th Annual Greater Northeast Recreation Vehicle Camping Equipment Show;" and Plaintiff's Exhibit C, an advertisement for the 1986 "Northeast R.V. Caper."  Plaintiff's Exhibit D is another set of promotional materials for the 1983 Greater Northeast 4x4 Truck Show, and is duplicative of Exhibit A.  In Exhibits A and C, REI appears to use the name of the show as the identifier of its services, listing the show name as the entity to which checks should be made and correspondence sent.  (Pl.'s Exs. A ("Direct all questions and information to our show office: NORTHEAST 4x4 Truck-Van Show, 529 North Street, Middletown, N.Y.); C ("Make checks payable to: Northeast RV Caper").)  Exhibit B, a flyer for the 1983 "9th Annual Greater Northeast Recreation Vehicle Camping Equipment Show," lists no entity as a contact, but only identifies Dave McCarey as the point of contact.  (Pl.'s Ex. B.)

licensor who exercises substantial control over the mark's use by a licensee, based upon use by the licensee.").[20]  The Trademark Manual of Examining Procedure ("TMEP") also provides that an applicant may base its claim of ownership in a service mark on use of the mark both by the applicant and by a related company, the use of which inures to the applicant's benefit.  TMEP § 1201.01 (8th ed. 2011).[21]  Related companies are defined in the Lanham Act to mean "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."  15 U.S.C.

---

[20] 15 U.S.C. § 1055 only applies to trademarks for which a person or entity has applied for or received a federal registration.  *See Carpenteri*, 2006 WL 2349586, at *6 (citing 15 U.S.C. § 1055).  As discussed, REI has applied for a federal registration for "Northeast" and thus seems to fall within § 1055's discussion of "applicant for registration" of a mark.  Given that § 1055 refers specifically to applicants, and that courts generally look to the principles qualifying a mark for registration under the Lanham Act to determine whether a mark is entitled to protection under §43(a), *Two Pesos*, 505 U.S. at 768, the Court will apply the related companies doctrine to REI's claim.

[21] In its trademark application to the USPTO, REI stated that "[t]he applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce . . ."  (Defs.' Ex. 41.)  According to the TMEP, "[w]here the application states that use of the mark is by a related company or companies, the USPTO does not require an explanation of how the applicant controls the use of the mark.  Similarly, the USPTO does not inquire about the relationship between the applicant and other parties named on the specimen . . . except when the reference to another party clearly contradicts the applicant's verified statement that it is the owner of the mark . . . ."  TMEP § 1201.03(b).  However, other regulations specify that the Office "may require such details concerning the nature of the relationship [between the related companies] and such proofs as may be necessary and appropriate for purpose of showing that the use by related companies inures to the benefit of the applicant and does not affect the validity of the mark."  37 C.F.R. § 2.38(c).  Furthermore, if the first use of the mark was by a related company and the use inures to the benefit of the applicant (as REI here claims), "the dates of first use . . . *may* be asserted with a statement that first use was . . . by the related company."  *Id.* § 2.38(a) (emphasis added).  REI does not appear to have stated that first use was by a related company on its trademark application.  However, the language in this section is permissive, rather than mandatory, so this defect may not be fatal to REI's claim.  *Cf. id.* § 2.38(b) ("If the mark is not in fact being used by the applicant but is being used by one or more related companies whose use inures to the benefit of the applicant under section 5 of the Act, such facts *must* be indicated in the application." (emphasis added)).

§ 1127.

The hallmark of related companies is control over use of the mark, and one court has noted that "[t]he related companies doctrine requires a showing of a substantial relationship between" the companies claiming to be related. *Secular Orgs. for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1131 (9th Cir. 2000). However, "the statute does not expressly require formal corporate control" for companies to be considered related, but instead the inquiry focuses on control over "'use of a mark . . . with respect to the nature and quality of the goods or services.'" *Estate of Coll-Monge*, 524 F.3d at 1348 (alteration in original) (quoting 15 U.S.C. § 1127); *see also* 3 McCarthy on Trademarks and Unfair Competition § 18:51 (4th ed. 2012) ("A superficial reading of the Lanham Act 'related company' provisions might lead one to the conclusion that the 'companies' (meaning 'any person') must be 'related' by some form of stock ownership, such as are parent and subsidiary corporations. This is incorrect. In fact, during the legislative hearings, the Department of Justice wanted to limit the language to 100 percent controlled subsidiaries, and this was rejected."). Therefore, the fact that REI and Northeast RV Shows are not subsidiaries or related through their corporate structures is not fatal to REI's claim.

However, it is also "established that corporations do not become 'related companies' under the Trademark Act merely by virtue of having the same stockholders, directors or officers, or by virtue of occupying the same premises . . . ." *In re Raven Marine, Inc.*, 217 U.S.P.Q. 68, 69 (T.T.A.B. 1983). REI therefore cannot rely solely on McCarey's position as President and shareholder of both companies, or his father's previous involvement in both companies (McCarey Dep. 8, 10, 12, May 8, 2009), to establish that REI and Northeast RV are related companies. REI instead must present evidence that it controlled Northeast RV's use of the "Northeast" mark and exercised quality control over that mark. *See, e.g.*, *Starsurgical, Inc. v.*

*Aperta, LLC*, 832 F. Supp. 2d 1000, 1003 (E.D. Wis. 2011) (noting that to establish ownership of the mark through the related company doctrine, applicant claiming ownership "must have actually controlled [the] use of the mark with respect to the quality of the [product]");

*Carpenteri*, 2006 WL 2349586, at *6 & n.8 (granting summary judgment against individual claiming ownership of mark through related company doctrine where he did "not proffer[] evidence that he had any authority . . . to control the nature and quality of products offered under the marks at issue").

In his deposition, McCarey testified that his father, the former president of REI, was involved with another entity, Northeast RV Shows, Inc. ("Northeast RV"), that was in the business of putting on trade shows. (McCarey Dep. 12-13, May 8, 2009.)[22] He testified that Northeast RV had been in business under another name since 1974, and changed its name in 1983, coinciding with the formation of REI. (*Id.*) According to McCarey, REI does not have an ownership interest in Northeast RV, although McCarey is now the president and shareholder of both companies. (*Id.* at 14.)[23] In 1983, the two individuals involved in Northeast RV were Dave McCarey Sr. (REI's president) and Robert Maxwell. (*Id.* at 12-13.)

According to McCarey, REI began running the RV shows for Northeast RV in 1983. (*Id.* at 15-16.) McCarey also testified that REI ran the Northeast Truck Show from 1983 to 1993,[24]

_____

[22] McCarey and his father founded REI in 1983. Dave McCarey, Sr. was the president and McCarey was the vice president. (McCarey Dep. 7-8, May 8, 2009.) McCarey became president of REI in 1997 when his father passed away. (*Id.* at 8.) McCarey became an officer of Northeast RV Shows in 2005. (*Id.* at 16.)

[23] McCarey is the sole shareholder and officer of REI (McCarey Dep. 9, May 8, 2009), and he and his wife are the only shareholders and officers of Northeast RV, (*id.* at 14).

[24] Plaintiff's Exhibits A and D are advertising brochures from the 1983 Greater Northeast 4x4 Truck - Van and Accessories Show.

and also ran the Northeast Tow Truck Expo from 1988 to 1992. (*Id.* at 37-38.) However, later in his deposition, McCarey testified that he believes that REI first used the "Northeast" mark in 1989 in relation to the "Northeast RV Show." (*Id.* at 172.) He further stated that Northeast RV used the "Northeast" mark in connection with several shows prior to 1989, including the "Northeast RV Show, the Northeast Fall RV Marketplace, the Northeast RV 4x4 Truck Show, the Northeast Tow Truck Expo and Cruising the Northeast Custom Car Show." (*Id.* at 175-76.) He clarified, however, that in 1983, REI began servicing these trade shows for Northeast RV. (*Id.* at 184-85.) Furthermore, in his Affirmation, McCarey states that "[s]ince 1974, REI, and its predecessor and related companies, ha[ve] been in the business of running trade shows," and states that since 1983, REI has provided automotive trade show services under the "Northeast" mark. (McCarey Affirmation ¶¶ 2-4.) McCarey also testified that Northeast RV entity continues to present the "Northeast RV Trade Show" as well as the "Northeast RV Shows' Fall Marketplace," even though REI runs the shows (*id.* at 30, 174), and claims to control use of the "Northeast" mark.[25] He also claims in his Affirmation that REI has "at all times . . . maintain[ed] exclusive control of the quality of the services identified by its NORTHEAST []mark." (McCarey Affirmation ¶ 6.) Based on this testimony, REI asserts that any use of "Northeast" by Northeast RV Shows from 1983 to 1989 should be attributed to REI because the use was by a related company, and all of the uses of "Northeast" were by and under the control of REI. (Pl.'s Sur-reply 5; McCarey Affirmation ¶ 6.) The Court agrees that this testimony provides at least some evidence that REI may have exercised control over Northeast RV's use of

---

[25] However, McCarey also testified that although REI was involved in operating the RV show for Northeast RV Show from 1983, because he was not an officer of Northeast RV at that time, he cannot say to what extent REI was involved. (McCarey Dep. 15-16, May 8, 2009.)

the "Northeast" mark beginning in 1983.  (*See* Pls.' Ex. A.)

Defendants counter that REI must provide more detail of its affiliation with any related companies to claim that it began using the "Northeast" mark as early as 1983, and argue that "the facts necessary to establish that two companies are related must be shown in detail." (Defs.' Sur-reply 5.)  Defendants rely on two cases decided by the T.T.A.B. which involved the standard that an applicant must meet to show that companies are related after an inconsistency has been found in the application for registration of the mark.  *See Great Seats, Ltd. v. Great Seats, Inc.*, 84 U.S.P.Q. 2d 1235, 1242-43 (T.T.A.B. 2007) (finding trademark application void ab initio where company that filed the trademark application had never used the mark (and was not even in existence when the mark was first used) and there was no evidence that the company that filed the application controlled the entity that in fact had used the mark); *Beech Aircraft Corp. v. Lightning Aircraft Co.*, 1 U.S.P.Q. 2d 1290, 1294 (T.T.A.B. 1986) (considering application where registrant claimed, after filing its application, that the mark was used by a related company prior to the date of first use indicated in the trademark application; the board required proof of relatedness "by evidence which is clear and convincing and not characterized by contradictions, inconsistencies and indefiniteness" (internal quotation marks omitted)). Unlike in these cases, REI has claimed use by related companies since it filed its trademark application.  (Defs.' Exs. 41-42.)  In the third case cited by Defendants, *In re Raven Marine, Inc.*, 217 U.S.P.Q. at 70, the board denied registration because the applicant did not provide any evidence of the control it exercised over the marks at issue.  Contrary to Defendants' assertions, the Trademark Manual of Examining Procedure provides, in the section titled "Claim of Ownership May Be Based on Use By Related Companies" that

[t]he examining attorney should accept the applicant's statement regarding

ownership of the mark unless it is clearly contradicted by information in the record. The USPTO does not inquire about the relationship between the applicant and other parties named on the specimen or elsewhere in the record, except when the reference to another party clearly contradicts the applicant's verified statement that it is the owner of the mark or entitled to use the mark. Moreover, where the application states that use of the mark is by a related company or companies, the examining attorney should not require any explanation of how the applicant controls such use.

TMEP § 1201.01 (8th ed. 2011) (citation omitted).

Furthermore, in this motion for summary judgment, the Court must draw all inferences in favor of Plaintiff as the non-moving party. Here, REI has provided some evidence, through McCarey's testimony, that it controlled the use of the "Northeast" mark as early as 1983. Though this evidence admittedly is minimal, the Court need not find that REI will prevail on its claim, but merely that it has presented a disputed issue of material fact. *See Jaramillo*, 536 F.3d at 145 ("[T]he nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."). Because there is a disputed issue of material fact as to whether REI can claim first use of the "Northeast" mark in 1983, Defendants' summary judgment motion falters on this point. *See Estate of Coll-Monge*, 524 F.3d at 1349 (holding that documents showing that plaintiff exercised control over claimed related company's use of mark "put into dispute whether or not Coll controlled the use of the Non-Profits' marks from the marks' first use and therefore preclude summary judgment on the ownership issue"); *I.H.T. Corp. v. News World Commc'ns, Inc.*, No. 83-CV-3862, 1984 WL 604, at *6-7 (S.D.N.Y. July 3, 1984) (denying summary judgment where plaintiff sought to establish its bona fide prior use of a mark through use by a related company and showed that it had an ownership interest in the company as well as four seats on the board).

## ii. Distinctiveness and Secondary Meaning

Even if REI can demonstrate first use of the mark, it still must demonstrate that its use of "Northeast" constitutes a valid service mark that is entitled to protection. Where (as here) a mark is unregistered, the plaintiff "has the burden of proving that its mark is a valid [service mark]." *Cache, Inc. v. M.Z. Berger & Co.*, No. 99-CV-12320, 2001 WL 38283, at *4 (S.D.N.Y. Jan. 16, 2001) (citing *Reese Publ'g Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980)). To be a valid and protectable service mark, "a mark must be capable of distinguishing the [service] it marks from those of others." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) (citing *Two Pesos*, 505 U.S. at 768); *see also Louis Vuitton Malletier*, 454 F.3d at 116 ("[T]o establish protectability under § 43(a), 'a mark must be sufficiently 'distinctive' to distinguish the registrant's goods [or services] from those of others.'" (quoting *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005))); *Morgans Group*, 2012 WL 1098276, at *4 (noting that to be entitled to protection, a mark "must be sufficiently distinctive to link a product or service to its source"). A plaintiff can demonstrate distinctiveness of a mark one of two ways: it can demonstrate that the mark is "inherently distinctive, i.e., intrinsically capable of identifying its source," or it can show that through its use of the mark that "the mark has acquired secondary meaning." *Louis Vuitton Malletier*, 454 F.3d at 116 (internal quotation marks omitted).

### a) Distinctiveness

To gauge a mark's distinctiveness, the Second Circuit has created a framework that divides marks into four broad categories. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co.*

*v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *see also Two Pesos*, 505 U.S. at 768 (noting that "[m]arks are often classified in categories of generally increasing distinctiveness[,] following the classic formulation set out by Judge Friendly [in *Abercrombie*]"); *Morgans Group*, 2012 WL 1098276, at *4 (same). Suggestive, arbitrary, or fanciful marks are "deemed inherently distinctive 'because their intrinsic nature serves to identify a particular source of a product.'" *Morgans Group*, 2012 WL 1098276, at *4 (quoting *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir. 1992)). Generic marks, on the other hand, are deemed not to be distinctive and are not afforded trademark or service mark protection, because they merely identify the class of goods or services offered, rather than a particular characteristic of those goods or services. *Id.*; *see also Abercrombie & Fitch*, 537 F.2d at 9 ("[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name."). Descriptive marks lie in the middle of this spectrum and generally "[a] term is considered descriptive if it conveys an immediate idea of the ingredients, qualities, or characteristics of the goods." *Lapham v. Porach*, No. 06-CV-6861, 2007 WL 1224924, at *11 (S.D.N.Y. Apr. 25, 2007) (internal quotation marks omitted); *see also PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir.1990) ("Examples of descriptive terms are terms conveying the characteristics of the goods, services, or business, or indicating the purpose, functions, size, quantity, capacity, or merits of a product, the effects of its use or the class of intended purchasers." (internal quotation marks omitted)).

     The Second Circuit has held that "the initial classification of a mark to determine its eligibility for protection is a question of fact left to the determination of the district court."

*Bristol-Myers*, 973 F.2d at 1039-40. Therefore, the classification of a mark can be determined on summary judgment as a matter of law where there are no material disputed facts relating to the issue. *Kensington Publ'g Corp. v. Gutierrez*, No. 05-CV-10529, 2009 WL 4277080, at *3 (S.D.N.Y. Nov. 10, 2009); *see also Hi-Tech Parmacal Co. v. Hi-Tech Pharm., Inc.*, No. 05-CV-2674, 2007 WL 1988737, at *7 (E.D.N.Y. July 5, 2007) ("[A] court may classify a mark for purposes of a summary judgment motion only if the evidence would lead a reasonable fact-finder to only one conclusion about the purchasing public's perception of the mark's distinctiveness."). Here, the Parties agree that the term "Northeast" as used to identify automotive trade shows is descriptive. (Defs.' Mem. 10; Pls.' Opp'n 11.) The term describes the geographic region in which the shows are occurring, and a mark that is "'descriptive of the geographic origin of a product [or service]'" is generally considered descriptive. *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*, 116 F. Supp. 2d 405, 409 (S.D.N.Y. 2000) (quoting *Forschner Grp., Inc. v. Arrow Trading Co.*, 30 F.3d 348, 348 (2d Cir. 1994)); *see also Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522-23 (11th Cir. 1991) (noting that "[m]arks which are descriptive of geographic location of the source of the service are" considered descriptive); *Morgans Group*, 2012 WL 1098276, at *6 (determining at summary judgment that the terms "Hudson Sky Terrace, "Sky Terrace at Hudson," and "Hudson Terrace" are all geographically descriptive). Therefore, there is no disputed issue of material fact as to the term's classification, and the Court finds that "Northeast" as used by the Parties is a descriptive mark.

### b) Secondary Meaning - General Principles

Descriptive marks are not inherently distinctive, and therefore use alone is insufficient to confer a protectable interest in a descriptive mark. *See TCPIP Holding Co. v. Haar Commc'ns,*

*Inc.*, 244 F.3d 88, 93 (2d Cir. 2001) ("Descriptive marks are marks that describe a product or its attributes. Because they are descriptions, they also lack distinctive quality as marks."); *PaperCutter*, 900 F.2d at 562 ("As to descriptive terms, a person cannot by mere adoption and use, obtain exclusive rights in words that describe the attributes of the goods, services, or business to which the words are applied . . . ." (internal quotation marks omitted)). The Second Circuit has explained that policy considerations generally "disfavor[] the grant of protection to descriptive marks," because "[a]ccording trademark exclusivity to a descriptive mark would inhibit competitors from using descriptions of their competing products." *TCPIP Holding Co.*, 244 F.3d at 93-94. A descriptive mark therefore qualifies for trademark protection only when it has acquired "secondary meaning." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212-13 (2000). "Secondary meaning attaches when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." *Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999) (internal quotation marks omitted). In other words, a mark has established "secondary meaning" when "in the minds of the public, the primary significance of a [mark] is to identify the source of the [service] rather than the [service] itself." *Wal-Mart*, 529 U.S. at 211. A party seeking to establish secondary meaning need not demonstrate that the consuming public knows the name of the producer, but must "show that the purchasing public associates goods [or services] designated by a particular mark with but a single — although [potentially] anonymous — source." *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987), *abrogated on other grounds by Bristol-Myers*, 973 F.2d 1033; *see also Erchonia Corp. v. Bissoon*, 410 F. App'x 416, 418 (2d Cir. 2011) ("[S]econdary meaning is established *only* in cases where an ordinary buyer associates the mark in question

with a single source, though that source may be anonymous."); *Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 406 (E.D.N.Y. 2011) ("Descriptive marks are only protectable if they acquire secondary meaning, *i.e.*, that despite describing the nature of the goods in question, such marks have come to be associated by the purchasing public over time with a single, albeit anonymous, source." (internal quotation marks omitted)).

Courts within the Second Circuit look at six factors to establish whether a mark has acquired secondary meaning. These include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Marshall v. Marshall*, No. 08-CV-1420, 2012 WL 1079550, at *16 (E.D.N.Y. Mar. 30, 2012) (quoting *Genesee Brewing*, 124 F.3d at 143 n.4); *see also Bristol-Myers*, 973 F.2d at 1041 (same); *Morgans Group*, 2012 WL 1098276, at *5 (same). However, "[n]o precise guidelines are applicable and no single factor is determinative," *Murphy*, 923 F.2d at 928 (internal quotation marks omitted), and the Second Circuit has emphasized that taking all the factors into consideration, "the fundamental question [] is whether 'the *primary* significance of the term in the minds of the consuming public is not the product [or service] but the producer [or provider],'" *Bristol-Myers Squibb*, 973 F.2d at 1041(quoting *Centaur Communications*, 830 F.2d at 1221). Furthermore, the analysis focuses not on the general public, but on the consumer group relevant to the product or services at issue, and the party claiming rights in the mark must demonstrate that "a substantial segment of the relevant consumer group makes the requisite association between the product [or service] and the producer [or provider]." *Morgans Group*,

2012 WL 1098276, at *5 (internal quotation marks omitted).[26]

Whether a mark has acquired secondary meaning is a "factual determination, proof of which entails vigorous evidentiary requirements." *Marshall*, 2012 WL 1079550, at *16 (internal quotation marks omitted); *see also Greenpoint Financial*, 116 F. Supp. 2d at 409 (noting that a plaintiff must satisfy a "heavy burden because proof of secondary meaning entails vigorous evidentiary requirements" (internal quotation marks and alterations omitted)). The burden of proof rests on the "party asserting rights in the mark," here REI. *Hi-Tech Pharmacal*, 2007 WL 1988737, at *10; *see also Investacorp*, 931 F.2d at 1525 ("This requisite high degree of proof [which plaintiff must meet] must be considered by the court when ruling on a motion for summary judgment."). "Moreover, [P]laintiff's burden is to establish that its mark acquired secondary meaning *before* Defendant began using its allegedly infringing mark." *Hi-Tech Pharmacal*, 2007 WL 1988737, at *10; *see also PaperCutter*, 900 F.2d at 564 ("To qualify for trademark protection, an owner of a descriptive mark must demonstrate that the mark had

---

[26] REI and Defendants dispute the relevant consumer group. REI characterizes its use of "Northeast" as relating to automotive themed trade shows, and includes the shows it ran with AASP from 1990 to 2008 in this category. (Pl.'s Opp'n 16 ("[F]rom 1983, until the present . . . Plaintiff has been using its trademark NORTHEAST to identify trade shows, open to the general public and have [sic] an automotive theme.").) Defendants claim that REI's other shows were consumer shows, rather than trade shows, and were not marketed to the automotive repair and collision trades. As Defendants put it, "[w]hatever rights REI may have with respect to consumer shows or trade shows targeted at markets other than the automotive repair and collision business, this action has a narrower frame: Does AASP have the right to use 'Northeast' in connection with its annual autobody/automotive trade show?" (Defs.' Sur-reply 4 n.4.) However, the shows which REI ran with AASP were open to members of the general public as well as industry professionals (McCarey Affirmation ¶ 15), though AASP marketed the show primarily to AASP members and industry professionals, (Greco Aff. ¶¶ 9, 12-13). Therefore, the relevant consumer group includes individuals — both industry professionals, and members of the public — who might attend automotive themed trade shows in the New York/New Jersey area, as well as the businesses that would be likely to participate as exhibitors in these trade shows.

acquired secondary meaning before its competitor commenced use of the mark."); *Morgans Group*, 2012 WL 1098276, at *5 ("A plaintiff bears the vigorous evidentiary burden of proving by a preponderance of the evidence that his mark had acquired secondary meaning at the time defendant began his allegedly infringing activities." (internal quotation marks omitted)); *Marshall*, 2012 WL 1079550, at *16 ("Plaintiff has the burden to establish that his mark acquired secondary meaning *before* defendant began using his allegedly infringing mark." (alterations and internal quotation marks omitted)); *Greenpoint Financial*, 116 F. Supp. 2d at 409 ("The critical question is whether [plaintiff's use of the mark] had gained secondary meaning by the time [defendant] entered the market.").[27] If the senior user cannot demonstrate that its use of the term acquired secondary meaning before the junior user commenced its use, there can be no infringement, "for if there was no secondary meaning, there was no likelihood of confusion when the junior user arrived on the scene." 2 McCarthy on Trademarks and Unfair Competition § 16:34 (4th ed. 2012); *accord Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1189 (11th Cir. 2011) (holding that where senior user's descriptive mark did not acquire secondary meaning prior to junior user's first use, senior user "has no protectable rights in the mark" and junior user "cannot be liable for trademark infringement based on rights to a mark that [the senior user] cannot enforce"); *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005) ("A necessary concomitant to proving

---

[27]    Therefore, REI's argument that it controls the right to the "Northeast" mark because it claims that it can demonstrate that it used the mark before AASP (Pl.'s Opp'n 9, 13, 15-16), is unavailing absent proof that its use of "Northeast" had acquired secondary meaning before AASP used the term "Northeast" in conjunction with its trade shows. "[A] business does not automatically obtain rights in a mark by using it. A business will obtain rights in a mark upon first use only if the mark is 'inherently distinctive.' If the mark is not inherently distinctive, a business may obtain rights in the mark when it attains a secondary meaning." *Investacorp*, 931 F.2d at 1522.

infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark." (internal quotation marks omitted)).  The question, therefore, is whether REI has provided evidence from which a reasonable jury could conclude that its use of "Northeast" in relation to its trade shows acquired secondary meaning — meaning that it became synonymous with a single source among the relevant consumers of automotive-themed trade shows, and that it did so before AASP's first use of "Northeast" to describe its trade shows.[28]

### c) Abandonment

Instead of focusing on secondary meaning, REI argues that AASP abandoned any claim it may have had to the "Northeast" mark by failing to use the mark in relation to its trade shows between 1988 and 1991; and then by resuming use of the mark in 1991 "as a sponsor" of REI's show.  (Pl.'s Opp'n 16-17.)  "The abandonment doctrine derives from the well-established principle that trademark rights are acquired and maintained through use of a particular mark." *ITC Ltd.*, 482 F.3d at 146.  If a user of a mark discontinues use with the intent not to resume such use in the foreseeable future, then the mark may be deemed "abandoned."  15 U.S.C. § 1127; *see also Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("'A mark shall be deemed to be abandoned . . . [w]hen its use has been discontinued with intent not to resume such use.'" (quoting 15 U.S.C. § 1127)).  "Intent not to resume may be inferred from [the] circumstances." *Marks Organization*, 784 F. Supp. 2d at 328 (quoting 15 U.S.C. § 1127); *see*

---

[28] Although REI need not demonstrate that the relevant consumer group be able to identify REI by name as the source of the services, it must present evidence that the "Northeast" name was associated among the consumer group with a single, albeit anonymous source. Therefore, it must show at least some evidence that "a substantial segment of the relevant group of consumers," *Centaur Communications*, 830 F.2d at 1222, would associate the "Northeast" RV shows with the same source as the Northeast Automotive Trade Show, even if the name of that source is unknown.

*also Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980) (same). Once abandoned, "a mark returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace, in accordance with the basic rules of trademark priority." *ITC Ltd.*, 482 F.3d at 147 (citation omitted).

The party claiming that a mark has been abandoned bears the burden of demonstrating that the former user of the mark discontinued its use with the intent to not resume use in the reasonably foreseeable future. *See Fifth Ave. of Long Island Realty Assocs. v. Caruso Mgmt. Co.*, 718 F. Supp. 2d 292, 306 (E.D.N.Y. 2010); *see also ITC Ltd.*, 482 F.3d at 147 ("The party asserting abandonment bears the burden of persuasion with respect to two facts: (1) non-use of the mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future."). Non-use for three years is prima facie evidence of abandonment. *See* 15 U.S.C. § 1127; *Caruso*, 718 F. Supp. 2d at 306. Such proof of three consecutive years of non-use shifts the burden of production to the owner of the mark to produce evidence demonstrating intent to resume use of the mark "within a reasonably foreseeable time." *ITC Ltd.*, 482 F.3d at 148. Even where this burden of proof shifts, the ultimate burden of proof of abandonment lies with the party asserting abandonment. *See Caruso*, 718 F. Supp. 2d at 306.

The record belies REI's claim that AASP abandoned use of "Northeast." Defendants have indisputably demonstrated that AASP used the term "Northeast" in relation to its trade shows in 1985, 1987, and 1988 (Defs.' Exs. L ("1985 Northeast Autobody Congress and Trade Show"); M (describing 1987 show as the "10th Annual Northeast Autobody Congress and Trade Show (ACTS)"); 151 (describing 1988 show as "ASA-NJ Presents Northeast ACTS Auto Congress & Trade Show")), and again in 1990, (Defs.' Ex. K ("The 13th Annual Northeast

Autobody Congress and Trade Show).)[29]  Therefore, AASP arguably only "abandoned" its use of

the term "Northeast" to refer to its trade show in 1989.  One year of non-use is insufficient to

create prima facie evidence of abandonment.  *See* 15 U.S.C. § 1127 (requiring three years of

non-use).  Furthermore, REI has presented no evidence relating to AASP's intent to abandon the

use of "Northeast," nor could it because AASP resumed using the term in 1990.  *See Blue &*

*White Food Prods. Corp. v. Shamir Food Indus., Ltd.*, 350 F. Supp. 2d 514, 519 (S.D.N.Y. 2004)

(holding that defendant did not meet its burden of showing that mark was abandoned where non-

use had been for less than one year and defendant presented no evidence of plaintiff's intent to

abandon the mark).  REI therefore has not met its burden of demonstrating that AASP

abandoned the use of "Northeast" to refer to its trade shows during the relevant time period.

　　　In the alternative, REI also argues that AASP did not in fact use "Northeast" as the name

of its trade show until 1991, after REI was already involved in the show's production.  (Pl.'s Sur-

reply 4-5.)  REI claims that AASP's use of "Northeast" in relation to its shows pre-1991 was

merely a descriptive label, and that AASP did not use "Northeast" as a service mark until 1991,

and only at REI's direction.  (McCarey Affirmation ¶¶ 35-37.)  Prior to 1991, AASP's annual

show was known as the ACTS (Auto Congress and Trade Show), though AASP described the

show as the "Northeast Auto Congress and Trade Show" in promotional materials.  (Defs.' Exs.

L-M, 146-52.)  Beginning in 1991, AASP began officially designating the show as AASP's

"[ordinal] Annual Northeast [year] Regional Autobody/Automotive Trade Show" (Defs.' Exs. P-

S), and referring to the show as "Northeast [year]," (Def.'s Exs. Q-S).  REI points to an article in

a trade journal advertising the 1991 show that states "NORTHEAST '91, formerly known as

---

[29] However, one flyer included in Defendants' exhibits refers to the 1990 show just as
"ACTS '90" with no mention of "Northeast."  (Defs.' Ex. O.)

ACTS (Autobody Congress and Trade Show), changed its name this year to reflect the event's regional scope." (Pl.'s Ex. R; Pl.'s Sur-reply 4-5.) REI claims that this name change demonstrates that AASP had in fact not used "Northeast" as a mark prior to 1991, and then began using the mark only after REI was involved in the show's management. (Pl.'s Sur-reply 4-5.) However, this article, the source of which is a mystery, does not counter the evidence that AASP used "Northeast" to refer to its trade shows before it began its relationship with REI.

### d) Secondary Meaning- Analysis of Applicable Principles

Even assuming that REI were to prevail on this argument, to claim a protected interest in the mark, REI would still need to demonstrate that its use of the "Northeast" mark has acquired secondary meaning.[30] The Court will consider each of the six aforementioned factors to determine secondary meaning, but notes that Plaintiff has made little effort, if any at all, to provide evidence relevant to these factors. Rather, Plaintiff has focused its fire on the claim that it is the senior user, as compared to AASP, of "Northeast." But, the question of which party is the senior user is only relevant if Plaintiff can establish distinctiveness in its descriptive mark, which requires it to establish secondary meaning.

### i. Advertising Expenditures

"Advertising expenditures provide circumstantial evidence of the possible effect that advertising of the trademark or [service mark] may have on consumers' association of it with the source of a product or service." *Morgans Group*, 2012 WL 1098276, at *6 (citing *Centaur Communications*, 830 F.2d at 1222). REI claims that the "wide, exclusive, and extensive

---

[30] For the purposes of the secondary meaning analysis, the Court considers the entire period of REI's purported use of "Northeast" — from 1983 to 2008 — even though AASP arguably began using the mark in 1985.

advertising of NORTHEAST by [REI] both well before and during AASP's sponsorship [] for a period of over 28 years, entitles [REI] to enforcement of its trademark rights." (Pl.'s Opp'n 12.) Apart from this conclusory assertion, however, REI has provided no evidence of its own advertising expenditures linked to either its own "Northeast" shows or to the Northeast Automotive Trade Show. In fact, Defendants note that the contract between REI and AASP provided that AASP would bear all advertising costs for the Northeast Automotive Trade Show, and that from 1990 through 2008, AASP spent $716,425.07 in advertising and marketing for the Northeast Automotive Trade Show. (Greco Aff. ¶¶ 30-32; Defs.' Ex. N.)[31] The Northeast Automotive Trade Show was consistently marketed with AASP's name (*see* Defs.' Exs. 170 ("31st Annual AASP New Jersey NORTHEAST 2008 Regional Autobody/Automotive Trade Show"), 172 ("Automotive Service Association of New Jersey Presents the 14th Annual Northeast '91 Autobody/Automotive Trade Show"), 173 ("ASA/NJ's 20th Annual Northeast '97 Regional Autobody/Automotive Trade Show"), 174 ("Alliance of Automotive Service Providers of the Garden State Presents the 25th Annual Northeast 2002 Autobody/Automotive Trade Show"); *see also* Defs.' Exs. 175-79), and REI has provided no evidence showing that the relevant consumer group would have made the requisite association between these advertisements and REI's other "Northeast" shows.[32]

_____

[31] This figure excludes advertising expenses for 1991, because AASP was unable to locate those expense records. (Greco Aff. ¶ 32.) REI also billed AASP annually for some nominal advertising expenses associated with the Northeast Automotive Trade Show, which totaled approximately $500 to $1,000 annually. (Defs.' Exs. 81-84.)

[32] REI also has not submitted any evidence of its advertising expenditures on other "Northeast" shows before or during its contract with AASP. Yet, during the time period when REI and AASP were presenting the annual Northeast Automotive Trade Show, REI continued to present two "Northeast" RV shows annually — the "Northeast RV Show" and the "Northeast RV Show's Fall RV Marketplace." (McCarey Dep. 30, May 8, 2009; McCarey Affirmation ¶ 4.)

Furthermore, "[m]erely showing that a certain amount was spent on advertising provides little support for secondary meaning" absent some demonstration that the advertisements caused consumers to associate the service with Plaintiff. *Marshall*, 2012 WL 1079550, at *17 (internal quotation marks omitted); *see also Gameologist Grp., LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141, 158 (S.D.N.Y. 2011) (noting that this factor did not favor plaintiff where plaintiff made no showing that promotional efforts were successful in associating the mark with plaintiff in the mind of consumers); *Jewish Sephardic Yellow Pages Ltd. v. DAG Media, Inc.,* 478 F. Supp. 2d 340, 345 (E.D.N.Y. 2007) ("[P]laintiff has not submitted any concrete evidence showing that these [promotional] efforts succeeded in reaching the Jewish phonebook users who are plaintiff's target audience and who, along with advertisers, comprise the relevant segment of the public for purposes of assessing secondary meaning."). Indeed, Defendants have argued that AASP focused its advertising efforts in Fender Bender (now known as New Jersey Automotive), the official magazine of AASP. (Greco Aff. ¶¶ 11-13.) But, as discussed above, all the promotional materials for the shows identified AASP as the shows' source, not REI. Therefore, even if geared toward the relevant consumer group, REI has not provided evidence that these advertisements would cause the consumer group to associate the Northeast Automotive Trade Show with Plaintiff or with Plaintiff's other "Northeast" shows. Therefore, advertising expenditures do not weigh in favor of establishing secondary meaning.

### ii. Consumer Surveys

Consumer surveys can be the most persuasive evidence of secondary meaning because they are direct evidence of the relevant consumer groups' association of a service with a particular source. *See Morgans Group*, 2012 WL 1098276, at *7. However, in the absence of consumer surveys, courts also will consider direct testimony of customers to show evidence of

secondary meaning. *See Centaur Communications*, 830 F.2d at 1223 ("We have never rejected use of direct testimony by consumers."). REI has provided neither. In lieu of consumer surveys or testimony, REI relies on McCarey's unsupported assertions that "the public has come to identify [REI's] trademark NORTHEAST as synonymous with the shows provided by REI, and hence, REI." (McCarey Affirmation ¶ 5.) However, in establishing secondary meaning, "[o]pinion testimony by a proprietor is considered self-serving and of little probative value." *Marshall*, 2012 WL 1079550, at *16 (quoting *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2d Cir. 1988)).

Furthermore, the only anecdotal evidence from a relevant consumer actually weighs against a finding of secondary meaning. Defendants have submitted several letters which were sent to REI from exhibitors who cancelled their contracts to exhibit at REI's planned 2009 show. (Defs.' Ex. X.) One such exhibitor, the Radiator Store, informed REI that it wished to cancel its contract because when it decided to participate, it was "under the impression that the show was still being run by AASP/NJ." (*Id.* at unnumbered page 11.) This letter suggests that at least this consumer did not make the requisite association between the Northeast Automotive Trade Show and REI's purported "umbrella" of other "Northeast" shows. (McCarey Affirmation ¶ 13.) Though one "anecdotal, unsworn statement" may be insufficient to establish secondary meaning, *Morgans Group*, 2012 WL 1098276, at *7, the Court considers this evidence as weighing against REI's claim of secondary meaning.

### iii. Sales Success

REI states that due to the "success of its active ownership of its NORTHEAST automotive trade shows," it has earned over $13,000,000 in gross revenue since 1983. (McCarey Affirmation ¶ 16.) This assertion does little to suggest a recognition among the relevant group of

consumers. Indeed, REI has not broken this figure down by year, nor has it demonstrated the amount of revenue generated from each "Northeast" show. *See BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 203 (S.D.N.Y. 2000) (finding that plaintiff's sales success "remain[ed] unclear" where plaintiff merely stated a number for sales with no further elaboration, and provided no documentary evidence to support market share or visits to its website).[33] Furthermore, REI does not specify whether this figure only includes revenue generated from "Northeast" shows, or whether it is the total amount of REI's gross revenue since its inception in 1983. Given that REI manages many shows that are not labeled with the "Northeast" mark (McCarey Dep. 30, May 8, 2009), it is impossible to ascertain how much revenue was generated from the "Northeast" shows versus REI's other trade shows marketed under different names.[34] *See Therapy Prods., Inc. v. Bissoon*, 623 F. Supp. 2d 485, 495

---

[33] Defendants' exhibits include breakdowns provided by REI of revenue for each year it produced the Northeast Automotive Trade Show from 1999 to 2008. (Defs.' Exs. 75-84.) These records indicate that REI earned the following profits from the Northeast Automotive Trade Show: $108,809.78 in 1999 (Defs.' Ex. 75); $107,887.64 in 2000 (Defs.' Ex. 76); $105,996.56 in 2001 (Defs.' Ex. 77); $99,769.06 in 2002 (Defs.' Ex. 78); $97,013.62 in 2003 (Defs.' Ex. 79); $98,177.04 in 2004 (Defs.' Ex. 80); $95,299.29 in 2005 (Defs.' Ex. 81); $87,480.37 in 2006 (Defs.' Ex. 82); $81,249.21 in 2007 (Defs.' Ex. 83); $83,468.57 in 2008 (Defs.' Ex. 84), totaling $965,151.14. Each of these documents also includes a profit amount for "trade show services" which ranges from approximately $27,000 to $50,000 each year, totaling $373,929.80. (Defs.' Exs. 75-84.) These numbers, however, do not demonstrate the amounts that REI earned from its own "Northeast" shows versus the amounts it earned from the Northeast Automotive Trade Show it put on with AASP, thus further undermining REI's claim. *See BigStar Entertainment*, 105 F. Supp. 2d at 203 (noting that plaintiff's sales figures were unpersuasive because they offered no specifics, among other things, about market share or sales volume).

[34] Since at least 2002, REI has managed several other trade shows annually that do not include "Northeast" in their names, including the Tri-State International Auto Show, the Tri-State Power Boat Show (which changed its name to the Orange County Power Boat Show), the Orange County Spring Home Show, and the Orange County Fall Home Show. (McCarey Dep. 30-33, May 8, 2009.) In addition to these shows, REI continues to manage the Northeast RV Show and the Northeast RV Show Fall Marketplace. (*Id.* at 30.)

(S.D.N.Y. 2009) (holding that sales figures did not support a finding of secondary meaning where plaintiff claimed that it made over $4 million from sales of the product, but did not show that these sales figures were linked to a product actually bearing the claimed mark), *aff'd in relevant part sub nom.*, *Erchonia Corp. v. Bissoon*, 410 F. App'x 416 (2d Cir. 2011); *accord Murphy*, 923 F.2d at 928 (affirming summary judgment where district court "found no evidence of expenditures that were related solely to [plaintiff's] [] advertisement" that he claimed was entitled to trademark protection); *Grout Shield Distributors*, 824 F. Supp. 2d at 412 (noting in the context of amount spent on advertising, that where plaintiff sold goods under several different marks, it was not clear how much was actually spent on the mark at issue); *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 345 (finding in the context of advertising expenditures, that expenditures did not support secondary meaning where plaintiff failed to show "with any level of specificity the portion of this outlay that was devoted to its [contested] mark," as opposed to other marks which it used).

Furthermore, REI's lack of sales success in promoting its own competing 2009 "Northeast" show demonstrates absence of secondary meaning. *See PaperCutter*, 900 F.2d at 565 ("The absence of sales or promotion after plaintiff's initial start-up while a lawsuit was contemplated hardly adds to the strength of the mark involved here, and indeed suggests that plaintiff's mark even now has not acquired secondary meaning."). REI signed contracts with less than twenty exhibitors for its 2009 show (McCarey Dep. 767-68, Oct. 15, 2010), and at least four of these exhibitors cancelled their contracts prior to REI's postponement notice, (Defs.' Ex. X).[35]  Although REI contends that the Second Circuit's analysis from *PaperCutter* is

---

[35] The contracts produced by REI show that REI signed contracts with only thirteen paying exhibitors for its 2009 show.  (Defs.' 56.1 ¶ 67; Defs.' Ex. X.)

inapplicable here because REI was not a start-up in 2009 (Pl.'s Opp'n 14), the fact that REI had problems attracting exhibitors for its own "Northeast" show once the show no longer contained "AASP" in the name does suggest that "Northeast" on its own had not established secondary meaning in relation to REI's services.

### iv. Unsolicited Media Coverage

REI has provided no evidence of unsolicited media coverage of any of its shows. Although the Northeast Automotive Trade Show was frequently written up in automotive trade journal "Fender Bender" (Greco Aff. ¶ 13) and at least once in "Body Language" in 1991 (Pl.'s Ex. R), there has been no showing that these were unsolicited, and in fact Fender Bender (which is now known as New Jersey Automotive) is the official magazine of AASP, (Greco Aff. ¶¶ 11-12). Furthermore, REI has not shown a single piece of media coverage, solicited or otherwise, for any of its other "Northeast" shows. Therefore, this factor does not weigh in support of REI's claim. *See Gameologist Group*, 838 F. Supp. 2d at 159 (finding that this factor weighed against a finding of secondary meaning where there was little to no evidence of unsolicited media coverage).

### v. Attempts to Plagiarize

REI asserts that AASP has plagiarized its "Northeast" mark by continuing to use "Northeast" to refer to its annual automotive trade show. However, the record shows that AASP, from at least 1985 to 1988, used the term "Northeast" to refer to its own shows before it began collaborating with REI in 1990. Furthermore, "[a]lthough imitative intent can help support a finding of secondary meaning, it does not necessarily mandate one." *Bristol-Myers*, 973 F.2d at 1042 (citation omitted); *see also Therapy Products*, 623 F. Supp. 2d at 494-95 (same); *cf. ITC Ltd. v. Punchgini, Inc.*, 373 F. Supp. 2d 275, 291 (S.D.N.Y. 2005) ("Although there may be

some circumstances in which intentional copying is sufficient to show 'secondary meaning,' it would be tautological to conclude that copying alone demonstrates 'secondary meaning' . . . where that copying is only prohibited . . . if the mark has 'secondary meaning'"), *aff'd*, 482 F.3d 135 (2d Cir. 2007).

### vi. Length and Exclusivity of Use

Regarding length and exclusivity of use, "there is no magic time span that confers secondary meaning," *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 346 (citing *Centaur Communications*, 830 F.2d at 1225)), but "the longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning," *BigStar Entertainment*, 105 F. Supp. 2d at 203. Although REI has been using "Northeast" to refer to several of its trade shows for many years, arguably since 1983, it cannot show exclusivity of use. Courts have found that whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's strength and is a factor weighing against a finding of exclusivity. *See BigStar Entertainment*, 105 F. Supp. 2d at 203 ("The Second Circuit has advised . . . that whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's overall strength." (citing *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 744 (2d Cir.1998)); *see also Ideal World Mktg., Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 246 (E.D.N.Y.1998) (finding that the fact that other manufacturers were using the same term to market diverse products weighed against a finding of exclusivity), *aff'd*, 182 F.3d 900, 1999 WL 464978 (2d Cir. 1999). In *Streetwise Maps*, in the context of analyzing a mark's strength, the Second Circuit noted that "a trademark search revealed the extensive use of the words 'street' and 'wise' in names registered by manufacturers of other products," and considered this a factor weighing against the mark's strength. 159 F.3d at 744; *see also Gameologist Group*, 838 F.Supp. 2d at 160 (finding that

plaintiff's use of a mark was not exclusive where a trademark search for the word "bling"

revealed more than 160 hits); *BigStar Entertainment*, 105 F. Supp. 2d at 203-04 (finding that

pending trademark applications by other unrelated business to register "Big Star" weighed

against a finding of exclusivity). A trademark search on the USPTO Trademark Electronic

Search System ("TESS") reveals 138 live trademark registrations and applications that include

the term "Northeast." USPTO Trademark Electronic Search System,

http://www.uspto.gov/trademarks/index.jsp (follow "Trademark Search" hyperlink; then follow

"Basic Word Mark Search (New User)" hyperlink; select "Plural and Singular" and "Live" and

type "Northeast" into Search Term window; then click on "Submit Query" ) (last searched Aug.

22, 2012).[36]

Furthermore, the record shows that AASP began using "Northeast" to refer to its own

trade shows in 1985, cutting against a finding of exclusivity of use by REI. During McCarey's

deposition, he also was asked about his familiarity with other automotive trade shows that use

"Northeast" in their names, including the "Northeast Recreational Vehicle and Camping Show"

in Connecticut, and the "Northeast International Auto Show." (McCarey Dep. 187-88, May 8,

2009.) McCarey acknowledged that he was aware of the "Northeast Recreational Vehicle and

Camping Show," but stated that he had not heard of the "Northeast International Auto Show."

(*Id.*) These facts further tip the scales against a finding of secondary meaning. *See Morgans

Group*, 2012 WL 1098276, at *8 (noting that "the length of the marks' use is tempered by third-

party uses of the marks' elements [] in similar markets"); *Air Cargo News, Inc. v. Tabmag Pub.,*

---

[36] As previously noted, pursuant to Federal Rule of Evidence 201(b)(2), the "Court may properly take judicial notice of official records of the United States Patent and Trademark Office." *Telebrands Corp.*, 719 F. Supp. 2d at 287 n.3.

*Ltd.*, No. 07-CV-480, 2007 WL 1101183, at *10 (E.D.N.Y. Apr. 11, 2007) ("Plaintiff's argument [regarding exclusivity] fails because given the number of publications using the words "air cargo" in their titles that circulate in the United States, plaintiff's use of the phrase cannot be characterized as exclusive."); *Kangadis, Inc. v. Euphrates, Inc.*, 378 F. Supp. 2d 162, 169-70 (E.D.N.Y. 2005) ("In light of the number of competitors using the word TRADITIONAL on their feta cheese packaging, [plaintiff's] use of TRADITIONAL cannot be characterized as exclusive.").

"Although the Second Circuit has stated that district courts should be cautious in weighing these factors [to determine secondary meaning] at the summary judgment stage, it has nonetheless supported summary judgment in cases where the proponent of the alleged trademark has failed to raise a material issue of fact on the question of secondary meaning." *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 344-45 (collecting cases); *see also ITC Ltd. v. Punchgini, Inc.*, 518 F.3d 159, 162, 164 (2d Cir. 2008) (affirming grant of summary judgment where the "record evidence [was] insufficient as a matter of law to raise a triable question of fact on the issue of secondary meaning"); *Therapy Products*, 623 F. Supp. 2d at 495 (granting summary judgment where party claiming trademark infringement failed to raise a question of fact as to whether the mark acquired secondary meaning); *Ideal World Marketing*, 15 F. Supp. 2d at 244-46 (granting summary judgment where claimed mark was descriptive and plaintiff failed to establish the existence of a genuine issue of material fact as to whether the mark had attained secondary meaning). Here, all of the factors which courts consider in determining whether secondary meaning has attached to a mark conclusively weigh against a finding that the relevant consumer group has come to identify "Northeast" with REI as a single source of automotive-themed trade shows. To put it simply, REI has not put forth (and really has not tried

to put forth) evidence from which a reasonable jury could find that its use of "Northeast" has acquired secondary meaning. *See Morgans Group*, 2012 WL 1098276, at *6 (granting summary judgment where "[o]n the record before it, the Court conclude[d] that a reasonable juror could not find that either term has acquired secondary meaning").

Because REI cannot demonstrate secondary meaning, its trademark infringement claim fails as a matter of law, and there is no need for the Court to examine whether AASP's use of the mark is likely to cause confusion. *See Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) ("If the district court rules that [the term] has not acquired secondary meaning, the mark cannot be protected and the inquiry properly concludes."); *Morgans Group*, 2012 WL 1098276, at *9 n.10 ("Because the Court finds that [plaintiff] has not sufficiently demonstrated that its marks have acquired secondary meaning, it need not consider whether [plaintiff] has shown that it can establish a likelihood of confusion."); *Marshall*, 2012 WL 1079550, at *17 (where plaintiff had not established that its descriptive mark had acquired secondary meaning, the court did not reach the issue of whether defendant's use of the marks created a likelihood of confusion); *Ideal World Marketing*, 15 F. Supp. 2d at 246 ("Because [plaintiff] has therefore failed, as a matter of law, to establish that [its claimed mark] has attained a secondary meaning, there is no need for the Court to examine the second prong of the test for trademark infringement — the likelihood of confusion between the two marks.").

### 2. State Law Claims for Trademark Infringement, Dilution, and Unfair Competition

In Count Ten of its Amended Complaint, REI claims that Defendants have engaged in unfair competition, trademark infringement, dilution, and palming off in violation of New York common law and in violation of New York General Business Law, Article 24. (Am. Compl. ¶¶

182-87.)  Article 24 is codified as New York General Business Law § 360.

### a. Trademark infringement

"The elements of trademark infringement under New York common law mirror the Lanham Act."  *Gucci Am., Inc. v. Guess?, Inc.*, No. 09-CV-4373, 2012 WL 2304247, at *21 (S.D.N.Y. June 18, 2012).  Under New York law, as under § 43(a) of the Lanham Act, to prevail on a claim for trademark infringement of an unregistered mark, a plaintiff must establish secondary meaning.  *See Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 369 N.E.2d 1162, 1164 n.2 (N.Y. 1977) ("[S]ince a trade name or nontechnical trade-mark cannot claim the procedural advantages afforded a technical mark, it is necessary to show in an action for infringement that the name or mark has acquired a secondary meaning." (citation omitted)); *see also Camelot Assocs. v. Camelot Design & Dev. LLC*, 750 N.Y.S.2d 155, 156 (App. Div. 2002) ("[W]ith respect to the trademark infringement claim, a plaintiff is required to [] show that the trade name has acquired a secondary meaning."); *Adirondack Appliance Repair, Inc. v. Adirondack Appliance Parts, Inc.*, 538 N.Y.S.2d 118, 120 (App. Div. 1989) (same).  Because REI has failed to adduce evidence of secondary meaning, its common law trademark infringement claim fails as a matter of law.

### b. Dilution

New York General Business Law § 360-l provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."  N.Y. Gen. Bus. Law § 360-l.  However, the Second Circuit has held that "New York law accords protection against dilution to marks that are distinctive as a

50

result of acquired secondary meaning as well as to those that are inherently distinctive." *N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC*, 293 F.3d 550, 557 (2d Cir. 2002) (citing *Allied Maintenance Corp.*, 369 N.E.2d at 1166); *see also Gucci America*, 2012 WL 2304247, at *21 ("To succeed on a claim for trademark dilution under New York General Business Law ("NY GBL") § 360-l, a plaintiff must prove [] that it possesses a strong mark, one which has a distinctive quality or has acquired a secondary meaning . . . ."). Because REI cannot show that "Northeast" has acquired secondary meaning, its claim of dilution under New York law also fails. *See Therapy Products*, 623 F. Supp. 2d at 495 (dismissing plaintiff's dilution claim at summary judgment where plaintiff was unable to establish any evidence of secondary meaning).

### c. Unfair Competition/Palming Off

New York law has "long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852, 858 (N.Y. 2007). Palming off refers to "the sale of the goods of one manufacturer as those of another," while misappropriation encompasses the principle that one may not in bad faith "misappropriate the results of the skill, expenditures and labor of a competitor." *Id.*; *Johnson & Johnson v. Am. Nat'l Red Cross*, 552 F. Supp. 2d 434, 446 (S.D.N.Y. 2008) (same); *see also ITC Ltd.*, 482 F.3d at 165 ("New York common law allows a plaintiff to sue for unfair competition where a 'property right or a commercial advantage' has been 'misappropriated.'" (quoting *Flexitized, Inc. v. Nat'l Flexitized Corp.*, 335 F.2d 774, 781-82 (2d Cir. 1964)); *Talk to Me Prods., Inc. v. Larami Corp.*, 992 F.2d 469, 470 (2d Cir. 1993) ("To prevail on the state-law claim [of unfair competition], the plaintiff must, [] show that the 'defendant has misappropriated the labors and expenditures of another.'" (quoting *Saratoga Vichy Spring Co.*, 625 F.2d at 1044)); *Abe's Rooms, Inc. v. Space Hunters, Inc.*, 833 N.Y.S.2d 138, 140 (App. Div. 2007) (noting that to

sustain a common law claim for unfair competition, "the plaintiffs must show that the defendants misappropriated the plaintiffs' labors, skills, expenditures, or good will and displayed some element of bad faith in doing so"). "New York's law of unfair competition is a broad and flexible doctrine that depends more upon the facts set forth . . . than in most causes of action." *Telecom. Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) (internal quotation marks omitted). A claim for unfair competition "'has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another.'" *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 548-49 (S.D.N.Y. 2011) (quoting *Telecom International*, 280 F.3d at 197-98).[37]

The cause of action for unfair competition under New York law "'shares many common elements with the Lanham Act claim[] of . . . trademark infringement.'" *Zip Int'l Grp., LLC v. Trilini Imports, Inc.*, No. 09-CV-2437, 2011 WL 2132980, at *8 (E.D.N.Y. May 24, 2011) (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir.1993)); *see also Giggle, Inc. v. netFocal, Inc.*, No. 09-CV-4844, 2012 WL 693933, at *10 (S.D.N.Y. Mar. 5, 2012) ("Unfair competition under New York Law shares most of the same elements as a claim for trademark infringement under the Lanham Act."). To prevail on a claim of unfair competition under New York law under either a misappropriation or a palming off theory, a plaintiff "must show a likelihood of confusion or deception of the consuming public as to the source of the

---

[37] Similarly, "[t]he gravamen of an unfair competition claim for 'palming off' is that the labors and expenditures of the plaintiffs have been misappropriated by the defendants, and are likely to cause confusion among the purchasing public as to the origin of the product." *Gameologist Group*, 838 F. Supp. 2d at 165.

allegedly infringing product [or service] *and* bad faith on the part of Defendants." *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 363-64 (S.D.N.Y. 1998) (citations omitted); *see also Gameologist Group*, 838 F. Supp. 2d at 165 ("Under New York law, [t]he essence of unfair competition . . . is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." (alteration in original) (internal quotation marks omitted)). This extra element of bad faith differentiates a common law claim for unfair competition from a trademark infringement claim under the Lanham Act. *See Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 485 (2d Cir. 2005) ("A plaintiff claiming unfair competition under New York law must show that the defendant acted in bad faith."); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 538 (S.D.N.Y. 2011) ("The only additional element that must be shown to establish a claim for unfair competition under the common law is bad faith.").

Until recently, courts have held that unlike trademark infringement and unfair competition claims brought under the Lanham Act, proof of secondary meaning is not always required in a common law claim for unfair competition. *See Talk To Me Products*, 992 F.2d at 470 ("Though a descriptive mark is not eligible for protection under § 43(a) of the Lanham Act absent a showing of secondary meaning, such a showing may not be necessary to prove unfair competition under New York law . . . ." (citations omitted)); *Bristol-Myers*, 973 F.2d at 1048 ("New York law, unlike federal law, does not conclusively presume that there is no likelihood of confusion if a descriptive mark has not acquired secondary meaning. Although it may be very difficult to show a likelihood of confusion where the senior mark is not associated in the public mind with a particular producer, under New York law it is not impossible." (citation omitted)); *Luv N' Care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 135 (S.D.N.Y. 2010) ("New York

unfair competition law mirrors the Lanham Act's trademark infringement standard in many ways, but does not always require a showing of secondary meaning."); *Allied Maintenance Corp.*, 369 N.E.2d at 1164 n.2 (noting that "an action for unfair competition turns not upon the acquisition of a secondary meaning, but upon whether the acts of the defendant can be characterized as unfair").

However, courts have also held that to state a claim for unfair competition, a plaintiff must demonstrate some misappropriation or use of its protected property right or commercial advantage. *See Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 302 n.8 (2d Cir. 2006) (noting that while New York's doctrine of unfair competition is broad, a plaintiff's ability to state a claim "depends upon the allegation of facts that, if true, would constitute misuse of plaintiffs' property"); *Telecom International*, 280 F.3d at 198 ("An unfair competition claim under New York law is not . . . dependent upon a showing of confusion or deception as to the origin of a product or service," but requires the "appropriation of an idea or knowledge in which [plaintiff] had a property interest or a contractual arrangement creating such an interest."); *Therapy Products*, 623 F. Supp. 2d at 495 (granting summary judgment against plaintiff on common law unfair competition claim where plaintiff failed to show "proof of ownership of a protectable mark"); *Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp. 2d 293, 297 (S.D.N.Y. 2008) (rejecting plaintiffs' claim that they did not need to demonstrate a property interest in the color and mark used on their packaging, and holding that "[i]n order to succeed on their misappropriation and unfair competition claims, plaintiffs must establish some wrongful appropriation or use of the plaintiffs' intellectual property" (internal quotation marks omitted)); *Einhorn v. Mergatroyd Prods.*, 426 F. Supp. 2d 189, 195 n.37 (S.D.N.Y. 2006) (noting that plaintiff did not state a colorable claim of unfair competition where the claim was based on use

of plaintiff's name and "plaintiff does not have anything that might be termed a property right in the use of his name, at least absent any allegation of secondary meaning"); *LoPresti v. Mass. Mut. Life Ins. Co.*, 820 N.Y.S.2d 275, 277 (App. Div. 2006) (affirming dismissal of unfair competition claim where plaintiff "failed to allege the bad faith misappropriation of a commercial advantage which belonged exclusively to him").  Based on these decisions, there is a serious question about whether a plaintiff which brings an unfair competition claim based solely on a defendant's alleged infringement of a plaintiff's descriptive mark, can demonstrate the misappropriation of its property or goodwill in that mark absent some showing of secondary meaning.

The recent case law supports the notion that absent a demonstration of secondary meaning, a plaintiff may not be able to demonstrate a protectable property interest in a descriptive mark sufficient to state a claim of unfair competition.  In *ITC Ltd. v. Punchgini, Inc.*, a restaurant in India brought a claim for trademark infringement and common law unfair competition against a restaurant bearing the same name in New York.  518 F.3d at 160.  The claim centered on the New York restaurant's alleged misappropriation of the plaintiff's goodwill.  In response to questions which the Second Circuit certified to it, *see id.*, the New York Court of Appeals wrote:

> Under New York Law, [a]n unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiffs [sic] own use of the same property . . . .  [W]hen a business, through renown in New York, possesses goodwill constituting property or a commercial advantage in this state, that goodwill is protected from misappropriation under New York unfair competition law.  This is so whether the business is domestic or foreign . . . .  If a [] plaintiff has no goodwill in this state to appropriate, there can be no viable claim for unfair competition under a theory of misappropriation.  At the very least, a plaintiff's mark . . . must call to mind its goodwill.  Otherwise, a plaintiff's property right or commercial advantage based on the goodwill associated with its mark is not appropriated in this state when its unregistered

> mark is used here . . . . If the customers of a New York defendant do not identify a mark with the foreign plaintiff, then no use is being made of plaintiff's goodwill, and no cause of action lies under New York common law for unfair competition.

880 N.E.2d at 859-60 (citations and internal quotation marks omitted). The Second Circuit interpreted this answer to require that the plaintiff demonstrate that its mark had acquired secondary meaning in the New York market in order to sustain its claim of unfair competition. *ITC Ltd.*, 518 F.3d at 161 ("In short, to pursue an unfair competition claim, ITC must adduce proof of both deliberate copying and 'secondary meaning.'"). As discussed above, REI cannot demonstrate that it has any protectable property interest in its use of the term "Northeast." Because REI bases its claim of unfair competition entirely on AASP's allegedly infringing use of "Northeast" to describe its own trade show (Am. Compl. ¶¶ 182-87), REI cannot state a claim for unfair competition under New York law absent some demonstrated property interest in the use of "Northeast." Furthermore, absent a showing of secondary meaning, under the reasoning of *ITC*, REI cannot establish that AASP's use of Northeast constituted any misappropriation of REI's goodwill associated with that mark.

However, regardless of whether REI's inability to demonstrate secondary meaning precludes its unfair competition claim, REI's claim also fails because there is not sufficient evidence in the record from which a jury could reasonably conclude that Defendants acted in bad faith. *See Empresa Cubana del Tabaco*, 399 F.3d at 485 ("A plaintiff claiming unfair competition under New York law must show that the defendant acted in bad faith."). In assessing bad faith, the Court considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff[']s reputation and goodwill and any confusion between his and the senior user's product." *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10-CV-

1611, 2012 WL 1022247, at *24 (S.D.N.Y. Mar. 22, 2012) (quoting *Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir. 1996)); *Pita v. Tulcingo Car Serv., Inc.*, No. 10-CV-0481, 2011 WL 1790833, at *5 (E.D.N.Y. Apr. 7, 2011) (same) (quoting *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir.1991)). The Second Circuit has specified that bad faith intent involves an intent to "mislead the public," and therefore the "only relevant intent is intent to confuse." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009); *see also Star Industries*, 412 F.3d at 388 ("Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products.").

Although an inference of bad faith can be drawn when a "company appropriates an identical mark that is well-known and has acquired a secondary meaning," *Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1087 (S.D.N.Y. 1993), as discussed at length above, REI has not established secondary meaning in its use of "Northeast." *See Starbucks Corp.*, 588 F.3d at 117 ("There is a considerable difference between an intent to copy and an intent to deceive."). Therefore, any inference of bad faith stemming from Defendants' use of the similar of mark "logically would be weakened where the defendant would derive no benefit from sowing confusion as to the source of the product, such as where the plaintiff has no good will or reputation on which the defendant could hope to capitalize." *Gameologist Group*, 838 F. Supp. 2d at 163.

REI argues that the fact that AASP "changed the name of its show from 'ACTS' to 'Northeast'" in 1991 demonstrates AASP's bad faith in continuing to use the "Northeast" mark after it breached its contract with REI. (Pl.'s Opp'n 19-20.) However, the record shows that at least since 1985, AASP has annually been involved in an automotive trade show that has been

57

labeled with AASP's name, has been identified by ordinal to indicate continuity, and in several instances prior to 1991, and consistently thereafter, has used "Northeast" in its name. (Greco Aff. ¶¶ 8, 10; Defs.' Exs. M (referring to the show as "The Automotive Service Association - New Jersey Presents ACTS '87," and calling it "the 10th annual Northeast Autobody Congress and Trade Show (ACTS)"); O ("Automotive Service Association of New Jersey Presents the 13th Annual ACTS '90"); P ("Automotive Service Association of New Jersey Presents the 14th Annual Northeast '91 Autobody/Automotive Trade Show"); S (referring to the show as "Northeast 2007" and also stating "Alliance of Automotive Service Providers of New Jersey is Pleased to Invite you to the Thirtieth Annual Northeast 2007 Regional Autobody/Automotive Trade Show").) After breaching its contract with REI and producing the trade show on its own, AASP continued with this pattern and referred to its 2009 show as its "32nd annual NORTHEAST Automotive Trade Show." (Defs.' Ex. 167.) This use alone is insufficient to demonstrate bad faith because the record establishes beyond dispute that AASP had used "Northeast" in the name of its trade show prior to its relationship with REI, and as explained below, AASP's actions demonstrate a reasonable belief that it has the right to continue to use "Northeast."

Furthermore, although REI is the plaintiff in this action, AASP has initiated its own action against REI for trademark infringement and other claims relating to the disputed "Northeast" mark, which has been transferred to this Court from the District of New Jersey and consolidated with this action. It is true that in some circumstances, courts have found that the continued use of a mark by a defendant after receiving cease and desist letters, or after a plaintiff filed suit, can demonstrate bad faith. *See Gucci America*, 2012 WL 2304247, at *26 (holding that evidence of cease and desist letters from plaintiff and others was probative of bad faith

intent); *Louis Vuitton Malletier*, 2012 WL 1022247, at *25 (inferring bad faith where defendant decided to air its allegedly infringing commercial even after plaintiff initiated the litigation); *Stern's Miracle-Gro Products*, 823 F. Supp. at 1088 (finding that where plaintiff sent defendant cease and desist letters, the evidence showed that defendant continued to use the mark with knowledge of plaintiff's objection, which "tends to indicate a measure of bad faith on defendant's part"). *But see Hi-Tech Pharmacal*, 2007 WL 1988737, at *11 ("[D]efendant's continued use of its mark after the cease and desist letters cannot by itself constitute evidence of bad faith."). However, where, as here, the parties claim to have a legitimate right to use the mark — and have initiated suit claiming that the other is infringing the mark — such evidence of continued use on its own does not demonstrate bad faith. *See Hi-Tech Pharmacal*, 2007 WL 1988737, at *11 ("[P]laintiff has presented no evidence that defendant's persistence in the use of its mark during the course of this litigation represents anything but a good faith belief that it is entitled to do so because plaintiff's mark is not protectible . . . ."); *Empresa Cubana del Tabaco*, 399 F.3d at 485 (affirming district court's conclusion that defendant did not act in bad faith where defendant believed it was the senior user of the mark when it began using the mark and plaintiff did not present any credible evidence that defendant did not believe it owned the mark at that time).

Other than AASP's continued use of "Northeast," REI cannot point to any evidence, either circumstantial or direct, that leads to an inference of bad faith by Defendants. For example, there is no evidence in the record which suggests that AASP breached its contract with REI with the bad faith intent to misappropriate REI's goodwill or to palm off REI's services as its own. To the contrary, the correspondence between AASP and REI suggests that AASP terminated its contractual relationship with REI due to concerns about the success of AASP's

show under REI's management. (*See* Defs.' Exs. 164, 189-90; Greco Aff. ¶¶ 34-40.)[38]

Furthermore, leading up to and following AASP's decision to terminate its relationship with REI for the 2009 show, AASP and REI sent each other letters where they each claimed the right to continue to use "Northeast" to refer to future trade shows. (Defs.' Exs. 107, 164, 191, 194-96.) These letters demonstrate that AASP had a good faith belief in its entitlement to continue to use "Northeast" to refer to its future Automotive Trade Shows. *See Grout Shield*, 824 F. Supp. 2d at 417 (noting that defendant's launch of its product after its knowledge of plaintiff's opposition did not demonstrate bad faith because "defendant was not under any obligation to cease its production, marketing and sale of [its product] just because someone had challenged its rights to use a trademark if defendant believed that it had a legitimate right to use it"). Finally, AASP has taken affirmative steps to dispel possible confusion among the relevant consumer group by informing the public (via the media) that it no longer was working with REI and that REI is not involved in AASP's current trade shows. (Defs.' Ex. 167; *see also* Defs.' Ex. 171.) For example, the record contains articles stating that the 2009 show was AASP's show. (Defs.' Ex. 168-69, 171.) Because REI must show that AASP had a bad faith intent to capitalize off of REI's goodwill and possible confusion regarding the origin of the service, *see Starbucks Corp.*, 588 F.3d at 117, AASP's efforts to distance its shows from REI cuts against a finding of bad faith. *See Home Builders Ass'n of Greater St. Louis*, 226 F.3d at 949 (noting that the trade show at issue identified "the sponsor or source in a way that leaves competitors free to adopt other

---

[38] Although McCarey states in one of his affirmations that it "is false" that "REI was informed of AASP/NJ's 'dissatisfaction' with its show management" before March 18, 2008 (McCarey Supplemental Affirmation ¶¶ 9-10 (Defs.' Ex 35)), this assertion is clearly undercut by AASP's June 22, 2007 letter to REI where AASP stated that its board was "not happy with the numbers" and required REI to present a new marketing plan for 2008 and beyond, (Defs.' Ex. 189).

names that are equally descriptive but not inherently confusing"). For the foregoing reasons, there is no disputed issue of material fact that could lead a reasonable jury to conclude that AASP has acted in bad faith. *See Johnson & Johnson*, 552 F. Supp. 2d at 446-47 (granting summary judgment where plaintiff "introduced no evidence to suggest that any of the defendants are attempting to palm-off their own products as [plaintiff's] products, or that [defendants] placed the [disputed] emblem on these products in order to take wrongful advantage of [plaintiff's] name or goodwill or in an effort to misappropriate the labors and expenditures of [plaintiff]."). Therefore, summary judgment is granted for Defendants and REI's claim of unfair competition is dismissed.

### 3. Lanham Act Claims for False and Deceptive Advertising, Trade Libel, and Disparagement

Defendants also move for summary judgment on Count Eight of REI's Amended Complaint, which alleges claims of false and deceptive advertising, trade libel, and disparagement under the Lanham Act. (Am. Compl. ¶¶ 161-71.) In its opposition papers, REI completely fails to address these claims.[39] In its opposition brief, REI accuses AASP of conflating Count Ten, alleging violations of New York law, with Count Eight, alleging false advertising and trade libel, but then proceeds to only to "deal [] with Counts Four and Ten." (Pl.'s Opp'n 17-18.) REI does not again mention its claims brought under Count Eight in either its Opposition or Sur-reply. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003);

---

[39] Plaintiff has voluntarily dismissed Count Nine, which is a claim for common law trade libel (Pl.'s Opp'n 2 n.1), but does not address its federal trade libel claims.

*see also Robinson v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-834, 2012 WL 1980410, at *6

(E.D.N.Y. May 31, 2012) (deeming plaintiff's claim abandoned where defendant moved for

summary judgment on that claim and she failed to address it in her opposition brief); *Gaston v.*

*City of New York*, No. 11-CV-4750, 2012 WL 1085804, at *12 & n.31 (S.D.N.Y. Apr. 2, 2012)

(dismissing plaintiff's claims as abandoned where plaintiff "failed to respond or even mention

these claims in his opposition brief to defendants' summary judgment motion") (collecting

cases); *Robinson v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 (S.D.N.Y.

Sept. 30, 2009) ("Plaintiff [in her opposition to summary judgment] has failed to address

defendants' arguments against or even mention several of the claims . . . . She therefore has

abandoned these claims."), *aff'd*, 396 F. App'x 781 (2d Cir. 2010). Because REI does not

address its claims for false advertising, trade libel and disparagement in response to Defendants'

motion for summary judgment, the Court deems REI to have abandoned these claims. Count

Eight of REI's Amended Complaint is therefore dismissed.

### 4. Tortious Interference with Prospective Business Advantage

Defendants move for summary judgment on Count Six of REI's Amended Complaint, for

tortious interference with business advantage.[40] REI alleges that Defendants came to the

"Rockland Community College Field House with employees and agents of the Meadowlands

---

[40] Although REI refers to this cause of action as "interference with prospective business advantage," it is more commonly called "tortious interference with business relations." *See, e.g.*, *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (referring to claim as "tortious interference with business relations"); *Armored Grp., L.L.C. v. Homeland Sec. Strategies, Inc.*, No. 07-CV-9694, 2009 WL 1110783, at *2 (S.D.N.Y. Apr. 21, 2009) (same); *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1102, 1104 (N.Y. 2004) (alternating between calling claim "tortious interference with prospective economic relations" and "tortious interference with business relations"). Therefore, the Court will refer to the claim as "tortious interference with business relations."

Exposition Center during the 2008 NORTHEAST Autobody/Automotive Trade Show and intentionally and willfully solicited and endorsed a competing 2009 automotive trade show so as to interfere with [REI's] ability to engage in its business." (Am. Compl. ¶ 145.) REI also claims that Defendants interfered with its prospective business relationships with exhibitors through "wrong and improper use of the NORTHEAST mark and improper solicitation of exhibitors to engage in their unlawful 2009 Meadowlands show." (Pl.'s Opp'n 29-30.)

To state a claim for tortious interference with business relations, a plaintiff must allege that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). "'[C]onduct constituting tortious interference with business relations is, by definition, conduct, directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.'" *Armored Grp., L.L.C. v. Homeland Sec. Strategies, Inc.*, No. 07-CV-9694, 2009 WL 1110783, at *2 (S.D.N.Y. Apr. 21, 2009) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004)). Furthermore, the Second Circuit has explained that the "wrongful means" requirement makes proving a claim for interference with prospective business relationships "more demanding" than a claim for interference with existing contracts. *Catskill Development*, 547 F.3d at 132 (internal quotation marks omitted). This stricter standard is justified, however, "because a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the competing interest of the interferer, as well as the broader policy of fostering healthy competition." *Id.* (citations and internal quotation marks omitted).

REI has provided evidence that it had relationships with the exhibitors at the 2008

Northeast Automotive Trade Show (Contract 1("Rockland Exposition, Inc. will handle all exhibitor space sales . . . .")), and has demonstrated that during the 2008 show, AASP solicited these exhibitors to present at its own 2009 Northeast show (McCarey Dep. 396-97, Oct. 14, 2010 ("They [AASP] solicited exhibitors during my 2008 show, right at the show itself, where is when I do the bulk of my selling.")).[41]  However, REI's claim fails with regard to the third element — that " the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means." *Catskill Development*, 547 F.3d at 132.  REI claims that Defendants' improper conduct includes "wrongful improper use of the NORTHEAST mark and improper solicitation of exhibitors to engage in their unlawful 2009 Meadowlands show."  (Pl.'s Opp'n 29-30.)  But, to satisfy the third element, REI must demonstrate that Defendants committed a "crime or an independent tort," or applied economic pressure "for the sole purpose of inflicting intentional harm on [REI]."  *Carvel Corp.*, 818 N.E.2d at 1103; *see also Catskill Development*, 547 F.3d at 132, 137

---

[41] In its Amended Complaint, REI does not allege specific business relationships with which AASP allegedly interfered, a potentially fatal defect.  *See AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., IBI, L.L.C.*, No. 02-CV-1363, 2003 WL 21203503, at *6 (S.D.N.Y. May 22, 2003) (noting that "[a] properly pleaded complaint . . . must allege relationships with specific third parties with which the respondent interfered"); *Four Finger Art Factory, Inc. v. Dinicola*, No. 99-CV-1259, 2000 WL 145466, at *7 (S.D.N.Y. Feb. 9, 2000) (dismissing tortious interference with business relations claim where "the complaint fail[ed] to identify any other relationships with any other specific parties with which the defendants interfered" (emphasis added)); *Envirosource, Inc. v. Horsehead Res. Dev. Co.*, No. 95-CV-5106, 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996) (noting that "[a] general allegation of interference with customers without any sufficiently particular allegation of interference with a *specific contract or business relationship* will not withstand a motion to dismiss" (internal quotation marks omitted)).  Instead, REI claims that the relationships with which AASP interfered include all the exhibitors from the 2008 Northeast Automotive Trade Show.  (Pl.'s Opp'n 29-30; McCarey Dep. 397-98, Oct. 14, 2010.)  However, given that the potential universe of customers is limited to those who were exhibitors at the 2008 Northeast Automotive Trade Show, the Court will construe REI's claims as adequately alleging interference with specific business relationships.

(same); *Learning Annex Holdings, L.L.C. v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 412 (S.D.N.Y.2011) (noting that no cause of action for tortious interference with business relations may survive where the defendant was "motivated by legitimate economic self-interest").  As the New York Court of Appeals has explained:

> [W]here a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not "lawful" but "more culpable."  The implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort.  Conduct that is not criminal or tortious will generally be "lawful" and thus insufficiently "culpable" to create liability for interference with prospective contracts or other nonbinding economic relations.

*Carvel Corp.*, 818 N.E.2d at 1103.  "[M]ethods sufficiently wrongful to be deemed tortious under New York law . . . include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure."  *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214-15 (2d Cir. 2002) (citing *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 664 N.E.2d 492, 497 (N.Y. 1996)).  Wrongful means "do not, however, include persuasion alone although it is knowingly directed at interference with the contract."  *NBT Bancorp*, 664 N.E.2d at 497 (internal quotation marks omitted).

Although soliciting exhibitors for its own 2009 show at the 2008 Northeast Automotive Trade Show may have constituted a breach of contract, *see Rockand I*, 2009 WL 1154094, at *9, such a breach of contract is insufficient to sustain a cause of action for tortious interference with business relationships.  *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").  Put simply, REI has not established that AASP's solicitation of vendors at the 2008 Northeast show constitutes a crime or a tort, as distinct from AASP's efforts to put on its own show.  *See*

*Kule-Rubin v. Bahari Grp. Ltd.*, No. 11-CV-2424, 2012 WL 691324, at *6 (S.D.N.Y. Mar. 5, 2012) (noting that a claim for tortious interference with business relations "is not established where the conduct is merely consistent with a motive of 'normal economic self-interest.'" (quoting *Carvel Corp.*, 818 N.E.2d at 1103)); *Emergency Enclosures, Inc. v. Nat'l Fire Adjustment Co.*, 893 N.Y.S.2d 414, 417 (App. Div. 2009) (holding that where competitor's actions were undertaken in economic self interest, and were not independently wrongful or unlawful, plaintiff could not state a claim); *Out of the Box Promotions, LLC v. Koschitzki*, 866 N.Y.S.2d 677, 680 (App. Div. 2008) (holding that where defendant's actions were motivated by economic self interest, the plaintiff must allege facts that the means employed by the defendant were "wrongful," which include "fraudulent representations, threats, or a violation of a duty of fidelity owed to the plaintiff by reason of a confidential relationship between the parties" (internal quotation marks omitted)).  Nor can REI claim that AASP's use of the "Northeast" mark to promote its own 2009 show, or its general solicitation of vendors to participate in its show, constitute "criminal, tortious or other conduct . . . within the meaning of *Carvel* and its progeny."  *Armored Group*, 2009 WL 1110783, at *2; *see also NBT Bancorp*, 664 N.E.2d at 497 (noting that "wrongful means" does not include persuasion, even if that persuasion is aimed at interfering with a business relationship).  REI therefore has not provided any evidence from which a reasonable fact finder could conclude that AASP employed "wrongful means," or committed any crime or tort, in relation to its solicitation of vendors for its 2009 Northeast show or through its continued use of "Northeast" as part of the show's name.[42]

---

[42]  McCarey claims that AASP issued "a lot of bad press" about REI and the Suffern location in an effort to get exhibitors to participate in its show rather than in REI's show. (McCarey Dep. 398-401, 415-45, 451-59, 460-68, 477-96, Oct. 14, 2010; Defs.' Exs. 167-69, 171.)  REI cannot rely on these articles to demonstrate any tort by Defendants to form the basis

"The one exception to this general rule is where 'a defendant engages in conduct for the sole purpose of inflicting intentional harm'" on a plaintiff. *Learning Annex Holdings*, 765 F. Supp. 2d at 412 (quoting *Carvel Corp.*, 818 N.E.2d at 1103.) However, this exception does not

---

of a tortious interference claim. In the articles and press releases to which McCarey refers, AASP promotes the Meadowlands location, highlights its reasons for moving the show to the Meadowlands, and points out what it perceives to be weaknesses with the Suffern location. (Defs.' Ex. 167-69, 171.) AASP also promotes its show over REI's, for example, by stating that it anticipates that vendors will support its show, which is managed by a non-profit trade association, rather than the competing show, which is managed by an independent company. (Defs.' Ex. 167, at 3.) McCarey claims that this statement cost REI business because "it makes people feel sorry for the association," (McCarey Dep. 440, Oct. 14, 2010), but this hardly supports Plaintiff's tortious interference claim.

McCarey also takes exception with AASP claiming that "for the first time in 32 years . . . the show has a 21st century online presence," something that AASP had "been attempting to get from [its] show producers for the last decade." (*Id.* at 451-56; Defs.' Ex. 168.) McCarey claims that this statement is false because AASP had never asked REI to establish a website, and believes that this statement was "damaging [to his] reputation for future business." (McCarey Dep. 451-56, Oct.14, 2010.) McCarey additionally highlights that in another press release, AASP referred to REI's promotional materials for REI's show as "amateur brochures." (McCarey Dep. 482, Oct. 14, 2010; Defs.' Ex. 171.) These statements, and others which McCarey claims are disparaging and factually incorrect, are nothing more than AASP's opinions and puffery, intended to promote AASP's show, and do not demonstrate that AASP used "wrongful means" to disrupt REI's business relationships. *See., e.g.*, *Catskill Development*, 547 F.3d at 134 (discussing "the general principle that statements of opinion generally cannot constitute fraud"); *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 405 (E.D.N.Y. 2004) (explaining un-actionable puffery as "an exaggeration or overstatement expressed in broad, vague, and commendatory language," or "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion" (internal quotation marks and citations omitted)). Furthermore, to the extent that these press releases and articles contain factual statements, none of the alleged "misrepresentations" to which McCarey points are either material, likely to deceive consumers, or likely to injure REI, and are thus un-actionable and cannot form the basis of any claim for misrepresentation. *See, e.g.*, *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, No. 11-CV-6353, 2012 WL 2376466, at *16 (S.D.N.Y. June 20, 2012) (noting that to state a claim for false advertising under the Lanham Act, a plaintiff must allege that the defendant "made a misrepresentation in commerce that: (1) actually deceived or tended to deceive its consumers; (2) was material . . . ; and (3) injured or was likely to injure [plaintiff]); *see also S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) ("The Lanham Act does not prohibit false statements generally. It prohibits only false or misleading . . . representations of fact made about one's own or another's goods or services." (internal quotation marks omitted)).

apply if the defendant's conduct is motivated by "legitimate economic self-interest." *Id.*; *see also Carvel Corp.*, 818 N.E.2d at 1103. The record is devoid of evidence suggesting that Defendants engaged in any conduct "for the sole purpose of inflicting intentional harm" on REI, and furthermore clearly establishes that AASP was motivated by its own economic self interest in organizing and soliciting exhibitors for its own 2009 show. (*See, e.g.*, Defs.' Exs. 164 ("Rockland Exposition however understands your Executive Board has been researching other options to generate more income in this economically difficult time . . . "), 189 ("It would be impractical to continue the trade show at its current pace if we cannot increase exhibit sales substantially.").) Therefore, REI's claim for tortious interference with business relations is dismissed. *See Catskill Development*, 547 F.3d at 137 ("Because the [plaintiff] has failed to present a triable issue of fact on the required element of wrongful means, we affirm the district court's grant of summary judgment to [defendant] dismissing the tortious interference with business relations claim."); *Lombard*, 280 F.3d at 214 (affirming district court's grant of summary judgment on claim for tortious interference with prospective economic advantage where "the record is simply bereft of any evidence that [defendant] either acted solely to injure [plaintiff] or used improper means to do so"); *Learning Annex Holdings*, 765 F. Supp. 2d at 420 (granting summary judgment where plaintiff "point[ed] to no evidence whatsoever that [defendant] engaged in dishonest, unfair, or improper means as defined by New York law, or that alternately, [defendant] acted for the sole purpose of harming [plaintiff]" (internal quotation marks omitted)).

### 5. Tortious Interference with Contract

Count Seven of REI's Amended Complaint alleges that Defendants tortiously interfered with REI's contract. "Under New York law, the elements of tortious interference with contract

are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)); *see also Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 796 (S.D.N.Y. 2008) (same). In its Amended Complaint, REI claims that Defendants intentionally procured the breach of contracts by vendors and exhibitors that REI had signed up for its 2009 show.  (Am. Compl. ¶¶ 151-60.)  However, in its opposition to Defendants' summary judgment motion, REI has changed its claim completely, and now alleges that Defendants Thomas Greco and Thomas Greco Publishing ("TGP") intentionally procured AASP's breach of the 2004 agreement with REI, thereby damaging REI.  (Pl.'s Opp'n 28-29.)[43]  Recognizing "that a party cannot assert a claim for the first time in its motion papers," *Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 796 (S.D.N.Y. 2011), *aff'd*, No. 11-CV-4251, 2012 WL 1605817 (2d Cir. May 9, 2012) (internal quotation marks and citation omitted), REI has requested to amend its Amended Complaint to conform with the proof, pursuant to Federal Rule of Civil Procedure 15(b).  (Pl.'s Sur-reply 3 n.2.)[44]  However, the Court denies leave to amend because REI, based on this new theory, does

---

[43] REI has voluntarily dismissed its tortious interference with contract claim against the remaining Defendants.  (Pl.'s Opp'n 28 n.8.)

[44] Although Rule 15(b) refers to amendments of the complaint during or after trial, some courts have applied Rule 15(b) to conform pleadings to the proof offered at summary judgment. *See, e.g.*, *Clomon v. Jackson*, 988 F.2d 1314, 1323 (2d Cir. 1993) ("[T]he undisputed facts as presented on the summary judgment motion served as a basis to deem the complaint amended to conform with the proof pursuant to Fed.R.Civ.P. 15(b)."); *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 213 n.8 (E.D.N.Y. 2010) (deeming the complaint amended under Rule 15(b) to conform with the evidence presented on the summary judgment motion); *Regent Ins.*

not state a valid claim for tortious interference with contract. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("A district court has discretion to deny leave [to amend] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.").

A claim for tortious interference with a contract "must be based on a *non-party* improperly interfering with a contract between two contracting parties," and cannot be based on the actions of a director or officer in his official capacity. *Scuderi v. Springer*, No. 03-CV-2098, 2004 WL 2711048, at *2 (S.D.N.Y. Nov. 29, 2004); *see also IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 407 (S.D.N.Y. 2009) ("[T]he general rule is that a claim for tortious interference will lie only against a stranger who improperly interferes with a contract between two contracting parties."). Here, Defendant Thomas Greco is a member of the Board of Directors of AASP and a member of its trade show committee (Greco Aff. ¶ 29), and is the sole shareholder of TGP, (*id.* ¶ 1.) As a member of the AASP Board of Directors, Greco was not a "stranger" to the contract because his actions were taken on behalf of AASP. *See Solow v. Stone*, 994 F. Supp. 173, 182 (S.D.N.Y. 1998) (explaining that corporate insiders were not third parties to the allegedly breached contract, and could not be held liable for tortious interference).[45]

---

*Co. v. Storm King Contracting, Inc.*, No. 06-CV-2879, 2008 WL 563465, at *13-14 (S.D.N.Y. Feb. 27, 2008) (applying Rule 15(b) standard where plaintiff sought to amend its claims at summary judgment to conform its pleadings to additional evidence revealed through discovery); *In re Citron*, No. 08-71442-AST, 2010 WL 2978062, at *5 (Bankr. E.D.N.Y. July 23, 2010) ("The undisputed facts presented by the summary judgment pleadings provide the basis to deem the Complaint amended to conform to the evidence, as authorized by FRCP 15(b).").

[45] REI also has not alleged how TGP could possibly be responsible for inducing AASP's breach of its contract with REI. It has not alleged that Greco was acting in his capacity as owner of TGP, rather than as an AASP Board member, when he allegedly induced AASP to breach its

Moreover, the law in New York is that "the existence of a plausible claim for breach of contract does not, without more, provide a basis for the assertion of a cause of action for interference with contractual relations against those corporate officers and directors whose actions brought about the asserted breach." *Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*, 744 N.Y.S.2d 384, 389-90 (App. Div. 2002); *see also Craig v. First Web Bill, Inc.*, No. 04-CV-1012, 2004 WL 2700128, at *9 (E.D.N.Y. Nov. 29, 2004) ("Generally, '[a] corporate officer who is charged with inducing the breach of a contract between the corporation and a third party is immune from liability if it appears that he is acting in good faith as an officer . . . (and did not commit) independent torts or predatory acts directed at another.'" (alterations in original) (quoting *Murtha v. Yonkers Child Care Ass'n*, 383 N.E.2d 865, 866 (N.Y. 1978))); *Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208, 222 (S.D.N.Y. 2002) ("[U]nder New York law, a corporate [director or] officer [generally] cannot be held individually liable for alleged tortious interference by his or her corporate employer.").  This flows from the "legal distinction drawn between a corporation and those who administer its affairs." *Joan Hansen*, 744 N.Y.S.2d at 390.  Indeed, the New York Court of Appeals has held that "owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owner." *Morris v. N.Y. Dep't of Taxation & Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993) (citing *Bartle v. Home Owners Coop.*, 127 N.E.2d 832, 833 (N.Y. 1955)).

---

contract with REI, nor does any evidence in the record support such an allegation.  Furthermore, in his deposition, McCarey was unable to state any acts which were taken by Greco in his personal capacity, rather than as a director of AASP.  (McCarey Dep. 501-02, Oct. 14, 2010.) McCarey claims that TGP harmed REI through some of its publications (*id.* at 502-03), but those allegations are not related to REI's claim for tortious interference with contract.

> As a matter of public policy, an officer or director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken . . . . To hold otherwise would be dangerous doctrine, and would subject corporate officers and directors continually to liability on corporate contracts and go far toward undermining the limitation of liability which is one of the principal objects of corporations.

*Joan Hansen*, 744 N.Y.S.2d at 390 (internal quotation marks omitted).

In a narrow exception to this general rule, a corporate director or officer may be held liable for tortious interference with contract where he or she "acts for [] personal, rather than the corporate interests." *Id.* (quoting *Hoag v. Chancellor, Inc.*, 677 N.Y.S.2d 531, 534 (App. Div. 1998)); *see also Craig*, 2004 WL 2700128, at *9 ("Personal liability can be imposed [on a director or officer] only if it is shown that the defendant acted outside the scope of his employment, by committing an independent tort, or by pursuing a personal, and not corporate, interest."). The New York courts have "construed personal gain [to mean] that the challenged acts were undertaken 'with malice and were calculated to impair the plaintiff's business for the personal profit of the [individual] defendant.'" *Petkanas v. Kooyman*, 759 N.Y.S.2d 1, 2 (App. Div. 2003) (alteration in original) (quoting *Joan Hansen*, 744 N.Y.S.2d at 391). Such claims are subject to a heightened pleading standard, which requires that a complaint "contain[] allegations that the acts of the corporate officers [or directors] were done with the motive for personal gain as distinguished from gain to their corporations," and that the acts were performed with malice and calculated to impair the plaintiff's business for the defendant's profit. *Joan Hansen*, 744 N.Y.S.2d at 390-91; *see also IMG Fragrance Brands*, 679 F. Supp. 2d at 407 (noting the enhanced pleading standard for stating a claim against a corporate officer or director for tortious interference); *Petkanas*, 759 N.Y.S.2d at 2 ("[W]e have construed such a standard to require a

particularized pleading of allegations that the acts of the defendant corporate officers which resulted in the tortious interference with contract either were beyond the scope of their employment or, if not, were motivated by their personal gain, as distinguished from gain for the corporation."); *Bonanni v. Straight Arrow Publishers, Inc.*, 520 N.Y.S.2d 7, 9 (App. Div. 1987) ("Failure to plead in nonconclusory language facts establishing all the elements of a wrongful and intentional interference in the contractual relationship requires dismissal of the action."). REI has not made such a showing. Instead, REI merely blames Greco for initiating discussions with the Meadowlands about moving AASP's show, and for recommending to the AASP Board of Directors that AASP terminate its contract with REI. (Pl.'s Opp'n 28-29.) These allegations, on their face, show that Greco was doing the work of AASP. Thus, absent some evidence that Greco acted "wholly outside the scope of [his] authority for purely personal gain," rather than for the benefit of AASP, REI cannot pursue a claim against him for tortious interference with contract. *IMG Fragrance Brands*, 679 F. Supp. 2d at 407-08; *accord Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996) (holding that summary judgment was properly granted on tortious interference claim because plaintiff could not establish that defendants had exceeded the bounds of their authority as employees, and thus they were not third parties to the contract). Therefore, REI's claim for tortious interference with contract is dismissed.

## 6. Breach of Contract

AASP moves for summary judgment on REI's Count Five for breach of contract, and asks the Court to reconsider its March 2009 Opinion and Order ("March 2009 Opinion") granting REI's motion for summary judgment on this claim. *See Rockland I*, 2009 WL 1154094, at *9, *16. In its March 2009 Opinion, the Court held that the 2004 contract bound the parties through the 2009 show and that AASP also breached the contract's non-compete clause by

promoting a rival show within four months of the 2008 Northeast Automotive Trade Show. *Id.* at *9. AASP asks the Court to reconsider its March 2009 Opinion under Federal Rule of Civil Procedure 54(b) and to grant summary judgment instead in AASP's favor. (Defs.' Mem. 16-17.)[46]

Under Rule 54(b), interlocutory decisions "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).[47] Though the Court has discretion to reconsider its prior rulings within the bounds of the law of the case doctrine, *see Official Comm. of Unsecured Creditors of Color Title, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003), "as a rule courts should be loathe to do so in the absence of extraordinary circumstances," *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *see also Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 288 (2d Cir. 2011) (noting that "there is a strong presumption against amendment of prior orders"); *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964) (noting that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason, permitted to battle for it again"). However, in the interest of balancing "the need for finality against the duty to render just decisions," *Davis v. Lehane*, 89 F. Supp. 2d 142, 147 (D. Mass. 2000), reconsideration is limited to circumstances where there is "'an intervening

---

[46] Although AASP asks for reconsideration in the context of a motion for summary judgment, its arguments are treated as though made in support of a motion to reconsider under Rule 54(b). Fed. R. Civ. P. 54(b). Because the Court has already granted summary judgment on REI's breach of contract claim against AASP, the Court would first need to grant reconsideration before deciding whether a grant of summary judgment dismissing the contract claim is appropriate.

[47] Because the March 2009 Opinion adjudicates some but not all of the claims at issue in the suit, AASP's motion is governed by Rule 54(b). *See* Fed. R. Civ. P. 54(b).

change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice,'" *Coopers & Lybrand*, 322 F.3d at 167 (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  In the absence of these circumstances, a motion for reconsideration is normally inappropriate, and the district court's decision "may not usually be changed."  *Id.*

When arguing for reconsideration based on new evidence, the moving party "'must demonstrate that the newly discovered evidence was neither in his possession nor available upon the exercise of reasonable diligence at the time the interlocutory decision was rendered.'"  *In re Rezulin Prods. Liab. Litig.*, 224 F.R.D. 346, 350 (S.D.N.Y. 2004) (quoting *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, No. 88-CV-9127, 1992 WL 296314, at *3 (S.D.N.Y. Oct. 6, 1992)).  Furthermore, the movant must show that "manifest injustice will result if the court opts not to reconsider its earlier decision."  *Id.*  In determining whether reconsideration is warranted, the Court may also consider the timeliness of the motion, a tardy movant's explanation for not presenting the evidence earlier, and the potential prejudice to the opposing party which may result from granting the motion.  *See Aini v. Sun Taiyang Co.*, 174 F.R.D. 327, 330 (S.D.N.Y. 1997) (characterizing an eight month delay as "extraordinary"); *see also Davis*, 89 F. Supp. 2d at 148-49 (denying motion for reconsideration filed thirteen years after the underlying interlocutory decision).  Furthermore, if the movant had the opportunity to present the evidence or litigate the issue earlier but did not do so, either because of inadvertence or as a strategic maneuver, the Rule 54(b) motion should be denied.  *In re Rezulin*, 224 F.R.D. at 352 ("Rule 54(b) motions may be denied where 'relief is sought on a basis which a party inadvertently failed to raise earlier or the interests of justice otherwise so require.'" (quoting *Aini*, 174 F.R.D. at 329)); *accord Waltman v. Int'l Paper Co.*, 875 F.2d 468, 474 (5th Cir. 1989) (denying reconsideration

where movant failed to explain why she waited to present evidence long in her possession until after summary judgment was granted).

AASP advances six theories upon which the Court should reconsider its previous ruling and grant summary judgment dismissing REI's breach of contract claim. (Defs.' Mem. 16-23.) Specifically, AASP offers claims based on REI's purported dishonesty (*id.* at 17-18), waiver, estoppel, and abandonment (*id.* at 18-21), the alleged ambiguity of the non-compete provision (*id.* at 21-22), and the "fictitious" $2,000 deposit, (*id.* at 23). Only two of these theories — the dishonesty and deposit arguments — are premised on the discovery of allegedly new evidence. In support of its other theories, AASP does not argue that its claims are supported by "an intervening change of controlling law" or the "need to correct a clear error or prevent a manifest injustice." *See Coopers & Lybrand*, 322 F.3d at 167 (internal quotation marks omitted).

### a. Dishonesty

AASP claims that REI consistently overcharged AASP for expenses relating to the Northeast Automotive Trade Show and that between 2003 and 2008, these markups totaled about $30,000 per year. (Defs.' Mem. 17-18.) AASP bases this conclusion on a report (the "Warshaw Report") compiled by an accounting expert who analyzed REI's summaries of revenues and expenses relating to each of the Trade Shows between 1999 and 2008 (Defs.' Exs. 75-84), REI's financial reports for 2002 through 2008 (Defs.' Exs. 36-37, 98-102), and invoices for the printing costs for each of the shows. (Defs.' Mem. 18; Defs.' Ex. Warshaw A.) Based on this analysis, Warshaw concluded that when REI billed AASP for the direct show expenses each year, it included mark-ups in the "cash disbursements" schedule, without disclosing to AASP that it was charging more than its actual cost of providing the goods and services. (Defs.' Ex. Warshaw A, at 2-6.) AASP argues that this "dishonesty" is a breach of REI's implied duty of good faith and

fair dealing, which AASP claims justifies its termination of the contract. (Defs.' Mem. 17.) REI disputes the reliability of the Warshaw Report and argues that it engaged in no dishonesty in its billing practices. (Pl.'s Opp'n 25-27.) REI and AASP clearly dispute the material facts underlying AASP's new claim (*see* McCarey Affirmation ¶¶ 44-50), and therefore even if the Court were to grant reconsideration, summary judgment dismissing REI's claim would be inappropriate.

Moreover, although AASP does not articulate the basis for its motion for reconsideration — whether it is based on new evidence, a change in law, or clear error — the Court construes AASP's arguments as relating to new evidence produced through discovery since the Court's March 2009 Opinion. In order to overcome the presumption against reconsideration, AASP must show that the evidence it seeks to admit is in fact new; that is, AASP did not possess it at the time of the earlier decision and could not have obtained it despite AASP's efforts to procure it. *In re Rezulin*, 224 F.R.D. at 350 (noting that the moving party must demonstrate that the newly discovered evidence was not in its possession, nor could it reasonably have been discovered at the time of the interlocutory decision). AASP does not assert that the financial documents which Warshaw analyzed were unavailable at the time the Court decided the March 2009 Opinion, and does not even address this issue in its Memorandum of Law. However, because the March 2009 Opinion was decided at the early stages of discovery (*see* No. 08-CV-7069, Dkt. No. 29), AASP likely did not have the benefit of these financial documents when the Court decided REI's motion for partial summary judgment in March 2009. Another potential explanation is that the Warshaw Report itself, completed in November 2010, is the new evidence on which AASP relies for its motion.

Regardless of whether AASP discovered this evidence after the March 2009 Opinion, it

still has delayed in bringing its motion for reconsideration before the Court. Neither the

financial documents on which the Warshaw Report relies (which were produced in April 2010

(Defs.' Exs. 36-37, 75-84, 98-102)), nor the Report itself can hardly be called "new," because as

noted, the Warshaw Report was completed in November 2010. Even if AASP was unaware of

"REI's dishonesty" when the Court issued the March 2009 Opinion, it still waited eleven months

between obtaining the Warshaw Report and filing the instant motion for reconsideration. This

delay alone independently justifies denying the motion. *See Aini*, 174 F.R.D. at 330 (eight

month delay in bringing the motion for reconsideration was "extraordinary"). However,

regardless of timeliness, "[a] district court retains absolute authority to reconsider or otherwise

affect its interlocutory orders any time prior to appeal." *Williams v. Cnty. of Nassau*, 779 F.

Supp. 2d 276, 280 (E.D.N.Y. 2011).

Even if the evidence on which AASP relies is new evidence, it also must demonstrate

that a "manifest injustice" would result from the Court's denial of reconsideration. *See In re

Rezulin*, 224 F.R.D. at 350. "For new evidence to justify reconsideration, the evidence must be

'of such importance that it probably would have changed the outcome' of the prior ruling."

*Vincent v. Money Store*, No. 03-CV-2876, 2011 WL 4501325, at *9 (S.D.N.Y. Sept. 29, 2011)

(citing *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir.2001)). AASP now

raises REI's alleged dishonesty as an affirmative defense to its breach of contract claim.[48]

Although under Federal Rule of Civil Procedure 8(c), a party "must affirmatively state any . . .

affirmative defense" in its answer, "where the defense was unavailable at the time the movant

_____

[48] Although AASP amended its Complaint in the consolidated action in January 2009 to
state claims for an accounting, breach of duty of loyalty, breach of implied covenant of good
faith and fair dealing, and breach of contract against REI, those claims were not based on any
alleged dishonesty by REI in its billing of expenses to AASP.

served the answer," a district court may construe "a subsequent summary judgment motion based on that defense as one to amend the answer to include it." *Plon Realty Corp. v. Travelers Ins. Co.*, 533 F. Supp. 2d 391, 394 (S.D.N.Y. 2008); *see also Cowan v. Ernest Codelia, P.C.*, 149 F. Supp. 2d 67, 74-74 (S.D.N.Y. 2001) ("A district court, however, 'has the discretion to entertain the defense when it is raised in a motion for summary judgment, by construing the motion as one to amend the [defendants'] answer.'" (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000))). Here, the defense on which AASP relies is a post-hoc rationalization for its breach of the contract, and AASP has not provided any authority for why the Court should now, more than three years after its breach, consider this affirmative defense. Indeed, AASP fails to point to any New York law that allows a party to defend a breach of contract based on conduct occurring before the breach, but not discovered until afterwards.[49]

---

[49] When a party terminates a contract with an express "for cause" termination provision, evidence discovered after the alleged breach can be used by the breaching party to justify its termination. *See Kerns, Inc. v. Wella Corp.*, 114 F.3d 566, 570 (6th Cir. 1997) (applying New York law and explaining "that although there is a dearth of authority on this issue, . . . New York courts would not bar the use of after-acquired evidence in a contract action" to allow a party who has terminated a contract for cause to demonstrate "that its estimate of the situation [that cause existed]" was justified based on the facts later proven); *see also Capuano v. Island Computer Prods., Inc.*, 382 F. Supp. 2d 326, 341 n.4 (D. Conn. 2005) (noting in the employment context, that "[u]nder New York law, evidence uncovered subsequent to the [employee's] termination may be used to support the contractual right to terminate, notwithstanding the employer's actual motive at the time of the decision" (citing *Robitzek v. Reliance Intercontinental Corp.*, 183 N.Y.S.2d 870, 871-72 (App. Div. 1959)). *But see King v. Fox*, No. 97-CV-4134, 2005 WL 3098933, at *5 (S.D.N.Y. Nov. 18, 2005) (holding that "'after-acquired' evidence is not relevant to the issue of whether the discharge [of a client's attorney] was for cause," because "[f]actors identified only after the relationship has been severed cannot have played a role in causing the breakdown"). However, the contract between AASP and REI contained no termination for cause provision, so this branch of New York law is inapplicable. *Cf. Life Care Ctrs. of Am., Inc. v. Charles Town Assoc. Ltd.*, 79 F.3d 496, 509 (6th Cir. 1996) (holding that where contract did not provide for unconditional right of termination, breaching party could not rely on newly discovered evidence to justify its breach, because "the law of Tennessee precludes them from justifying their conduct retroactively on a ground that is different from that which was proffered at the time of [their] decision to terminate [the

Alternatively, even though the Court declines to grant AASP's motion for reconsideration, AASP may pursue its claim against REI for the alleged overcharges as a counterclaim. AASP, in its Second Amended Complaint, has brought claims against REI for breach of contract and for an accounting. (AASP Second Am. Compl. ¶¶ 116-20, 144-47.) These claims are considered counterclaims because they were raised by AASP in an action that was transferred to this court and consolidated with the present action. *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 295-96 (2d Cir. 2008) (explaining that "[defendant's] California action was transferred to the Southern District of New York, where it was consolidated with the present action, with [defendant's] California action claims becoming counterclaims in the present action"). Therefore, if AASP's claim is found to have merit, any amount which it owes REI for its breach of contract may be offset by the amount which it was overcharged by REI. *See Astra USA, Inc. v. Bildman*, 375 F. App'x 129, 134 (2d Cir. 2010) (noting that plaintiff's recovery was properly reduced by the value of the damages awarded on defendant's counterclaim); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 498 (2d Cir. 1995) (granting judgment for defendant on counterclaim and remanding case for an offset of plaintiff's damages award by the amount of the counterclaim); *cf. Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 467 (1960) (noting that where parties to a contract each have claims against each other, "when the promises are to pay money, or are reducible to a money amount, the promisor, when sued by the promisee, [may] offset[] the damages which he has sustained [because of the promisee's breach] against the amount he owes, and [may] obtain[] a judgment for any excess").

---

contract]").

## b. AASP's Deposit Argument

AASP also argues for reconsideration based on the alleged "fictitious" deposit it paid to REI in July 2007 as a deposit for the 2009 Northeast Automotive Trade Show. (Defs.' Mem. 23.) After the issue was covered at length in the parties' respective memoranda of law relating to REI's 2009 motion for partial summary judgment (*see* Mem. of Law in Opp'n to Rockland Exposition, Inc's Mot. for Partial Summ. J on Count V of REI's Compl. 3-5 (No. 08-CV-7069, Dkt. No. 41)), the Court rejected the notion that AASP was "tricked" into paying the $2,000 deposit for the 2009 show as was claimed. *Rockland I*, 2009 WL 1154094, at *2. AASP seeks reconsideration of the issue based on new evidence, namely REI's General Ledgers and Trial Balances from 2008 and years prior. (Defs.' Mem. 23.) AASP claims that REI only produced the 2007 and 2008 General Ledgers "[a]fter months of repeated denials," and that the documents prove that the deposit was "fictitious" because they do not contain a line item notation of credits or debits created by the deposit payments. (*Id.*)

Though AASP makes a convincing argument that REI's bookkeeping was sloppy, there are several significant deficiencies in AASP's theory that weigh against reconsideration of the deposit issue. First, the motion to reconsider the deposit issue is notably tardy. AASP received the 2008 General Ledger in April 2010, and the General Ledgers and Trial Balances for previous years shortly thereafter. (Defs.' Mem. 23; Defs.' Exs. 155-60.) Even if REI denied the ledgers' existence and delayed turning them over for "months" as AASP claims, that suggests that AASP neglected to request them until months after the March 2009 Decision was issued. Furthermore, AASP argued the deposit issue extensively in its opposition to REI's partial summary judgment motion, yet failed to request the ledgers until after the issue had been determined. AASP provides no explanation for this delay. After belatedly obtaining the documents, AASP waited

until October 2011, a year and a half later, to seek reconsideration of the issue.

Second, reconsideration is inappropriate because this "new evidence" changes nothing in the Court's analysis of the deposit issue. "The party moving for reconsideration based on allegations of newly-discovered evidence bears the burden of demonstrating that the evidence . . . is of such material and controlling nature that it demands a probable change in the outcome." *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 649 F. Supp. 2d 1063, 1070 (E.D. Cal. 2009) (internal quotation marks omitted); *see also Vincent*, 2011 WL 4501325, at *9 (noting that new evidence must be "of such importance that it probably would have changed the outcome of the prior ruling" (internal quotation marks omitted)). AASP has not met this burden. AASP ascribes great significance to the fact that the $2,000 deposit for 2009 and the $2,000 credit for 2008 are not clearly noted in REI's 2007 General Ledger (Defs.' Mem. 23; Defs.' Exs. 159-60), but it makes no argument at all as to how this "new evidence" is even relevant to the Court's prior determination. AASP fails to acknowledge that even if REI failed to keep accurate internal records, this does not in any way alter AASP's contractual obligation in 2007 to pay a $2000 deposit for the 2009 show as it had done in years prior. (Contract 2 ("AASP-GS agrees to submit a $2,000 deposit for the [] exposition [to occur two years out].").) The lack of a line item in the General Ledgers has no bearing on this requirement, and the Court accepted that AASP did in fact pay the deposit to REI in 2007. *Rockland I*, 2009 WL 1154094, at *2. AASP does nothing more than rehash the arguments it previously made in response to REI's motion for partial summary judgment, and "a motion for reconsideration is not a vehicle for giving an unhappy litigant an additional chance to sway the judge, nor is it intended to allow a party to make arguments already presented to, and rejected by, the [C]ourt." *Davis*, 89 F. Supp. 2d at 148 (quoting *Froudi v. United States*, 22 Ct. Cl. 290, 300 (1991)).

<u>c. AASP's Remaining Arguments for Reconsideration</u>

In raising the remaining four theories for reconsideration of the Court's March 2009 Opinion — waiver, estoppel, abandonment, and ambiguity — AASP does not even attempt to ground its argument on a change in law, clear error or manifest injustice, or new evidence.  *See Coopers & Lybrand*, 322 F.3d at 167.  These arguments merit little discussion, as they are simply attempts to relitigate issues already decided by the Court in its March 2009 Opinion.  AASP now attempts to argue that REI's July 2007 and March 2008 letters demonstrate that REI waived the automatic renewal provision, and that by sending these letters and insisting in holding its own show in 2009, it abandoned any rights in the contract, and should now be estopped from enforcing it.  (Defs.' Mem. 18-21.)  In the March 2009 Opinion, the Court explicitly rejected the notion that REI's communications in July 2007 and March 2008 in any way altered the parties' obligations regarding the 2009 show.  *Rockland I*, 2009 WL 1154094 at *12 n.12 (noting "that the July 17, 2007 Memorandum and March 3, 2008 letters did not alter the Parties existing contractual relationship," and that the communications in no way "'induce[d]'" AASP into believing the contract was terminable because by the time REI sent the communications, AASP was already bound through 2009 by the renewal provisions of the 2004 Agreement).  By the same logic, REI's subsequent statements indicating its intent to host the 2009 show irrespective of Defendant's participation has no bearing on whether the parties were bound by the 2004 Agreement through the 2009 show.  *Id.* at *9, *11.  Thus, AASP is not justified in its apparent belief that couching the rejected reliance argument in terms of waiver, abandonment, and estoppel provides a sufficient basis for revisiting the contract issue.  AASP cannot now seek to re-litigate the same issue based on arguments it previously could have, but elected not to make.  *See In re Rezulin*, 224 F.R.D. at 352 (explaining that a litigant cannot

decline to address an issue, either through inadvertence or as a strategic maneuver, and then expect the court to grant reconsideration to advance arguments that it previously could and should have made); *Davis*, 89 F. Supp. 2d at 149 ("The motion for reconsideration is not an opportunity for a party to improve upon his arguments or try out new arguments; nor is it properly a forum for a party to vent his dissatisfaction with the Court's reasoning." (internal quotation marks omitted)). Therefore, AASP's motion for reconsideration on this ground is denied.

Similarly, AASP's argument that the non-compete provision of the 2004 Contract is ambiguous doubles back into territory already covered by the Court in the March 2009 Order. AASP argues that in holding that AASP breached the non-compete clause, the Court did not consider whether the clause was ambiguous. (Defs.' Mem. 21.) However, this argument fails to account for the fact that by ruling that AASP breached the non-compete clause in March 2008, the Court implicitly deemed it unambiguous. *See Rockland I*, 2009 WL 1154094, at *9 (noting that "[w]here, as here, a contract is unambiguous, it is enforced according to its terms," and holding that because the 2004 contract continued to govern the Parties' relationship, AASP breached the non-compete provision by promoting its 2009 Northeast Trade Show within four months of the 2008 show). Because "a court may grant summary judgment when the contractual language is plain and unambiguous," *Rockland I*, 2009 WL 1154094, at *6 (internal quotation marks omitted), the Court could not have reached the conclusion that AASP breached the non-compete provision without interpreting the meaning of the provision itself. Furthermore, AASP did not argue that the provision was ambiguous at the time, and the Court clearly agreed, interpreting the provision to mean that promotion of a competing show during the March 2008 show was a breach of the contract. *Id.* at *9. AASP offers no evidence, change in law, or claim

of clear error that would support reconsideration of this point, and its apparent inadvertence to raise this argument previously is grounds for denying a Rule 54(b) motion. *See Aini*, 174 F.R.D. at 329 (noting that reconsideration "may be denied where relief is sought on a basis which a party inadvertently failed to raise earlier"). Therefore, because of the absence of a clear and compelling justification for why it failed to raise this ambiguity argument on the first go-around, AASP cannot be allowed another bite at the apple on REI's breach of contract claim.

For the foregoing reasons, AASP's motion for reconsideration is denied.

## III. Conclusion

For the reasons stated herein, Defendants' motion for partial summary judgment is granted in part and denied in part. Count Four and Counts Six through Eleven of REI's Amended Complaint are dismissed. The Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 133).

SO ORDERED.

Dated:     September ⅃⅃ , 2012
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List: (by ECF)
Philip Furgang, Esq.
Furgang & Adwar, L.L.P.(Nyack)
2 Crosfield Avenue
Suite 210
West Nyack , NY 10994
(845) 353-1818
Fax: (845) 353-1996
Email: philip@furgang.com
*Counsel for Plaintiff*

Stephanie Furgang Adwar, Esq.
Furgang & Adwar, L.L.P.
1325 Avenue of the Americas
28th fl
New York , NY 10019
845-353-1818
Email: stephanie@furgang.com
*Counsel for Plaintiff*

Armando Llorens, Esq.
Law Offices of Armando Llorens
5 Stockbridge Avenue
Suffern , NY 10901
(787)-587-3517
Fax: (561)-624-1345
Email: armando@furgang.com
*Counsel for Plaintiff*

Arthur M. Peslak, Esq.
Mandel & Peslak, LLC
80 Scenic Drive, Suite 5
Freehold , NJ 07728
(732)-761-1610
Fax: (732)-761-1611
Email: apeslak@mandelpeslak.com
*Counsel for Defendants*

Benjamin Zelermyer, Esq.
Law Offices of Wesley Chen
425 Park Avenue
5th Floor
New York , NY 10022
(203) 855-8698
Fax: 203-855-8698
Email: bzlaw@optonline.net
*Counsel for Defendants*

Thomas Anthony Catalano, Esq.
Lester, Schwab, Katz and Dwyer LLP
120 Broadway
New York , NY 10271
212-341-4298
Fax: 212-267-5916
Email: tcatalano@lskdnylaw.com
*Counsel for Defendants*